UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- X

SCOTT-MACON SECURITIES, INC.,

Plaintiff,

-v-

ZOLTEK COMPANIES, INC.,

Defendant.

Civ. No. 04 CV 2124 (MBM)

---------------------------------------------------------------- X

ZOLTEK COMPANIES, INC.,

Plaintiff,

-v-

SCOTT-MACON LIMITED,

Defendant.

Civ. No. 04 CV 4896 (MBM)

---------------------------------------------------------------- X

**MEMORANDUM OF LAW OF SCOTT-MACON SECURITIES, INC. IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT AND OF SCOTT-MACON, LTD. IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Stewart D. Aaron (SA 1276)
Joseph B. Shumofsky (JS 2147)
DORSEY & WHITNEY LLP
250 Park Avenue
New York, NY 10177-1500
(212) 415-9200

Attorneys for

Plaintiff SCOTT-MACON SECURITIES, INC.
and Defendant SCOTT-MACON, LTD.

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ..................... 1

I. STATEMENT OF FACTS ..................... 2

A. Zoltek Hired Scott-Macon Securities as Its Exclusive Placement Agent. ..................... 2

1. Key Terms of the Agreement. ..................... 5

2. Scott-Macon Securities Fulfilled All of Its Obligations Under the Agreement. ..................... 6

B. Zoltek Breached the Agreement. ..................... 9

1. Zoltek Had Already Retained Equiplace Securities, LLC As Zoltek's Non-Exclusive Placement Agent By The Time That It Executed The Agreement With Scott-Macon Securities. ..................... 10

2. By Mid-October 2003, Zoltek Began Discussions with and Ultimately Retained a Third Placement Agent, G. Koppolow & Associates, Who Helped Secure Three Financings for the Company. ..................... 11

3. Scott-Macon Securities Independently Contacted Omicron and Midsummer. ..................... 14

4. Zoltek's Misrepresentation to Omicron in Response to Omicron's ConcernThat The Zoltek Investment Opportunity Was Being Shopped.. 14

5. Despite Zoltek's Representation That Scott-Macon Securities Had Been "Shut Down," Scott-Macon Securities Continued Working On Behalf Of Zoltek To Secure Financing For The Company. ..................... 16

6. Scott-Macon Securities Never Received Various Fees From Zoltek To Which It Is Entitled Under The Agreement. ..................... 18

C. Procedural History ..................... 18

II. ARGUMENT ..................... 20

A. SCOTT-MACON SECURITIES SHOULD BE AWARDED SUMMARY JUDGMENT AS TO LIABILITY IN THE NEW YORK ACTION. ..................... 20

1. Zoltek's Actions Constitute a Clear Breach of the Agreement ..................... 20

a. The Agreement That The Parties Executed On September 5, 2003 Is A Valid And Enforceable Contract. ..................... 21

b. Scott-Macon Securities Fulfilled All of Its Obligations Under the Contract. ..... 21

c. Zoltek's Conduct Demonstrates That It Breached Several Provisions of the Agreement. ..... 23

d. Scott-Macon Securities Has Suffered Damages As A Result Of Zoltek's Breach Of The Agreement. ..... 26

2. Zoltek's Defenses and Counterclaims are Meritless. ..... 27

a. Zoltek's Defense-Counterclaim Relating to Fraudulent Inducement Cannot Be Sustained Under New York Law. ..... 27

b. Zoltek's Defense-Counterclaim Relating To Breach Of Contract Is Entirely Unfounded. ..... 28

c. Zoltek's Remaining Defenses Are Baseless. ..... 29

B. SCOTT-MACON, LTD. SHOULD BE AWARDED SUMMARY JUDGMENT IN THE TRANSFERRED ACTION. ..... 29

1. Scott-Macon, Ltd. is not a Party to the Agreement ..... 30

2. Scott-Macon. Ltd. Cannot Be Held Liable Pursuant to an Agency Theory Of Liability ..... 30

CONCLUSION ..... 31

# TABLE OF AUTHORITIES

## FEDERAL CASES

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) ....................20

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ....................20

Chateaugay Corp., et. al. v. Thomson-CSF, S.A., 198 B.R. 848 (S.D.N.Y. 1996) ....................22

Laurus Master Fund, Ltd. v. Versacom International, Inc., No. 02 Civ. 5340, 2003 WL. 21219791 (S.D.N.Y. May 21, 2003) ....................26

Manchester Equipment Co., Inc. v. American Way and Moving Co., Inc., 60 F. Supp. 2d 3 (E.D.N.Y. 1999) ....................30

Royal Industries Limited v. Kraft Foods, Inc., 926 F. Supp. 407 (S.D.N.Y. 1996) ....................30

Teachers Insurance and Annuity Associate of America v. Coaxial Committees of Central Ohio, Inc., 799 F. Supp. 16 (S.D.N.Y. 1992) ....................21

United States Life Insurance Co. v. Macaluso, No. 03 Civ. 2337, 2004 WL. 1497606 (S.D.N.Y. July 2, 2004) ....................20

## STATE CASES

Garwood v. Sheen & Shine, Inc., 175 A.D.2d 569, 572 N.Y.S.2d 237 (4th Dep't 1991) ....................28

Wegman v. Dairylea Co-op, Inc., 50 A.D.2d 108, 376 N.Y.S.2d 728 (4th Dep't 1975) (alteration in original) ....................28

## FEDERAL STATUTES

Fed. R. Civ. P. 56(c) ....................20

**PRELIMINARY STATEMENT**

Presently, there are two related cases pending before this Court: (1) Scott-Macon Securities, Inc. v. Zoltek Companies, Inc., No. 04 CV 2124 (MBM), and (2) Zoltek Companies, Inc. v. Scott-Macon, Ltd., No. 04 CV 4896 (MBM). The cases have not been consolidated.

These actions arise out of the same subject matter, a September 5, 2003 contract between Scott-Macon Securities, Inc. ("Scott-Macon Securities") and Zoltek Companies, Inc. ("Zoltek"), pursuant to which Scott-Macon Securities was engaged to serve as Zoltek's exclusive placement agent (the "Agreement"). In Scott-Macon Securities, Inc. v. Zoltek Companies, Inc., No. 04 CV 2124 (MBM), plaintiff Scott-Macon Securities, Inc. ("Scott-Macon Securities") filed a Complaint asserting claims against Zoltek Companies, Inc. ("Zoltek") for breach of contract, breach of the implied covenant of good faith and fair dealing, and specific performance and/or damages (the "New York Action"). The crux of Scott-Macon Securities' Complaint is that Zoltek's actions constitute a blatant breach of the terms of the Agreement.

In Zoltek Companies, Inc. v. Scott-Macon, Ltd., No. 04 CV 4896 (MBM), transferred to this Court from the United States District Court for the Eastern District of Missouri, Zoltek has brought claims against Scott-Macon, Ltd. for breach of contract and fraudulent misrepresentation (the "Transferred Action"). Zoltek asserts that Scott-Macon, Ltd., the parent company of Scott-Macon Securities (which was not a party to the Agreement) did not perform its obligations under the Agreement and offered misrepresentations to Zoltek to induce Zoltek to enter into the Agreement.

With respect to the New York Action, the record substantiates that, while Scott-Macon Securities performed all of its obligations under the Agreement, Zoltek continuously dishonored the Agreement. Accordingly, Scott-Macon Securities seeks partial summary judgment as to

liability and respectfully requests that this Court refer the New York Action to a magistrate judge for an inquest on damages.

Additionally, Zoltek's claims in the Transferred Action are meritless. Scott-Macon Securities is the correct party in interest to the Agreement; Scott-Macon, Ltd. is not a party to the Agreement. The complaint in the Transferred Action does not include any allegations to support piercing the corporate veil, and nothing in the record establishes justification to pierce the corporate veil to hold Scott-Macon, Ltd. responsible for any duties that Scott-Macon Securities owed under the Agreement (which Scott-Macon Securities has fully performed). Furthermore, Zoltek's fraudulent misrepresentation claim, which is ostensibly a claim for fraudulent inducement, cannot be sustained under New York law. Finally, it should be noted that United States District Judge Stephen N. Limbaugh came just short of dismissing the Transferred Action. Judge Limbaugh "agreed that [Zoltek] has no cause of action under the first amended complaint which [was] pending before [his] Court [prior to transfer to the Southern District of New York]." Declaration of Stewart D. Aaron in Supp. of Summ. J. of Pl. Scott-Macon Securities, Inc. ("Aaron Decl.") ¶ 13, Ex. L at 5. Instead of dismissing the Transferred Action, however, Judge Limbaugh stated that he preferred to transfer the case. <u>See</u> <u>id.</u> ¶ 13, Ex. L at 6.

Accordingly, both cases may appropriately be disposed of pursuant to summary judgment.

## I. STATEMENT OF FACTS

### A. Zoltek Hired Scott-Macon Securities as Its Exclusive Placement Agent.

Defendant-Plaintiff Zoltek is a publicly traded company specializing in the commercialization of carbon fiber as a primary composite building material. Zsolt Rumy ("Rumy"), the Chief Executive Officer of Zoltek, founded Zoltek in 1975. Since 1975, Rumy built Zoltek into a company with approximately 800 employees in six national and international

offices and sales of approximately $80 million. Aaron Decl. ¶ 10, Ex. I.; Deposition of Zsolt Rumy ("Rumy Depo.) pp. 12:3-14, 13:9-14:7.[1]

In 2003, Zoltek needed financing of approximately $10 to $15 million and, beginning in March 2003, sought the assistance of investment bankers to help secure financing for the Company. Rumy Dep. pp. 14:8-15:5, 23:4-11; Deposition of Kevin Schott (Schott Depo.) pp. 11:20-12:1, 72:12-16.[2]

On July 31, 2003, Zoltek met with plaintiff Scott-Macon Securities to discuss the possibility of Scott-Macon Securities assisting Zoltek to obtain financing. Scott-Macon Securities is an investment banking company that is a wholly owned subsidiary of Scott-Macon, Ltd., founded in 1973 by Mr. Alfred L. Scott. Among other things, Scott-Macon Securities has expertise in conducting private placements and raising financing for companies that deal with chemicals, especially in the amounts of $5 to $30 million. Deposition of Alfred L. Scott ("Scott Depo.") pp. 5:4-7, 6:16-20, 7:16-22;[3] Deposition of Allan M. Benton ("Benton Depo.") pp. 10:22-11:3;[4] Deposition of Jeffrey M. Tepper ("Tepper Depo.") pp. 5:19-24, 16:15-22.[5]

---

1 The transcript from the deposition of Zsolt Rumy is attached to the Aaron Decl. as Ex. D. Exhibit D to the Aaron Decl. does not include the exhibits offered at the Rumy deposition unless they are exhibits that are also cited herein.

2 The transcript from the deposition of Kevin Schott is attached to the Aaron Decl. as Ex. E. Exhibit E to the Aaron Decl. does not include the exhibits offered at the Schott deposition unless they are exhibits that are also cited herein.

3 The transcript from the deposition of Alfred L. Scott is attached to the Aaron Decl. as Ex. A.

4 The transcript from the deposition of Allan M. Benton is attached to the Aaron Decl. as Ex. B.

5 The transcript from the deposition of Jeffrey M. Tepper is attached to the Aaron Decl. as Ex. C. Exhibit C to the Aaron Decl. does not include the exhibits offered at the Tepper deposition unless they are exhibits that are also cited herein.

At the July 31, 2003 meeting, Rumy, on behalf of Zoltek, met with Allan M. Benton ("Benton"), Vice Chairman of Scott-Macon Securities, and Jeffrey M. Tepper ("Tepper"), Managing Director of Scott-Macon Securities, at Scott-Macon Securities' New York offices. Rumy Depo. 21:16-22:4; Scott Depo. p. 22:22-23:2; Benton Depo. p.8:11-14; Tepper Depo. pp. 6:11-13, 9:14-22, 18:19-24. Rumy provided a background of Zoltek and explained that the Company needed financing by January 15, 2004. Scott-Macon Securities shared with Zoltek its capabilities in assisting a company such as Zoltek in obtaining financing and suggested a strategy that Scott-Macon Securities would pursue to find investors for Zoltek if retained. Rumy Depo. pp. 21:16-22,21; 26:24-27:6, 68:23-69:6; Benton Depo. p. 12:7-16, 40:18-41:2, 83:6-13; Tepper Depo. pp. 19:15-20, 80:9-16, 161:12-162:13. On or about September 5, 2003, Zoltek executed an engagement letter with Scott-Macon Securities (the "Agreement"), retaining Scott-Macon Securities as Zoltek's "exclusive placement agent." Schott Depo. Ex. 15.

Prior to executing the Agreement, Zoltek was afforded an opportunity to negotiate the terms of the Agreement and to discuss the provisions of the Agreement with its legal counsel. Zoltek received drafts of the Agreement that it shared with its outside counsel, Thompson Coburn LLP. Thompson Coburn reviewed the drafts of the Agreement and forwarded its comments to Zoltek. On August 27, 2003, Zoltek forwarded Thompson Coburn's comments on the draft of the Agreement to Scott-Macon Securities. Rumy Depo. pp. 48:23-49:1, 50:24-52:1, 52:20-23, 55:25-56:6 and Ex. 16 at SMS 2267; Tepper Depo. Ex. R. Furthermore, Rumy had negotiated and executed agreements with investment bankers and placement agents to assist with locating investors for Zoltek a number of times in the past. Rumy Depo. pp. 146:18-147:8. Most significantly, Rumy reviewed the final version of the Agreement prior to signing. Rumy Depo. pp. 57:25-58:3.

### 1. Key Terms of the Agreement.

The term of the Agreement was "for nine months and thereafter until the unilateral termination of [the Agreement] by either the Company or [Scott-Macon Securities] upon at least thirty (30) days written notice to the other party." Schott Depo. Ex. 15 ¶ 9. Pursuant to the Agreement, Scott-Macon Securities was engaged as Zoltek's exclusive placement agent to assist the Company with locating investors to offer financing to the Company. Schott Depo. Ex. 15 at ¶ 1. With respect to Zoltek's obligations, the Agreement included the following provisions:

> In order to properly coordinate the efforts of Scott-Macon [Securities] during its engagement by the Company during the term of this Agreement, the Company will not initiate any discussions regarding a Placement[6] except through Scott-Macon [Securities]. In the event that the Company receives an inquiry or otherwise becomes aware of the interest of any third party in a Placement, the Company will promptly inform Scott-Macon [Securities] of such interest.
>
> Schott Depo. Ex. 15 at ¶ 2.
>
> It is understood that execution of this Agreement does not assure the successful completion of the Placement, or any portion thereof, and that Scott-Macon [Securities] is undertaking the Placement on a "reasonable efforts" basis.
>
> Schott Depo. Ex. 15 at ¶ 3.

Paragraph 4 of the Agreement outlined Scott-Macon Securities' obligations. According to the Agreement, Scott-Macon Securities, as appropriate or as requested by the Company, was to, inter alia, (a) perform due diligence on the Company and its finances and recommend a structure for any secured financing; (b) prepare an executive summary and confidential information memorandum in consultation with the Company; (c) prepare a list of investors that Scott-Macon Securities would contact in an effort to locate financing for the Company and

---

6 The Agreement defined Placement to mean a placement of equity and/or debt securities of the Company. See Schott Depo. Ex. 15 at ¶ 1.

provide Zoltek with a copy of such list; (d) contact prospective investors on the prepared list and provide interested investors with a copy of the confidential information memorandum upon execution of a confidentiality agreement (unless waived by the Company); (e) coordinate meetings between potential investors and Zoltek; and (f) solicit proposals from interested investors. Schott Depo. Ex. 15 at ¶¶ 4(a-f).

For its services under the Agreement, Scott-Macon Securities was to receive: (i) an initial retainer of $10,000, id. at ¶ 5; (ii) monthly retainers of $10,000 each for a total of three months, id.; (iii) certain reimbursable expenses, id. at ¶ 7; (iv) a fee and warrants to purchase shares of Zoltek stock if the Company received financing during the term of the Agreement, id. at ¶ 6; and (v) a fee and warrants to purchase shares of Zoltek stock if the Company received financing, within eighteen months of termination of the Agreement, from an investor included on Scott-Macon Securities' list of investors provided to Zoltek within thirty days after termination of the Agreement. Id. at ¶ 9(b).

**2. Scott-Macon Securities Fulfilled All of Its Obligations Under the Agreement.**

The record reflects that Scott-Macon Securities undertook far greater than "reasonable efforts" on behalf of Zoltek in complying with its responsibilities under the Agreement and performed its obligations under ¶ 4 of the Agreement. On August 26, 2003, Scott-Macon Securities provided Zoltek with proposed term sheets, suggesting the types of financing deals that Scott-Macon Securities believed Zoltek should pursue. Zoltek discussed the proposals with its outside counsel, Thompson Coburn, and forwarded Thompson Coburn's comments to Scott-Macon Securities. On September 23, 2003, Scott-Macon Securities sent revised term sheets to Zoltek for its consideration. Rumy Depo. pp. 45:11-48:1 and Ex. 16 at SMS 2268; Schott Depo. pp. 70:22-24, 71:19-72:11; Tepper Depo. Ex. G-H, J.

Scott-Macon Securities also drafted several documents related to Zoltek's business to present to potential investors. Tepper Depo. Exs. D-E. As part of that effort, Scott-Macon Securities performed due diligence on the Company. In an August 26, 2003 letter to Rumy, Benton solicited due diligence materials from Zoltek, including financial projections and cash flow statements. Tepper Depo. Ex. H. Additionally, on September 9, 2003, Benton and Tepper met with Rumy and Kevin Schott ("Schott"), Zoltek's Chief Financial Officer, for about four hours at Zoltek's offices in St. Louis, Missouri to conduct further due diligence and discuss drafting a confidential information memorandum ("CIM"). Rumy Depo. pp. 81:21-83:4; Schott Depo. 17:23-18:23. With Zoltek's assistance, Scott-Macon Securities completed a CIM by the beginning of October 2003. Schott Depo. 124:16-24; Tepper Depo. pp. 52:15-54:18; 96:8-97:7 and Exs. D-F.

In addition, Scott-Macon Securities formulated a list of potential investors (which increased over time) that Scott-Macon Securities believed would have an interest in investing in Zoltek. Scott-Macon Securities began contacting potential investors on October 3, 2003 and ultimately contacted 263 potential investors. If an investor expressed interest, Scott-Macon Securities sent out a "teaser," consisting of a concise overview of the executive summary contained in the CIM, and a confidentiality agreement to the investor. Following the signing of a confidentiality agreement (or if Zoltek waived the need for the confidentiality agreement), Scott-Macon Securities sent the investor the CIM and followed-up with that investor with additional phone calls and emails. Benton Depo. pp. 23:5-24:23. 38:5-12, 39:13-19; Tepper Depo. pp. 56:13-24, 62:4-21, 63:16-64:2, 64:17-65-22, 94:8-17, 105:15-106:14, 113:7-22 and Exs. K, M and P at SMS 328, 332-33, 338, 341, 347-48, 350, 355, 358, 367, 375, 378-79, 384, 409, 417, 421, 431, 440, 457-58.

Scott-Macon Securities maintained a log of all activity that was done to seek to secure financing on behalf of Zoltek. The log, which was updated on a daily basis contemporaneously with the activity performed, was comprised of a list of the investors that Scott-Macon Securities contacted, the date that contacts were made and a description of the activity done. Benton Depo. pp. 20:12-24, 73:11-75:20; Tepper Ex. P. Scott-Macon Securities also kept additional logs of who received CIMs and their level of interest in investing in Zoltek. All together, Scott-Macon Securities sent CIMs to 55 different potential investors. Tepper Depo. pp. 107:17-25, 108:18-109:2 and Ex. L. Scott-Macon Securities shared these logs and the investor contact lists with Zoltek to keep Zoltek up-to-date about Scott-Macon Securities' efforts to help secure financing for the Company. Rumy Depo. pp. 84:20-85:15, 90:16-21; Schott Depo. pp. 23:5-9.

Ultimately, pursuant to the contacts that Scott-Macon Securities had been making to investors, Scott-Macon Securities coordinated telephone conference calls with Zoltek and potential investors. Rumy Depo. 201:24-202:5. More significantly, Scott-Macon Securities arranged and coordinated eight in-person meetings that Rumy and Benton attended:

a. Angelo Gordon & Company on November 5, 2003 in New York;

b. The Huff Alternative Income Fund L.P. on November 6, 2003 in New Jersey;

c. Camden Partners on November 20, 2003 in Maryland;

d. Dimeling Schreiber & Park on November 20, 2003 in New York;

e. Pegasus Partners II Investors, L.P. on November 20, 2003 in New York;

f. ABS Capital Partners Management Company on November 21, 2003 in Massachusetts;

g. New England Partners on November 21, 2003 in Massachusetts; and

h. Resurgence Asset Management, LLC on November 21, 2003 in New York. Rumy Depo. pp. 90:10-92:14, 93:6-9; Benton Depo. p 46:11-24; Tepper Depo. Ex. P at SMS 325, 333, 350, 363, 408, 415, 426, 446.

Zoltek has admitted that initial in-person meetings with potential investors are particularly important. If a company hopes to receive an actual investment, the company must first get an investor interested. An initial meeting provides that opportunity. Schott Depo. pp. 127:7-128:1. Indeed, Scott-Macon Securities recommended to Zoltek that, in addition to Rumy, Schott should attend all of the meetings to help present a stronger management case to the potential investor. Despite the importance of the in-person meetings, Rumy never advised Schott of Scott-Macon Securities' recommendation, and Schott never attended any of the meetings. Rumy Depo. pp. 153:12-154:6; Schott Depo. Ex. 13 at SMS 740; Scott Depo. pp. 30:12-32:6; Benton Depo. pp. 44:21-46-5.

In December 2003, Scott-Macon Securities received term sheets concerning proposed investments in Zoltek from two investors that Scott-Macon Securities had contacted. On December 4, 2003, Scott-Macon Securities received term sheets from Cornell Capital Partners, L.P. ("Cornell"), and on December 12, 2003, Scott-Macon Securities received term sheets from Ramius Capital Group, LLC ("Ramius"). Both sets of term sheets were forwarded to Zoltek for its review and consideration. Schott Depo. pp. 85:7-86:9, 89:2-13 and Ex. 9; Tepper Depo. pp. 71:5-16, 118:3-119:20 and Exs. N, O, P at SMS 360 and 423. Zoltek rejected the proposed term sheets from Cornell and Ramius without discussing the term sheets with Scott-Macon Securities or engaging in any negotiations with Cornell or Ramius. Schott Depo. pp. 87:7-15, 89:14-90:2; Benton Depo. p. 49:10-17.

**B. Zoltek Breached the Agreement.**

At the same time that Scott-Macon Securities was expending efforts on behalf of Zoltek to secure financing as the Company's "exclusive" placement agent under the Agreement, but unbeknownst to Scott-Macon Securities, Zoltek was working with two other placement agents. Zoltek knowingly concealed from each placement agent (and from Scott-Macon Securities,

Zoltek's contractually-mandated exclusive placement agent) that Zoltek was working with multiple placement agents.

**1. Zoltek Had Already Retained Equiplace Securities, LLC As Zoltek's Non-Exclusive Placement Agent By The Time That It Executed The Agreement With Scott-Macon Securities.**

In July 2003, Zoltek entered into an agreement with Equiplace Securities, LLC ("Equiplace") pursuant to which Equiplace would serve as Zoltek's non-exclusive placement agent to help locate and secure financing for the Company. The agreement between Zoltek and Equiplace provided that Equiplace would receive a fee for the successful completion of any private placement with any investor that Equiplace introduced to the Company. The agreement did not include a termination date and was in effect on September 5, 2003 when Zoltek executed the exclusive Agreement with Scott-Macon Securities. Rumy Depo. pp. 14:20-16:10, 110:20-111:9; Aaron Decl. ¶ 11, Ex. J.

In mid-October 2003, Equiplace contacted Midsummer Capital LLC ("Midsummer") about the possibility of investing in Zoltek and forwarded to Midsummer a Zoltek presentation. Deposition of Michel A. Amsalem ("Amsalem Depo.") pp. 9:4-12, 10:17-12:5, 12:6-15, 21:21-22 and Ex. A. at MSC 6, 239.[7] Pursuant to that contact from Equiplace, Midsummer had a conference call with Zoltek on October 22, 2003. Amsalem Depo. pp. 16:11-18:12. Scott-Macon Securities was not a party to that telephone conference. On November 4, 2003, Midsummer received an email from Equiplace inquiring whether Midsummer reviewed certain Zoltek materials that Equiplace had forwarded to Midsummer and if Midsummer was interested

---

7 The transcript from the deposition of Michel A. Amsalem is attached to the Aaron Decl. as Ex. F. Exhibit F to the Aaron Decl. does not include the exhibits offered at the Amsalem deposition unless they are exhibits that are also cited herein.

in investing in Zoltek. Amsalem Depo. Ex. A at MSC 246. Midsummer did not pursue any financing with Zoltek through Equiplace's efforts.[8]

**2. By Mid-October 2003, Zoltek Began Discussions with and Ultimately Retained a Third Placement Agent, G. Koppolow & Associates, Who Helped Secure Three Financings for the Company.**

In October 2003, Zoltek began serious communications with yet a third placement agent. On October 17, 2003, Schott received a telephone call from Gilbert Koppolow ("Koppolow") of G. Koppolow & Associates to inquire if Zoltek needed assistance with financing. G. Koppolow & Associates was a company in the business of finding potential investors for companies in need of financing. Koppolow was the principal at G. Koppolow & Associates. Rumy and Schott understood G. Koppolow & Associates to be a placement agent. Schott told Koppolow that Zoltek was actively seeking financing and would consider any proposals that Koppolow brought to Zoltek's attention. When Schott informed Rumy of the telephone call from Koppolow, Rumy advised Schott that he could pursue communications with G. Koppolow & Associates regardless of his exclusivity obligations to Scott-Macon Securities. Rumy Depo. p. 118:3-14; Schott Depo. pp. 30:13-31:11, 31:21-24; Deposition of Richard Scott Bader ("Bader Depo.") pp. 9:23-10:22, 14:18-15:6, 17:2-7.[9] Additionally, despite its contractual duty to promptly inform Scott-Macon Securities of any third-party interested in financing, Zoltek did not inform Scott-Macon Securities about the telephone call from G. Koppolow & Associates. Schott Depo. p. 32:17-21.

After Koppolow enlisted the help of Bader, who sometimes worked with Koppolow in locating financing for companies, on October 31, 2003, Koppolow and Bader telephoned

---

8 Midsummer pursued financing with Zoltek through Omicron. See infra part I.B.2.

9 The transcript from the deposition of Richard Scott Bader is attached to the Aaron Decl. as Ex. H. Exhibit H to the Aaron Decl. does not include the exhibits offered at the Bader deposition unless they are exhibits that are also cited herein.

Omicron Capital L.P. ("Omicron") and spoke with Bruce Bernstein ("Bernstein"), Co-President of Omicron, to discuss the possibility of investing in Zoltek. Bader Depo. pp. 25:2-19, 26:15-27:2, 33:21-33:24, 80:15-22; Deposition of Bruce Bernstein ("Bernstein Depo.") pp. 7:17-25, 9:12-10:19.[10] Pursuant to that initial contact with Omicron, G. Koppolow & Associates organized a conference call between Zoltek and Omicron on November 3, 2003. Schott, Bernstein, Koppolow and Bader participated in that conference call. Schott Depo. pp. 32:23-34:9, 39:13-40:10; Bernstein Depo. p. 9:12-24.

On November 3, 2003, Omicron sent a proposed term sheet to Bader regarding investing in Zoltek, and on November 4, 2003, Bader forwarded to Schott Omicron's proposed term sheet and G. Koppolow & Associates' standard fee agreement. Bader Depo. pp. 33:21-34:8, 35:20-36:11, 39:21-24 and Ex. 25 at Koppolow 194-200; Schott Depo. pp. 40:25-41:7 and Ex. 3. At that time, although the Agreement requires otherwise, Zoltek did not advise Scott-Macon Securities that Zoltek received the proposed term sheets or forward the term sheets to Scott-Macon Securities. Schott Depo. pp. 41:21-23, 48:2-8.[11]

Thereafter, Omicron conducted due diligence on Zoltek. On November 12, 2003, through Rumy's initiation, Omicron traveled to Zoltek's offices in St. Louis, Missouri to meet with the Company. Bernstein and Bruce Daly of Omicron met with Rumy, Schott, Koppolow and Bader in Zoltek's St. Louis office for several hours. The parties discussed an overview of Zoltek, and Omicron was provided with a tour of Zoltek's offices and facilities. Rumy Depo. pp.

---

[10] The transcript from the deposition of Bruce Bernstein is attached to the Aaron Decl. as Ex. G.

[11] Additionally, on the same date that G. Koppolow Associates forwarded to Zoltek its standard fee agreement and Omicron's proposed term sheets, Equiplace was contacting Midsummer to inquire about Midsummer's interest in investing in Zoltek. Amsalem Depo. Ex. A at MSC 246.

118:15-119:21, 121:10-21; Schott Depo. p. 92:3-24; Bernstein Depo. pp. 12:9-13:21, 14:23-16:19. Zoltek did not inform Scott-Macon Securities about Zoltek's November 12, 2003 meeting with Omicron. Schott Depo. pp. 92:25-93:5.

Ultimately, Omicron decided to invest in Zoltek and headed three financings for Zoltek: (a) a $7 million financing that closed in January 2004,[12] (b) a $5.75 million financing that closed in March 2004, and (c) a $20 million financing that closed in October 2004. Rumy Depo. pp. 125:17-127:11; Schott Depo. pp. 94:17-95:9; Bernstein Depo. pp. 20:3-8, 20:18-21:9, 21:17-20. To assist with those financings, Omicron invited Midsummer to participate in all three financings for Zoltek. Pursuant to Omicron's invitation, Midsummer decided to invest in Zoltek and contribute to all three financings. Schott Depo. pp. 94:25-95:4, Bernstein Depo. pp. 19:12-23, 20:18-21:9; Amsalem Depo. pp. 7:12-15, 14:8-22.

G. Koppolow & Associates was the placement agent for all three Omicron-Midsummer financings. Bernstein Depo. pp. 20:13-17, 21:17-20, 24:2-5; Schott Depo. p. 95:5-9. Zoltek executed fee agreements with G. Koppolow & Associates with respect to each of the three financings, and Zoltek complied with all payment obligations to G. Koppolow & Associates pursuant to the fee agreements, including paying to G. Koppolow & Associates its fees in connection with all three financings. Rumy Depo. p. 113:13-23; Schott Depo. pp. 58:23-59:6, 64:35-65:24; Bader Depo. pp. 67:7-68:5, 75:1-20, 83:13-17.

---

12 At the same time that Zoltek was working on the closing documents for the Omicron financing, it received the Cornell and Ramius proposed term sheets from Scott-Macon Securities. Schott Depo. p. 88:1-23. Certainly, Zoltek had no incentive to negotiate with Cornell or Ramius to obtain more favorable financing terms because Zoltek was near to closing on an initial $7 million financing.

**3. Scott-Macon Securities Independently Contacted Omicron and Midsummer.**

Pursuant to its efforts to locate financing for Zoltek, Scott-Macon Securities contacted Midsummer and Omicron to inquire about their interest in investing in the Company. Amsalem Depo. pp. 36:9-37:18; Bernstein Depo. pp. 26:11-28:6; Benton Depo. p. 64:15-24. On December 5, 2003, Benton telephoned Amsalem at Midsummer to discuss the possibility of investing in Zoltek. Upon learning that the potential investment involved Zoltek, however, Amsalem advised Benton that he could not work with Scott-Macon Securities because he was already working with the Company to participate in an investment. Tepper Depo. Ex. P at SMS 405; Amsalem Depo. pp. 36:9-37:18.

On December 4, 2003, Benton telephoned Bernstein at Omicron to discuss the possibility of investing in a carbon fiber company. Bernstein expressed interest, and Benton said he would call back. On December 12, 2003, Benton telephoned Bernstein again and identified that the investment possibility would be with Zoltek. Similar to what occurred when Benton spoke with Midsummer, once Bernstein knew that Benton was calling about investing in Zoltek, he ended the telephone call because Omicron already was in discussions with the Company to invest. Tepper Depo. Ex. P at 413; Bernstein Depo. pp. 26:11-28:14.

**4. Zoltek's Misrepresentation to Omicron in Response to Omicron's Concern That The Zoltek Investment Opportunity Was Being Shopped.**

After speaking with Benton on December 12, 2003, Bernstein telephoned Bader to ask about Scott-Macon Securities' relationship with Zoltek. Prior to receiving the telephone call from Bernstein regarding Scott-Macon Securities' representation of Zoltek, G. Koppolow & Associates and Bader had no knowledge of Scott-Macon Securities' relationship with the Company. Bader Depo. pp. 54:23-55:2, 76:12-19; Schott Depo. p. 60:3-23. Accordingly, upon receiving Bernstein's telephone call, Bader immediately contacted Schott to express concern that

Scott-Macon Securities had telephoned Omicron and apparently had some relationship with Zoltek. Schott Depo. pp. 73:18-74:17 and Ex. 8 at SMS 731.

Bernstein was concerned that the Zoltek investment opportunity was being shopped to other investors. Bernstein Depo. pp. 29:15-30:2; Bader Depo. pp. 53:6-54:21. Shopping an investment opportunity to multiple investors once negotiations have begun for financing is problematic because it may cause investors to "shy away" from participating in the transaction. Bader Depo. 55:8-21.

Schott quickly advised Bader that Scott-Macon Securities' involvement was not something that should concern either G. Koppolow & Associates or Omicron. Specifically, Schott stated in a December 12, 2003 email to Bader, "As of this morning, Zsolt has shut down Scott-Macon [Securities] from talking to other potential investors. There should be no more problems." Schott Depo. Ex. 8 at SMS 731; Bader Depo. pp. 53:22-54:19. Significantly, this representation was false. Schott admits that he never spoke with Rumy about Omicron's or Bader's concerns and was never told by Rumy that he "shut down" Scott-Macon Securities' efforts to secure financing for Zoltek. Schott Depo. pp. 78:21-79:14. Schott claims that he provided this misrepresentation to Bader because Schott did not want G. Koppolow & Associates or Omicron to worry about Scott-Macon Securities' involvement. Schott Depo. p. 79:15-21.

Regardless of the representation that Zoltek had ended any relationship with Scott-Macon Securities, Omicron still insisted that a disclosure addressing Zoltek's relationship with Scott-Macon Securities and any potential fee due to Scott-Macon Securities be included in the closing documents to be filed with the SEC. Bernstein Depo. pp. 31:6-35:12; Schott Depo. pp. 80:14-81:16. Zoltek's counsel, Thompson Coburn, provided a draft of a disclosure regarding Zoltek's relationship with Scott-Macon Securities to Omicron's counsel, Bryan Cave, and Bryan Cave

forwarded the draft disclosure to Omicron. The disclosure represented that Zoltek believed that the Agreement with Scott-Macon Securities did not apply to the transactions with Omicron and that no fee would be due to Scott-Macon Securities in connection with the Omicron-led financings. Bernstein Depo. pp. 18:14-17, 31:6-35:12; Schott Depo. Ex. 8 at OC 16-18.

Receipt of the disclosure allayed Omicron's concerns regarding being contacted by a second placement agent with respect to investing in Zoltek. Bernstein Depo. 35:8-12. Moreover, Omicron believed that the disclosure regarding Scott-Macon Securities was included in the documents filed with the SEC concerning each of the three Zoltek financings. Bernstein Depo. pp. 34:19-35:12, 39:23-40:15. In fact, however, no Zoltek-related-documents filed with the SEC mention Scott-Macon Securities. See, e.g., Zoltek's Form 10-K Filing with the SEC at Ex. 4.6 (see Aaron Decl. ¶ 12 Ex. K). It is readily apparent that the reason the disclosure was never filed with the SEC is because Zoltek recognized that if it filed a disclosure intimating that Scott-Macon Securities is not entitled to a fee pursuant to the Omicron-Midsummer financings, it would be making a misrepresentation to the SEC.

**5. Despite Zoltek's Representation That Scott-Macon Securities Had Been "Shut Down," Scott-Macon Securities Continued Working On Behalf Of Zoltek To Secure Financing For The Company.**

Scott-Macon Securities continued to contact investors and expend efforts to locate financing for the Company through December 2003 and January 2004. Schott Depo. pp. 95:20-24, 106:24-107:17. In fact, in January 2004, Scott-Macon Securities identified investors that wanted to contribute to the Omicron-led financings. On January 5, 2004, Rumy sent an email to Benton stating that Zoltek was aware that Scott-Macon Securities had represented that it knew of investors who wanted to "piggy back onto the Omicron financing" and that Zoltek was seeking Omicron's permission to include those investors in the transaction. Rumy Depo. pp. 184:16-185:11 and Ex. 20; Schott Depo. pp. 106:24-107:17.

In his January 5, 2004 email, Rumy requested from Benton a list of the potential investors and a list of all of the investors that Scott-Macon Securities had contacted on behalf of Zoltek but also stated that, unless Scott-Macon Securities would waive its minimum fees as outlined in the Agreement, the potential investors could not be included in the Omicron financing. Rumy Depo. pp. 184:16-185:11 and Ex. 20. On January 6, 2004, Benton sent a letter to Rumy advising him that Angelo Gordon & Company, with whom Rumy met with previously, Treeline Investment Partners and SF Capital were interested in investing approximately $6 to $6.5 million in Zoltek. Rumy Depo. pp. 189:17-190:25 and Ex. 21. Benton also stated in his January 6, 2004 letter: "There is no rationale for reducing the Scott-Macon [Securities] below the minimum fee." Rumy Depo. Ex. 21. Additionally, on January 7, 2004, Benton sent to Rumy an email stating that Bluegrass Growth Fund Partners, L.P. was interested in scheduling a telephone conference call with the Company to discuss the possibility of investing in Zoltek. Rumy Depo. Ex. 22. On January 8, 2004, pursuant to Rumy's request, Benton forwarded to Rumy a complete list of the investors that Scott-Macon Securities contacted in an effort to secure financing for Zoltek. Tepper Depo. Ex. M. Finally, on January 12, 2004, Benton sent to Rumy a follow-up email, informing him that Angelo Gordon & Company, Treeline Investment Partners, SF Capital, and Bluegrass Growth Fund Partners, L.P. were still interested in investing in Zoltek and were willing to contribute as much as $9.5 million to any financing. Aaron Decl. ¶ 20, Ex. S.

Despite locating additional investors for the Company and providing the Company with the names of those investors, Zoltek never pursued financings with the investors that Scott-Macon Securities had found. Bernstein testified at his deposition that Omicron was never contacted by Zoltek about Scott-Macon Securities identifying additional investors who wanted to participate in any financings for the Company. Bernstein Depo. p. 37:8-20. Indeed, the record

shows that Omicron likely would have been extremely surprised if Zoltek requested Omicron's permission to include additional investors that Scott-Macon Securities had located because Zoltek had previously represented to Omicron that Scott-Macon Securities no longer had any relationship with the Company. Thus, it is apparent that Zoltek never brought the possibility to Omicron's attention because Omicron would have realized that it had been lied to by the Company.

In a continuing effort to perform its responsibilities under the Agreement, however, on January 22, 2004, Benton sent a letter to Schott stating that Scott-Macon Securities still was interested in assisting the Company to secure financing and continued to have investors interested in coordinating their efforts with Omicron and Midsummer and inquiring whether Zoltek had received permission from Omicron to include the Scott-Macon Securities' investor group in any financing. Rumy Depo. Ex. 23.

#### 6. Scott-Macon Securities Never Received Various Fees From Zoltek To Which It Is Entitled Under The Agreement.

Scott Macon Securities has never received from Zoltek (a) payment of the December monthly retainer, (b) reimbursement of allowable expenses, or (c) a fee or warrants to purchase shares of Zoltek stock for any of the financings that Zoltek accomplished with Omicron and Midsummer. Schott Depo. Ex. 15 at ¶¶ 5-7, 9(b); Tepper Depo. pp. 74:12-75:5, 76:7-0, 170:13-15.

### C. Procedural History

In view of Zoltek's breach of the Agreement, on March 17, 2004, Scott-Macon Securities commenced the New York Action in the U.S. District Court for the Southern District of New York, for breach of contract, breach of the implied covenant of good faith and fair dealing, and specific performance and/or damages. In response to the Complaint in the New York Action,

Zoltek filed a motion to dismiss or transfer the case to the Eastern District of Missouri, where Zoltek earlier had commenced the Transferred Action against Scott-Macon, Ltd., which was not a party to the Agreement, regarding the same facts and transactions that are at issue in this action.

Zoltek had initiated the Transferred Action against Scott-Macon Securities in Missouri State Court on or about February 27, 2004, by filing but not serving a Petition, alleging that Scott-Macon Securities breached its contractual obligations to Zoltek under the Agreement "by failing to use its best efforts to obtain financing for Zoltek." On or about March 12, 2004, Zoltek filed a First Amended Petition in the Transferred Action, substituting as defendant Scott-Macon, Ltd. On or about March 26, 2004, after it became aware of the Transferred Action, Scott-Macon, Ltd. removed that action to federal court, and on or about April 8, 2004, filed a motion to dismiss or transfer the Transferred Action to this Court. The Missouri Federal Court ruled that the Transferred Action more appropriately belonged in this Court and transferred the case to here. In its decision, the Missouri Court stated that "given the existence of the forum selection clause [contained in the Agreement at ¶ 16 and providing that each party submits to the jurisdiction of New York in any case arising out of the Agreement], the Court believes that the plaintiff's decision to sue in St. Louis is indicative of bad faith and appears to be little more than a preemptive strike." Aaron Decl. ¶ 13 at Ex. L.

After the Missouri Court transferred the Transferred Action to this Court pursuant to Scott-Macon, Ltd.'s motion to dismiss or transfer action, Zoltek withdrew its motion to dismiss or transfer in the New York Action. On or about June 29, 2004, Zoltek filed its answer and counterclaims in the New York Action, alleging counterclaims for breach of contract and fraudulent inducement to contract against Scott-Macon Securities. On or about July 19, 2004,

Scott-Macon Securities filed its reply to Zoltek's counterclaims in the New York Action, asserting an additional claim against Zoltek for indemnification pursuant to the provisions of the Agreement. On or about September 28, 2004, Zoltek filed its reply to Scott-Macon Securities' counterclaim for indemnification. On or about July 27, 2004, after the Transferred Action was referred to this Court as a related case, Scott-Macon, Ltd. filed its answer to the First Amended Petition (Complaint) and counterclaim in the Transferred Action.[13]

## II. ARGUMENT

### A. SCOTT-MACON SECURITIES SHOULD BE AWARDED SUMMARY JUDGMENT AS TO LIABILITY IN THE NEW YORK ACTION.

Scott-Macon Securities is entitled to summary judgment as to liability in this case because there are no genuine issues of material fact and the evidentiary record substantiates Scott-Macon Securities' claims against Zoltek. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

#### 1. Zoltek's Actions Constitute a Clear Breach of the Agreement.

To establish a breach of contract claim under New York law, plaintiff must demonstrate: (1) a valid contract; (2) plaintiff's performance under the contract; (3) defendant's failure to perform its obligations under the contract; and (4) damages resulting from defendant's breach. See United States Life Ins. Co. v. Macaluso, No. 03 Civ. 2337, 2004 WL 1497606, at *3 (S.D.N.Y. July 2, 2004).

---

13 The pleadings filed in Scott-Macon Securities, Inc. v. Zoltek Companies, Inc., No. 04 CV 2124 (MBM), are attached to the Aaron Decl. ¶¶ 13-16, Exs. L-O. The pleadings filed in Zoltek Companies, Inc. v. Scott-Macon, Ltd., No. 04 CV 4896 (MBM), are attached to the Aaron Decl. ¶¶ 17-18, Exs. P-Q.

**a. The Agreement That The Parties Executed On September 5, 2003 Is A Valid And Enforceable Contract.**

The Agreement is an enforceable contract that binds Zoltek. The terms of the Agreement are clear and unambiguous. Significantly, Zoltek was represented by a sophisticated businessman and operated with the advice of counsel before it entered into the contract. See Teachers Ins. and Annuity Assoc. of Am. v. Coaxial Comms. of Central Ohio, Inc., 799 F. Supp. 16, (S.D.N.Y. 1992) (indicating that the sophistication of a party and whether it was represented by counsel are significant factors in determining whether an agreement is a binding contract). Here, Rumy negotiated the Agreement on behalf of Zoltek. Rumy is a sophisticated businessman who is the CEO of a company that he founded in 1975, which today boasts approximately $80 million in sales, 800 employees and six national and international facilities. Rumy Depo. pp. 12:3-14, 13:9-14:7. Moreover, Rumy admitted at his deposition that he has experience negotiating agreements with investment bankers for the purpose of retaining their services to assist with securing financing, having negotiated such agreements several times in the past. Rumy Depo. pp. 146:18-147:8. On this occasion, Rumy reviewed the final version of the Agreement prior to signing. Rumy Depo. pp. 57:25-58:3.

Additionally, Zoltek received the assistance of Thompson Coburn, its outside counsel, prior to executing the Agreement. Thompson Coburn had the opportunity to review drafts of the Agreement and discuss them with Zoltek. Rumy Depo. pp. 48:23-49:1, 50:24-52:1, 52:20-23, 55:25-56:6 and Ex. 16 at SMS 2267; Tepper Depo. Ex. R. Accordingly, the Agreement is a valid contract.

**b. Scott-Macon Securities Fulfilled All of Its Obligations Under the Contract.**

Paragraph 4 of the Agreement outlined Scott-Macon Securities' responsibilities. With respect to Scott-Macon Securities' duties, the Agreement provided that Scott-Macon Securities

needed to exercise only "reasonable efforts" and did not have to successfully secure financing for the Company. Schott Depo. Ex. 15 at ¶ 3; see generally Chateaugay Corp., et. al. v. Thomson-CSF, S.A., 198 B.R. 848, 854 (S.D.N.Y. 1996) ("The standard imposed by a 'reasonable efforts' clause . . . is indisputably less stringent than that imposed by [a] 'best efforts' clause[ ] . . . ."). It is evident from the record developed during discovery that Scott-Macon Securities expended efforts far greater than "reasonable efforts" in attempting to secure financing for Zoltek and complying with its responsibilities under the Agreement:

- Pursuant to ¶ 4(a), Scott-Macon Securities conducted due diligence of the Company, including requesting financial information from the Company, visiting Zoltek's headquarters in St. Louis Missouri, and meeting with Zoltek's senior management, and provided Zoltek with proposed term sheets of the type of financing Scott-Macon Securities thought Zoltek should pursue. Rumy Depo. pp. 45:11-48:1 and Ex. 16 at SMS 2268; Schott Depo. pp. 70:22-24, 71:19-72:11; Tepper Depo. Ex. G-H, J.
- Pursuant to ¶ 4(b), Scott-Macon Securities drafted a CIM with Zoltek's assistance. Schott Depo. 124:16-24; Tepper Depo. pp. 52:15-54:18; 96:8-97:7 and Exs. D-F.
- Pursuant to ¶ 4(c), Scott-Macon Securities formulated a list of potential investors to contact in an effort to secure financing for the Company and provided Zoltek with lists of the investor contacts being made on behalf of the Company. Rumy Depo. pp. 84:20-85:15, 90:16-21; Schott Depo. pp. 23:5-9.
- Pursuant to ¶ 4(d), beginning October 3, 2003, Scott-Macon Securities contacted 263 potential investors and sent CIMs to 55 of those investors.

- Pursuant to ¶ 4(e), Scott-Macon Securities coordinated telephone conference calls between the Company and potential investors and scheduled and attended eight in-person meetings between the Company and investors. Rumy Depo. pp. 90:10-92:14, 93:6-9, 201:24-202:5; Benton Depo. p 46:11-24; Tepper Depo. Ex. P at SMS 325, 333, 350, 363, 408, 415, 426, 446.
- Pursuant to ¶ 4(f), Scott-Macon Securities solicited financing proposals from two investors and forwarded those term sheets to Zoltek for its review and consideration. Schott Depo. pp. 85:7-86:9, 89:2-13 and Ex. 9; Tepper Depo. pp. 71:5-16, 118:3-119:20 and Exs. N, O, P at SMS 360 and 423. Scott-Macon Securities also identified investors to Zoltek who were interested in contributing financing to Zoltek and coordinating their efforts with the Omicron-led financing. Rumy Depo. pp. 189:17-190:25 and Exs. 21-22.
- Pursuant to ¶ 4(g), while because of Zoltek's conduct Scott-Macon Securities never had the opportunity to act as Zoltek's placement agent in a transaction that led to actual financings, as late as January 22, 2004, Scott-Macon Securities emphasized its willingness to Zoltek to continue assisting the Company to secure financing. Rumy Depo. Ex. 23.

The record reflects that Scott-Macon Securities efforts were reasonable under the Agreement and that Scott-Macon Securities fulfilled its obligations thereunder.

**c. Zoltek's Conduct Demonstrates That It Breached Several Provisions of the Agreement.**

Pursuant to the Agreement, Zoltek was obligated to (a) honor the exclusive arrangement it had established with Scott-Macon Securities, see Schott Depo. Ex. 15 at ¶ 1; (b) promptly inform Scott-Macon Securities if Zoltek becomes aware of any third-party interest in investing in

the Company see id. at ¶ 2; (c) not initiate any discussions with an investor regarding obtaining financing for the Company except through Scott-Macon Securities, see id.; (d) pay to Scott-Macon Securities a monthly retainer for December 2003, see id. at ¶ 5; (e) reimburse Scott-Macon Securities for its allowable expenses, see id. at ¶ 7; (f) tender to Scott-Macon Securities a fee and warrants to purchase shares of Zoltek stock if the Company completed a financing during the term of the Agreement, see id. at ¶ 6; and (g) tender to Scott-Macon Securities a fee and warrants to purchase shares of Zoltek stock if the Company received financing, within eighteen months of termination of the Agreement, from an investor included on Scott-Macon Securities' list of investors provided to Zoltek within thirty days after termination of the Agreement, see id. at ¶ 9(b). Zoltek breached all of these provisions.

When Zoltek executed the exclusive Agreement, Equiplace already was Zoltek's non-exclusive placement agent. Rumy Depo. pp. 14:20-16:10, 110:20-111:9; Aaron Decl. ¶ 11, Ex. J. Thus, Zoltek was in breach of the Agreement upon execution. Record evidence also shows that Zoltek continued to work with Equiplace into the fall of 2003, and according to the terms of the contract between Equiplace and Zoltek, that contract is still in effect. Aaron Decl. ¶ 11, Ex. J. Amsalem Depo. pp. 9:4-12, 10:17-12:15, 16:11-18:12, 21:21-22 and Exs. A. at MSC 6, 239, 246, B. Additionally, not even one month after Scott-Macon Securities had completed the CIM and had begun contacting investors, Zoltek engaged the assistance of G. Koppolow & Associates, which resulted in the closing of three financings for the Company, independent of Scott-Macon Securities, with investors that Scott-Macon Securities had contacted on behalf of the Company. Rumy Depo. p. 118:3-14; Schott Depo. pp. 30:13-31:11, 31:21-24, 32:23-34:9, 39:13-40:10, 95:5-9; Bader Depo. pp. 14:18-15:6; Bernstein Depo. pp. 9:12-24, 20:13-17, 21:17-20, 24:2-5.

Furthermore, Zoltek never promptly notified Scott-Macon Securities of any communications that Zoltek had with third-parties interested in investing in the Company. In particular, Zoltek did not promptly inform Scott-Macon Securities that (a) it participated in a conference call with Midsummer, (b) G. Koppolow & Associates contacted Zoltek and asked if Zoltek would consider financing proposals that G. Koppolow & Associates would bring to Zoltek's attention, (c) Zoltek received term sheets from Omicron through G. Koppolow & Associates, or (d) Zoltek was going to meet with representatives of Omicron to discuss financing at Zoltek's offices in St. Louis, Missouri on November 12, 2003.

Zoltek also initiated a discussion with an investor regarding financing independent of Scott-Macon Securities. It was at Rumy's initiation that Omicron visited Zoltek's offices. Scott-Macon Securities was not made aware of that meeting or invited to that meeting. Schott Depo. pp. 92:22-24.-93:5.

Finally, Zoltek has not paid to Scott-Macon Securities all fees owed under the Agreement. Zoltek has not paid to Scott-Macon Securities its monthly retainer for December 2003 or its allowable reimbursable costs. Tepper Depo. pp. 74:12-75:5, 76:7-10, 170:13-15. Zoltek also has not tendered to Scott-Macon Securities its fees or the warrants to purchase shares of Zoltek stock that Scott-Macon Securities is owed pursuant to the three financings that Zoltek completed with Omicron and Midsummer, investors who appear on Scott-Macon Securities final investor contact list. The Agreement provides that Scott-Macon Securities is owed a fee and warrants to purchase shares of Zoltek stock if (i) the Company received financing, during the term of the Agreement, id. at ¶ 6, and (ii) the Company received financing, within eighteen months of termination of the Agreement, from an investor included on Scott-Macon Securities' list of investors provided to Zoltek within thirty days after termination of the Agreement, id. at ¶

9(b). The three financings that Zoltek received closed in January 2004, March 2004, and October 2004, respectively. The initial nine month term of the Agreement lasted into June 2004. Additionally, on January 8, 2004, Scott-Macon Securities, pursuant to Zoltek's request, provided Zoltek with a complete final list of all investors that Scott-Macon Securities had contacted. Omicron and Midsummer are included in that list. Tepper Depo. Ex. M.

Zoltek's conduct since executing the Agreement with Scott-Macon Securities has been egregious. Zoltek continuously dishonored the provisions of the Agreement and is in breach of contract.

**d. Scott-Macon Securities Has Suffered Damages As A Result Of Zoltek's Breach Of The Agreement.**

Zoltek owes Scott-Macon Securities fees as outlined in the Agreement. Scott-Macon Securities is due to receive payment for the December monthly retainer and its allowable reimbursable expenses. Additionally, Scott-Macon Securities is owed fees for the financings that Zoltek completed with Omicron and Midsummer pursuant to ¶¶ 6 and 9(b) of the Agreement. The December 2003 and March 2004 financings were closed during the initial nine month term of the Agreement, and the October 2004 financing closed during the eighteen months following the end of the Agreement with investors that Scott-Macon Securities contacted independently and has included on its final investor contact list that it provided to Zoltek. Schott Depo. Ex. 15 at ¶ 5, 7, 9(b); Tepper Depo. Ex. M.[14]

---

14 Even if Zoltek is able to assert that the Agreement was terminated prior to the completion of the initial nine month term, which Scott-Macon Securities strongly contests, all three financings still closed within eighteen months of any purported termination.

Additionally, Scott-Macon Securities included a claim for specific performance against Zoltek because of the warrants to purchase shares of Zoltek stock that Zoltek owes to Scott-Macon Securities. <u>See generally</u> <u>Laurus Master Fund, Ltd. v. Versacom Int'l, Inc.</u>, No. 02

### 2. Zoltek's Defenses and Counterclaims are Meritless.[15]

In defense to Scott-Macon Securities' claims in the New York Action, Zoltek asserts several defenses and two counterclaims. Zoltek alleged that Scott-Macon Securities' claims: (1) are barred because Scott-Macon Securities fraudulently induced Zoltek into the Agreement; (2) are barred because Scott-Macon Securities breached the Agreement, thereby excusing Zoltek's performance; (3) are barred by failure of consideration; (4) are precluded or reduced because Scott-Macon Securities failed to mitigate its damages; and (5) are barred by waiver, estoppel and laches. See Zoltek's Answer at ¶¶ 29-33. Additionally, Zoltek asserted counterclaims for breach of contract and fraudulent inducement against Scott-Macon Securities.

#### a. Zoltek's Defense-Counterclaim Relating to Fraudulent Inducement Cannot Be Sustained Under New York Law.

Zoltek's defense-counterclaim for fraudulent inducement is nothing more than a weak attempt to get out from under the contractual language, which places Zoltek squarely in breach. First, any alleged misrepresentations made outside of the Agreement are immaterial. Paragraph 17 of the Agreement states: "This Agreement contains the complete agreement between the parties with respect to the subject matter hereof and supersedes any prior understandings, agreements or representations by or between the parties, written or oral. This Agreement may not be amended or waived except in a writing executed by the party against which such amendment or waiver is sought to be enforced." Schott Depo. Ex. 15 at ¶ 17.

---

Civ. 5340, 2003 WL 21219791, at *3 (S.D.N.Y. May 21, 2003) (stating that specific performance is warranted when "plaintiff has no adequate remedy at law").

15 The Agreement includes a broad indemnification provision requiring Zoltek to indemnify Scott-Macon Securities for all attorneys' fees and costs for the defense against any claims brought against Scott-Macon Securities arising out of the Agreement, including claims brought by Zoltek. Schott Depo. Ex. 15 at Annex A. Accordingly, Scott-Macon Securities is entitled to be indemnified for all attorneys' fees and costs, to be determined at an inquest on damages, expended in defending against Zoltek's meritless counterclaims.

Second, even assuming Zoltek's representations properly could be alleged, they cannot form the basis of a fraud claim under New York law because they relate to the very breach of contract alleged in Zoltek's first counterclaim. See Garwood v. Sheen & Shine, Inc., 175 A.D.2d 569, 569, 572 N.Y.S.2d 237, 237 (4th Dep't 1991) ("The complaint fails to state a legally sufficient cause of action for fraud because the only fraud alleged relates to the breach of the employment contract."); see also Wegman v. Dairylea Co-op, Inc., 50 A.D.2d 108, 113, 376 N.Y.S.2d 728, 735 (4th Dep't 1975) ("It is recognized that a cause of action for fraud will not arise when the only fraud relates to a breach of contract.") (citation omitted) (alteration in original).

**b. Zoltek's Defense-Counterclaim Relating To Breach Of Contract Is Entirely Unfounded.**

Zoltek's attempts to relieve itself of its responsibilities pursuant to the Agreement by alleging that Scott-Macon Securities did not perform its obligations under the Agreement are laughable. First, Scott-Macon Securities was required to use only reasonable efforts. Schott Depo. Ex. 15 at ¶ 3; see generally Chateaugay Corp., 198 B.R. at 854 ("The standard imposed by a 'reasonable efforts' clause . . . is indisputably less stringent than that imposed by [a] 'best efforts' clause[ ] . . . ."). It is inconceivable that Zoltek will be able to demonstrate that Scott-Macon Securities' substantial efforts on behalf of the Company did not rise to the level of reasonable. See supra part II.A.1.b. Second, by the terms of the Agreement, Zoltek specifically acknowledged that entering into the Agreement did not assure that Scott-Macon Securities would successfully secure financing for Zoltek. Schott Depo. Ex. 15 at ¶ 3. Accordingly, any failure of Scott-Macon Securities to secure financing does not constitute a breach of contract or suggest that Scott-Macon Securities did not use reasonable efforts. Third, the Agreement provides for an initial nine-month term, only after which may a party terminate the Agreement unilaterally by

providing thirty days notice to the other party. Schott Depo. Ex. 15 at ¶ 9. Thus, any alleged unilateral termination of the exclusivity provisions of the Agreement in November 2003 by Zoltek would have been in contravention of the provisions of ¶ 9 of the Agreement.

#### c. Zoltek's Remaining Defenses Are Baseless.

Nothing in the record supports Zoltek's remaining defenses. Given Scott-Macon Securities' substantial efforts and money expended on behalf of the Company, there is no doubt that Scott-Macon Securities provided Zoltek with ample consideration under the Agreement. Additionally, upon a review of the record, Zoltek's defenses of the grounds of waiver, estoppel and laches similarly have no bases and appear to be nothing more than boilerplate defenses that Zoltek included in its Answer. Finally, any allegations with respect to Scott-Macon Securities' mitigation of damages (or lack thereof) can be dealt with by the magistrate judge at an inquest on damages.

### B. SCOTT-MACON, LTD. SHOULD BE AWARDED SUMMARY JUDGMENT IN THE TRANSFERRED ACTION.

Zoltek's claims in the Transferred Action are unfounded. Indeed, in his decision transferring the case to the Southern District of New York, with respect to Zoltek's amended complaint, Judge Limbaugh stated that "there does not appear (at this time) under the standard for a motion to dismiss that plaintiff can state any facts [against Scott-Macon, Ltd.] which would entitle it to recover as a matter of law." Aaron Decl. ¶ 13, Ex. L at 5. Since that time, Zoltek has not offered any allegations to substantiate that Scott-Macon, Ltd. (as opposed to Scott-Macon Securities) somehow should be responsible for the Agreement, and the record does not indicate otherwise. Thus, at this time, under the standard for summary judgment, Zoltek's claims against Scott-Macon, Ltd. should be dismissed as a matter of law.

1. **Scott-Macon, Ltd. is not a Party to the Agreement.**

The only parties to the Agreement are Zoltek and Scott-Macon Securities, not Scott-Macon, Ltd. Schott Depo. Ex. 15. Indeed Judge Limbaugh held in no uncertain terms: "The [A]greement clearly states that the contractual relationship is between S-M Securities and Zoltek . . . .," Aaron Decl. ¶ 13, Ex. L at 2, and "This case involves the contractual relationship of two parties: the plaintiff [Zoltek] and S-M Securities . . . ." Aaron Decl. ¶ 13, Ex. L at 5.

2. **Scott-Macon. Ltd. Cannot Be Held Liable Pursuant to an Agency Theory Of Liability.**

The record cannot establish that Scott-Macon Securities, in entering into the Agreement with Zoltek, was merely acting as Scott-Macon, Ltd.'s agent. In an attempt to pierce the corporate veil, "[s]uing a parent corporation on an agency theory … is premised on the view that the subsidiary had authority to act, and was in fact acting, on the parent's behalf – that is, in the name of the parent." Royal Industries Limited v. Kraft Foods, Inc., 926 F. Supp. 407, 412 (S.D.N.Y. 1996) (emphasis in original). From a threshold standpoint, however, it is well-settled that "in the case of a parent-subsidiary relationship … the standards to be applied for determining whether a corporation is acting as an agent for a related corporation are the same as the standards" used to pierce the corporate veil. See Manchester Equipment Co., Inc. v. American Way and Moving Co., Inc., 60 F. Supp. 2d 3, 7 (E.D.N.Y. 1999). Zoltek has failed to satisfy this standard.

Under New York law, "a parent corporation may become a party to its subsidiary's contract under an agency theory if the parent's conduct manifests an intent to be bound by the contract." Id. at 413. Zoltek has not alleged any facts in its First Amended Petition to support such a claim, nor can it in good faith. Despite Zoltek's repeated misstatement of fact, the Agreement clearly identifies the parties as Scott-Macon Securities and Zoltek. Moreover, the

record evidence has not revealed sufficient facts to reflect an intent by Scott-Macon, Ltd. to be obligated for Scott-Macon Securities' actions.

## CONCLUSION

For the reasons stated above, it is respectfully requested that Scott-Macon Securities' motion for summary judgment as to liability in the New York Action be granted in all respects. It is further requested that Zoltek's counterclaims in the New York Action be dismissed in their entirety. It is further requested that the New York Action be referred to a magistrate judge to determine the amount of damages due to Scott-Macon Securities and whether an award of specific performance with respect to the warrants owed is appropriate. Finally, it is further requested that Scott-Macon, Ltd.'s motion for summary judgment in the Transferred Action be granted in all respects.

Dated: December 3, 2004

DORSEY & WHITNEY LLP

By:______________________________
Stewart D. Aaron (SA 1276)
Joseph B. Shumofsky (JS 2147)
250 Park Avenue
New York, New York 10177
(212) 415-9200

Attorneys for Plaintiff Scott-Macon Securities, Inc. and Defendant Scott-Macon, Ltd.