UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------x

SCOTT MACON SECURITIES, INC.,

Plaintiff,

04 CV 2124 (MBM)

-against-

ZOLTEK COS., INC.,

Defendant.

---------------------------------------------------------------------x

ZOLTEK COS., INC.,

Plaintiff,

-against-

04 CV 4896 (MBM)

SCOTT MACON, LTD.,

Defendant.

---------------------------------------------------------------------x

**MEMORANDUM OF LAW OF ZOLTEK COMPANIES, INC. IN OPPOSITION TO THE MOTIONS OF SCOTT-MACON SECURITIES, INC. AND SCOTT-MACON, LTD. FOR SUMMARY JUDGMENT**

KODNER, WATKINS, MUNCHNICK, DUNNE & WEIGLEY, L.C.
Gerald M. Dunne, Esq.
Old Town Executive Office Building
168 N. Meramec Avenue, Suite 200
St. Louis, Missouri 63105-3758
(314) 727-9111
(314) 727-9110 Facsimile

REITLER BROWN & ROSENBLATT LLC
Craig J. Albert, Esq. (CA-0495)
800 Third Ave., 21st Floor
New York, New York 10022
(212) 209-3050

TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... ii

PRELIMINARY STATEMENT ..... 1

FACTS ..... 2

A. The Parties to the Action ..... 2

B. Zoltek Hired Scott-Macon As Its Exclusive Placement Agent With Institutional Investors. ..... 4

C. Scott-Macon's Weak Efforts Yielded Nothing. ..... 6

D. Zoltek Terminated The Exclusivity of the Agreement On November 17, 2003. ..... 8

E. Scott-Macon's Belated December Efforts Add Nothing To Its Claims. ..... 9

ARGUMENT ..... 10

I. STANDARD OF REVIEW ..... 10

II. SCOTT-MACON IS NOT ENTITLED TO SUMMARY JUDGMENT IN THE NEW YORK ACTION. ..... 11

A. Zoltek Effectively Terminated The Exclusivity Of The Agreement On November 17, 2003. ..... 11

1. Zoltek's View That The Agreement Includes A Right to Terminate Upon Thirty Days' Notice Is Supported By Admissible Parol Evidence. ..... 12

2. Even Under Scott-Macon's Interpretation, It Is Not Entitled To Any Payment From Zoltek Because The Companies That Invested In Zoltek Are Not Disclosed on the Scott-Macon's Institutional Investor Contact List. ..... 14

B. Scott-Macon Cannot Recover Because It Materially Breached The Agreement When It Failed To Undertake Reasonable Efforts To Obtain Financing For Zoltek. ..... 16

C. Scott-Macon Cannot Recover Because Zoltek Did Not Breach the Agreement. ..... 19

D. Scott-Macon Cannot Recover Because It Fraudulently Induced Zoltek to Enter into the Agreement. ..... 20

III. SCOTT-MACON IS NOT ENTITLED TO SUMMARY JUDGMENT IN THE TRANSFERRED ACTION. ..... 22

A. Scott-Macon Ltd. Is Liable Because Scott-Macon Securities, Inc. Is An Alter Ego of Scott-Macon, Ltd. ..... 23

B. Scott-Macon, Ltd. Is Liable To Zoltek Under The Agency Theory Of Liability. ..... 25

CONCLUSION ..... 26

TABLE OF AUTHORITIES

CASES

*1000 Northern of New York Co. v. Great Neck Medical Associates*, 7 A.D.3d 592, 775 N.Y.S.2d 884 (2d Dept. 2004) ........ 17

*Ace Wire & Cable Co., Inc. v. Aetna Casualty & Surety Co.*, 60 N.Y.2d 390, 469 N.Y.S.2d 655, 457 N.E.2d 761 (1983) ........ 12

*Am. Protein Corp. v. A.B. Volvo*, 844 F. 2d 56 (2d Cir. 1988) ........ 23

*Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.*, 98 F.3d 13 (2d Cir. 1996) ........ 22

*Brooke Group Ltd. v. JCH Syndicate*, 87 N.Y.2d 530, 663 N.E.2d 635, 640 N.Y.S.2d 479 (1996) ........ 2

*Brown v. Henderson*, 257 F.3d 246 (2d Cir. 2001) ........ 10

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........ 10

*Channel Master Corp. v. Aluminium Limited Sales, Inc.*, 4 N.Y.2d 403, 151 N.E.2d 833, 176 N.Y.S.2d 259 (1958) ........ 20, 21

*Church of American Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197 (2d Cir. 2004) ........ 10

*Cifra v. General Electric Co.*, 252 F.3d 205 (2d Cir.2001) ........ 10

*Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 157 N.E.2d 597, 184 N.Y.S.2d 599 (1959) ........ 21

*Deerfield Communications Corp. v. Chesebrough-Ponds, Inc.*, 68 N.Y.2d 954, 502 N.E.2d 1003, 510 N.Y.S.2d 88 (1986). ........ 22

*DiFilippo v. Hidden Ponds Assocs.*, 146 A.D.2d 737, 537 N.Y.S.2d 222 (2d Dept. 1989) ........ 21

*Dunne v. Libbra*, 330 F. 3d 1062 (8th Cir. 2003) ........ 2

*Green Door Realty Corp. v. TIG Ins. Co.*, 329 F.3d 282 (2d Cir. 2003) ........ 25

*Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 780 N.E.2d 166, 750 N.Y.S.2d 565 (2002) ........ 12

*Hallock v. State*, 64 N.Y.2d 224, 474 N.E.2d 1178, 485 N.Y.S.2d 510 (1984) ........ 25

*In re Brandon (Nationwide Mut. Ins. Co.),* 97 N.Y.2d 491, 769 N.E.2d 810, 743 N.Y.S.2d 53 (2002) ........ 16

*Losei Realty Corp. v. City of New York*, 254 N.Y. 41, 171 N.E. 899 (1930) ........ 16

*Mallad Const. Corp. v. County Fed. Sav. & Loan Ass'n*, 32 N.Y.2d 285, 298 N.E.2d 96, 344 N.Y.S.2d 925 (1973) ........ 12

*Mars Elecs. of N.Y. v. U.S.A. Direct, Inc.*, 28 F. Supp. 2d 91 (E.D. N.Y. 1998) ........ 23

*Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.*, 182 F.3d 157 (2d Cir. 1999) ........ 11

*New York State Ass'n of Realtors, Inc. v. Shaffer*, 27 F.3d 834 (2d Cir.1994) ........ 10

*Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*, 92 N.Y.2d 458, 705 N.E.2d 656, 682 N.Y.S.2d 664 (1998) .................................................................. 19

*R.H. Damon & Co., Inc. v. Softkey Software Products, Inc.*, 811 F. Supp. 986 (S.D.N.Y.1993) .................................................................................................... 16

*S.O. Textiles Co., Inc. v. A & E Products Group*, 18 F.Supp.2d 232, 238 (E.D.N.Y. 1998)........ 16

*Sabo v. Delman*, 3 N.Y.2d 155, 164 N.Y.S.2d 714, 143 N.E.2d 906 (1957) .............................. 21

*Timberline Development, LLC v. Kronman*, 263 A.D.2d 175, 702 N.Y.S.2d 237 (1st Dept. 2000) .................................................................................................... 17

*Treglia v. Town of Manlius*, 313 F.3d 713 (2d Cir. 2002)........................................................... 10

*Tynan Incinerator Co., Inc. v. International Fidelity Ins. Co.*, 117 A.D.2d 796, 499 N.Y.S.2d 118 (2d Dept. 1986) ............................................................................ 17

*Uribe v. Merchants Bank of New York*, 91 N.Y.2d 336, 693 N.E.2d 740, 670 N.Y.S.2d 393 (1998).......................................................................................................... 12

RULES

Fed. R. Civ. P. 15(a) ...................................................................................................... 23

Fed. R. Civ. P. 56(c) ...................................................................................................... 10

## PRELIMINARY STATEMENT

These two actions, which have not been formally consolidated, arise from the failure of Scott-Macon Securities, Inc. and its parent Scott-Macon, Ltd. (collectively referred to as "Scott-Macon") to fulfill the promises that they made to Zoltek Companies, Inc. ("Zoltek") with respect to raising the financing that Zoltek needed when it faced a looming financial disaster in 2003. Zoltek dealt in good faith with Scott-Macon, but Scott-Macon failed to uphold its end of the bargain. Rather, Scott-Macon was content to sit back and do nothing as precious time ticked away and Zoltek slipped toward oblivion.

Scott-Macon cannot prevail on its motion for summary judgment in the New York Action for four reasons. First, the portion of the Agreement upon which Scott-Macon seeks to recover was effectively terminated by Zoltek under a provision permitting either party to terminate on thirty days' notice. Even if it had not been terminated, though, Scott-Macon could not recover a fee because the investors who ultimately funded Zoltek were not on a list of institutional investors that Scott-Macon was required to deliver to Zoltek. (Point II A.) Second, even assuming that Scott-Macon's gloss on the contractual language that it drafted is the only reasonable interpretation (and it is not), Scott-Macon simply cannot show that its half-hearted and tardy efforts to find financing for Zoltek were the "reasonable efforts" that it promised to undertake. (Point II B.) They were manifestly and unreasonably weak, but the reasonableness of Scott-Macon's efforts is a disputed factual issue. Third, Scott-Macon cannot recover because it must show that Zoltek breached the Agreement, and it cannot do so; Zoltek performed its obligations. (Point II C.) Fourth, Scott-Macon cannot recover on the Agreement because it fraudulently induced Zoltek to make the Agreement in the first place. (Point II D.)

Scott-Macon also seeks summary judgment in the Transferred Action, in which Zoltek seeks damages against both Scott-Macon companies. Summary judgment is not appropriate because Zoltek's motion for leave to amend its complaint in that case is still pending.[1] As amended, the complaint would address the substantive defects in the earlier amended complaint that had been filed in Missouri. Scott-Macon's arguments on this motion address the earlier version of the complaint, and in any event lack merit because they misstate the law of New York regarding agency liability and alter ego liability, and because the factual record shows that there is indeed a factual basis for those claims. (Point III.) Until the motion to amend the complaint is either granted or denied, summary judgment is inappropriate.

## FACTS

A. The Parties to the Action.

The two pending actions arise from a contract entered into by Zoltek Companies, Inc. and Scott-Macon Securities, Inc, and Scott-Macon, Ltd. The "Transferred Action" – 04 CV 4896 – was commenced by Zoltek in the Circuit Court for St. Louis County in Missouri. The complaint was amended once and then removed to federal court by Scott-Macon on March 29, 2004.[2] That action seeks damages arising from Scott-Macon's breach of contract and fraudulent misrepresentation. Judge Limbaugh ordered the case transferred to this district in June 2004. There is still pending a motion to allow Zoltek to amend its complaint to assert its claims against Scott-Macon, Ltd. based on theories of veil-piercing and alter ego liability. The "New York

[1] The motion for leave to amend and serve a second amended complaint was pending before Judge Limbaugh in the Eastern District of Missouri when he transferred the case to this district in June 2004. The motion to amend has not been decided.

[2] The Agreement at issue contains a permissive New York "service of suit" clause. Zoltek opted, in good faith, to sue instead in its home state of Missouri under prevailing doctrine holding such clauses to permit the commencement of the action in an alternative forum. *See Dunne v. Libbra*, 330 F. 3d 1062, 1064 (8th Cir. 2003) (applying Illinois law); *Brooke Group Ltd. v. JCH Syndicate*, 87 N.Y.2d 530, 534, 663 N.E.2d 635, 638, 640 N.Y.S.2d 479, 482 (1996) ("service of suit" clause did not amount to mandatory forum selection).

Action" – 04 CV 2124 – was brought by Scott-Macon Securities, Inc. against Zoltek Companies, Inc. to recover for an alleged breach of contract by Zoltek.

Since its founding by Zsolt Rumy in 1975, Zoltek has grown into a mutli-national company with more than 800 employees and approximately $80,000,000 in annual sales. Deposition of Zsolt Rumy ("Rumy Depo."), pp. 13:9-14:7, 12:3-5.[3] It has dealt with both Scott-Macon, Ltd. and its wholly-owned subsidiary Scott-Macon Securities, Inc. during the event at issue. Its initial negotiations were with Allan Benton, who wrote on the letterhead of Scott-Macon, Ltd. to Mr. Rumy on August 26, 2003 to describe an outline for a proposal under which Zoltek would engage Scott-Macon. Zoltek signed a September 5, 2003 Agreement (the "Agreement") with Scott-Macon Securities, Inc., and subsequently received invoices from both companies, the majority of which were from Scott-Macon, Ltd. Deposition of Jeffrey Tepper ("Tepper Depo."), Ex. F; SMS000516, 517, 524, 525; Ex. G; Ex. H, SMS001123; Ex. J; Ex. M.

Scott-Macon, Ltd. and Scott-Macon Securities, Inc. are investment bankers who claim to have specific expertise in Zoltek's industry. *See* Scott Depo., pp. 6:2-8, 7:15-22. The two companies share the same corporate office, located at 800 Third Ave., New York, New York. Deposition of Alfred Scott ("Scott Depo."), pp. 4:2-4; Tepper Depo., pp. 9:8-9. Both corporations use the same phone and facsimile numbers. Tepper Depo., Exhibit F, p. (i); Deposition of Kevin Schott ("Schott Depo."), Ex. 13, SMS000740. They have significant overlap of directors and personnel. Scott Depo., pp. 6:19-7:10. For example, Alfred Scott is President of Scott-Macon, Ltd. and Chairman of Scott-Macon Securities, Inc. Scott Depo., pp.

---

[3] All of the relevant deposition transcripts have been included in the Declaration of Stewart D. Aaron in Support of the Motions for Summary Judgment of Plaintiff Scott-Macon Securities, Inc. and Defendant Scott-Macon, Ltd. ("Aaron Decl.") Citations here follow the form in Scott-Macon's motion. The exhibits that are relevant to Zoltek's responses to these motions, and which are not already before the Court in the Aaron Decl. are included in the Declaration of Craig Albert in Support of Defendant Zoltek Companies, Inc.'s, Response to Motion for Summary Judgment ("Albert Decl.")

10:15-20. Allan Benton is employed as Vice Chairman for both Scott-Macon, Ltd. and Scott-Macon Securities, Inc. Tepper Depo., Ex. F, p. (i); Schott Depo., Ex. 13, SMS000740. Robert Dimmitt is also an officer of both companies. Scott Depo., pp. 10:25-11:3.

The overlap between the two companies is evidenced by the fact that Scott-Macon, Ltd. and Scott-Macon Securities do not "work with a table of organization." Scott Depo., pp. 8:11-12, 11:7-8. There is no distinguishing between the functions of either company. In fact, with the exception of the Agreement, most of Allan Benton's communications were made on Scott-Macon, Ltd. stationery. *See* Schott Depo., Ex. 13, SMS000740-42; SMS005683-84; Tepper Depo., Ex. F, SMS000516, 517, 524, 525; Ex. G; Ex. H, SMS001123; Ex. J; Ex. M.

B. Zoltek Hired Scott-Macon As Its Exclusive Placement Agent With Institutional Investors.

In March 2003, long before Zoltek ever had any contact with Scott-Macon, it had sought the assistance of investment bankers to acquire financing of approximately $10 to $15 million. Rumy Depo., pp. 14:8-15, 23:4-11; Schott Depo., pp. 11:20-12:1, 72:12-16. In July 2003, Zoltek entered into an agreement with Equiplace Securities, LLC ("Equiplace"), pursuant to which Equiplace was to serve as a non-exclusive placement agent for Zoltek. The agreement between Zoltek and Equiplace provided that Equiplace would receive a fee for the successful completion of financing from any private placement investor that Equiplace introduced to Zoltek. The Equiplace agreement did not contain a time limitation. Rumy Depo., pp. 110:20-111:9.

At the same time Zoltek entered into the agreement with Equiplace, Zoltek investigated financing possibilities other than those that might come from Equiplace. Rumy Depo., pp. 17:8-10. Zoltek contacted Credit Suisse First Boston ("CSFB") to seek financing prospects. CSFB informed Zoltek that Zoltek's needs were too small for CSFB to handle, but that CSFB had a group of pre-screened investment bank firms that would be more suited to Zoltek's needs. Rumy

Depo., pp. 18:6-16. Scott-Macon was one of three firms suggested to Zoltek by CSFB. Rumy Depo., pp. 19:11-16. Unbeknownst to Zoltek, though, CSFB's referral to Scott-Macon was colored by a kickback fee that Scott-Macon had promised to CSFB. Scott Depo., pp. 18:11-22; Benton Depo., 35:12-17; Rumy Depo., 20:12:19-22. Had Zoltek known of that arrangement, it would not have contracted with Scott-Macon at all.

On or about July 31, 2003, Mr. Rumy met with the managing partners of Scott-Macon. They discussed the possibility of Scott-Macon locating potential investors and securing certain financing for Zoltek. Prior to coming to any agreement, Zoltek made it clear to Scott-Macon that although the absolute final date for financing was January 15, 2004, and that in order to obtain the financing by that date, there had to be viable financing in place by no later than December 15, 2003. Rumy Depo., pp. 68:09-70:10; Schott Depo., pp. 14:19-15:20; Deposition of Allan Benton ("Benton Depo."), pp. 82:19-83:23. Mr. Rumy recalls that Scott-Macon "virtually assured [Zoltek] that [Scott-Macon] have the right investors for making the deal." Rumy Depo., pp. 27:23-28:8. His account was essentially confirmed by Allan Benton. *See* Benton Depo., pp. 13:20-25, 68:8-10 ("we told him at the onset of the transaction that we would get the financing done for him.")

During its negotiations with Scott-Macon, Zoltek disclosed to Scott-Macon that it had an on-going relationship with Equiplace. Rumy Depo., pp. 24:20-26:8, 28:14-18, 36:21-37:10, 65:3-7, 127:24-128:4. Allan Benton told Mr. Rumy that Zoltek's relationship with Equiplace would not be affected by the proposed agreement between Zoltek and Scott-Macon. Rumy Depo., pp. 24:20-23, 28:14-18, 36:21-37:10, 65:3-7, 127:24-128:4. Benton explained that the pre-existing relationship with Equiplace would be unaffected because Equiplace and Scott-Macon targeted different investors, in that Equiplace looked primarily to "hedge fund investors",

while Scott-Macon would pursue only "long-term investors." Rumy Depo., pp. 24:3-25:12, 61:24-62:8.

On or about September 5, 2003, Scott-Macon Securities, Inc. drafted an engagement letter (the "Agreement") and sent it to Zoltek for signature. Schott Depo., Ex. 15. Despite negotiations between the parties, none of the drafts of the Agreement contained the substantive provisions desired by Zoltek. Rumy Depo., pp. 50:20-23, 60:11-13. However, Scott-Macon assured Zoltek that if Scott-Macon failed to perform adequately, the contract could be canceled at any time. Rumy Depo., 40:4-13, 60:15-17, 71:24-72:13, 71:6-10; Schott Depo., 12:2-14, 61:20-62:1.

Zoltek signed the agreement, despite the changed terms, because Zoltek had a procedural protection: Scott-Macon's assurance that the contract could be terminated if Scott-Macon failed to perform in a satisfactory manner. Rumy Depo., 40:4-13, 60:15-17, 71:24-72:13, 71:6-10; Schott Depo., 12:2-14, 61:20-62:1. Additionally, Zoltek believed in Scott-Macon's purported integrity and was under significant pressure to obtain financing. Time was of the essence, and there was not enough time to continue to negotiate the terms of the contract. Rumy Depo., pp. 52:6-19, 60:11-61:15, 66:8-17. Finally, at the time Zoltek signed the Agreement, Zoltek believed that Scott-Macon was the exclusive agent for only equity-type financing, since Benton had expressly told him that. Rumy Depo., pp. 24:3-25:12, 61:24-62:8.

C. Scott-Macon's Weak Efforts Yielded Nothing.

The Agreement required Scott-Macon to use "reasonable efforts" to undertake the placement of Zoltek securities. The parties had a shared understanding as to what that term meant, for Alfred Scott understood "reasonable efforts" to mean "that we diligently pursue the assignment and do everything that we can to successfully complete." Scott Depo., pp. 8:19-9:4. That view was consistent with Zoltek's view that the term "reasonable efforts" was to be

interchangeable with "best efforts." Rumy Depo., pp. 58:25-59:1. At a minimum, therefore, Scott-Macon was required to diligently pursue procurement of financing, using every means at its disposal to accomplish that goal. It failed miserably.

Scott-Macon knew and understood that it was imperative for Zoltek to acquire financing prior to January 15, 2004. (Scott-Macon concedes, in its brief at page 4, the existence of the January 15 deadline.) That January 15 deadline triggered earlier practical deadlines: in order to obtain the financing by the absolute final date of January 15, 2004, there had to be viable financing in place by no later than December 15, 2003. Rumy Depo., pp. 68:09-70:10; Schott Depo., pp. 14:19-15:20; Benton Depo., pp. 82:19-83:23. Accordingly, Zoltek had only a little more than three months from signing to procure financing.

As the ink dried on the September 5, 2003 Agreement, though, Scott-Macon slowed down. It took over a month to create a confidential information memorandum ("CIM"), Schott Depo., pp. 123:2-124:7, even though such documentation can be created in approximately one week. Schott Depo., pp. 128:15-24. Because the CIM took so long to create, Zoltek was forced to accept it even though it did not adequately represent the interests of Zoltek. Schott Depo., pp. 124:25-125:16.

Scott-Macon's delay from the outset created problems for Zoltek. Scott-Macon was targeting "long-term investors." Such investors are known to take time, often at least a month, in making investment decisions. Benton Depo., pp. 68:22-25. However, despite the knowledge that time was of the essence, and that the targeted investors take considerable time in coming to a decision point, Scott-Macon delayed contacting potential investors until October 3, 2003. Tepper Depo., Ex. P at SMS000328, 332-33, 338, 341, 347-48, 350, 355, 358, 367, 375, 378-79, 384, 409, 417, 421, 431, 440, 457-58. Thus, Scott-Macon wasted 28 days—almost one-third of

the time remaining for Zoltek to procure financing—before its representatives made even a simple phone call to a single potential investor.

Due to the inadequate efforts of Scott-Macon, none of the long-term investors that Scott-Macon targeted were interested in a financing placement with Zoltek. Rumy Depo., pp. 146:1-17. As of mid-November, Scott-Macon had neither procured any financing nor produced any potential leads for financing. Rumy Depo., pp. 145:13-20. When Zoltek expressed sincere doubt in Scott-Macon's ability to deliver the necessary financing, Scott-Macon gave Zoltek no comfort. It did not even inform Zoltek that Scott-Macon intended to shift its focus from "long-term investors" to "hedge funds." Benton Depo., pp. 85:17-20. Without any adequate assurances from Scott-Macon that it was going to perform, Zoltek had no alternative but to seek independent financing in order to remain a viable entity. Schott Depo., pp. 13:21-24.

D. Zoltek Terminated The Exclusivity of the Agreement On November 17, 2003.

On November 17, 2003, Mr. Rumy took action. He sent Mr. Benton an email stating that Zoltek could no longer afford to wait for Scott-Macon to procure the financing necessary for Zoltek to maintain its ongoing viability and, therefore, could not continue to honor the exclusivity clause in the Agreement. Rumy Depo., pp. 138:20-139:2, 144:17-145:19, Exhibit 12 (*see* Albert Decl. Ex. B). That document revoked the exclusivity clause of the Agreement.

Mr. Rumy's concerns and actions were well-founded and justified. Scott-Macon had never told Zoltek what steps it would take if its prospective investors chose not to invest in Zoltek. In fact, Scott-Macon never informed Zoltek that it intended to shift focus from "long-term investors" to "hedge fund investors." Benton Depo., pp. 85:17-20. Therefore, Scott-Macon did nothing to relieve the anxiety of Zoltek and reassure Zoltek that Scott-Macon had alternative options to generate the necessary financing by January 15. Accordingly, because Zoltek was under a pressing need to acquire immediate financing and Scott-Macon did not provide adequate

assurances that it could deliver the needed financing, Zoltek was forced to terminate the exclusivity of the Agreement with Scott-Macon.

Two days after exclusivity was terminated, Scott-Macon delivered its Institutional Investor Contact List (the "List") to Zoltek pursuant to § 9(b) of the Agreement. Rumy Depo., pp. 89:19-24; Ex. 10 (*see* Albert Decl. Ex. A). This comprehensive List contained all of the investors contacted by Scott-Macon in regard to obtaining the financing needed by Zoltek. Zoltek does not dispute that Scott-Macon is entitled to the stated fee if a Placement is made by and between any of the investors on the List,[4] but none was made.

Zoltek correctly refused to pay any of the sums demanded by Scott-Macon. First, Zoltek refused to pay the final monthly retainer because Scott-Macon was not using reasonable efforts to obtain financing and Zoltek had terminated the Agreement on November 17, 2003. Rumy Depo., pp. 75:25-76:9. Additionally, Zoltek did not pay the bill for the "reimbursable expenses" because the expenses were not properly enumerated as to when and why they were incurred. Rumy Depo., pp. 78:11-80:1. Finally, the fee and/or warrants were not paid out because there was no longer any exclusivity and because the firm from which Zoltek obtained financing was not on the List. Rumy Depo., pp. 78:16-21.

E. Scott-Macon's Belated December Efforts Add Nothing To Its Claims.

Scott-Macon knows fully well that its efforts were unreasonable and were wholly inadequate to the task at hand. It alleges, for example, that Zoltek rejected proposed term sheets

[4] Scott-Macon was required to "prepare, in consultation with [Zoltek], a list of Institutional Investors to be contacted by Scott-Macon in connection with the Placement . . . and provide [Zoltek] with a copy of such list, it being understood that [Zoltek] shall furnish to Scott-Macon the names of all parties (i) with which the Company has had discussions or contacts (either before or during the term hereof) concerning a Placement during the term of this Agreement, and (ii) of which [Zoltek] is aware could reasonably be requested to have an interest in participating in a Placement" Agreement, § 4(c). Schott Depo., Ex. 15. Scott-Macon obviously did not consult with Zoltek in preparing its unilateral list (which breach would itself excuse performance by Zoltek), but even the list it presented does not support its claim for relief.

from Cornell and Ramius without discussing the situation with Scott-Macon. It mentions only in passing, though, that those term sheets were not delivered until December 2003, after the Agreement's exclusivity had been terminated by Zoltek. They were completely unacceptable to Zoltek and could not have been negotiated in time to close the deal prior to January 15, 2004. Rumy Depo., pp. 103:17-104:5. Finally, nothing in the Agreement required Zoltek to accept (or even discuss) such financing with Scott-Macon, Cornell or Ramius. Thus, the fact that Zoltek did not negotiate those last-ditch term sheets with Scott-Macon does have any bearing on any alleged breach of the Agreement.

## ARGUMENT

### I. STANDARD OF REVIEW

It is well-established that a movant may be awarded summary judgment only if there is no genuine issue as to any material fact and, under those facts, the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The evidence offered must be examined in the light most favorable to the non-movant, and all ambiguities should be resolved and all factual inferences drawn in favor of the non-movant. *See, e.g., Church of American Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 203 (2d Cir. 2004) (evidence viewed in light most favorable to non-movant); *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002); *Cifra v. General Electric Co.*, 252 F.3d 205, 216 (2d Cir.2001) (resolve ambiguities and draw inferences in favor of non-movant); *Brown v. Henderson*, 257 F.3d 246, 251 (2d Cir. 2001) (same); *New York State Ass'n of Realtors, Inc. v. Shaffer*, 27 F.3d 834, 838 (2d Cir.1994) (evidence viewed in light most favorable to non-movant). If there is any doubt whether there exits a triable issue of fact, then the motion should be denied. All doubts as to the existence of a genuine issue as to any material fact must be

resolved against the moving party. *Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.*, 182 F.3d 157, 160 (2d Cir. 1999).

## II. SCOTT-MACON IS NOT ENTITLED TO SUMMARY JUDGMENT IN THE NEW YORK ACTION.

Summary judgment is inappropriate in the New York Action because, despite Scott-Macon's assertions, there exist genuine issues of fact material to both Scott-Macon's claims and Zoltek's defenses. First, the portion of the Agreement upon which Scott-Macon seeks to recover was effectively terminated by Zoltek under a provision permitting either party to terminate on thirty days' notice. Even if it had not been terminated, though, Scott-Macon could not recover a fee because the investors who ultimately funded Zoltek were not on a list of institutional investors that Scott-Macon was required to deliver to Zoltek. Second, even assuming that Scott-Macon's gloss on the contractual language that it drafted is the only reasonable interpretation (and it is not), Scott-Macon simply cannot show that its half-hearted and tardy efforts to find financing for Zoltek were the "reasonable efforts" that it promised to undertake. Third, Scott-Macon cannot even show that Zoltek breached the Agreement. Fourth, Scott-Macon fraudulently induced Zoltek to make the Agreement in the first place.

### A. Zoltek Effectively Terminated The Exclusivity Of The Agreement On November 17, 2003.

Summary judgment is inappropriate in this action because there is a dispute as to whether and when the exclusivity of the Agreement was terminated. Zoltek contends that it had the right to terminate and that it did effectively terminate the exclusivity of the Agreement on November 17, 2003. Because the Agreement was terminated before Scott-Macon had any contact with Omicron and Midsummer, Scott-Macon is not entitled to either fees or warrants pursuant to the three financings which Zoltek placed with Omicron and Midsummer. Scott-Macon contends that

Zoltek lacked the power to terminate at any time before June 2004, nine months after the execution of the Agreement.

1. Zoltek's View That The Agreement Includes A Right to Terminate Upon Thirty Days' Notice Is Supported By Admissible Parol Evidence.

Scott-Macon's assertion that the Agreement was not terminable before the expiration of an initial nine month period is incorrect. The clause upon which it relies gives Zoltek the right to terminate upon thirty days' notice. Under New York law, the trier of fact must look to extrinsic evidence where an agreement's terms are reasonably susceptible of more than one interpretation. *See, e.g., Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 570, 780 N.E.2d 166, 171, 750 N.Y.S.2d 565, 570 (2002); *Mallad Const. Corp. v. County Fed. Sav. & Loan Ass'n*, 32 N.Y.2d 285, 290, 298 N.E.2d 96, 99, 344 N.Y.S.2d 925, 930 (1973). Any ambiguities in an agreement are to be construed against the drafter. *See Uribe v. Merchants Bank of New York*, 91 N.Y.2d 336, 341, 693 N.E.2d 740, 743, 670 N.Y.S.2d 393, 396 (1998); *Ace Wire & Cable Co., Inc. v. Aetna Casualty & Surety Co.*, 60 N.Y.2d 390, 398, 469 N.Y.S.2d 655, 658, 457 N.E.2d 761, 764 (1983).

There are two reasonable interpretations of the clause that provides that the Agreement "shall continue for a period of nine months and thereafter until the unilateral termination of this agreement by either the [Zoltek] or Scott-Macon upon at least thirty (30) days written notice to the other party." Schott Depo., Ex. 15, p. 5, § 9. First (as Scott-Macon now contends), it can be interpreted to mean that the Agreement shall last at least nine months and may be cancelled any time thereafter with thirty days written notice. Second (as Zoltek has always maintained and understood), it means that the Agreement can be canceled at any time by thirty days written notice, it being anticipated at the outset that the Agreement will last for nine months. Both are supported by the language of the Agreement, and both find support in the record.

Several facts call Scott-Macon's interpretation into doubt, though. Indeed, Zoltek's interpretation is the only one that makes sense given Scott-Macon's admission concerning the contract's commercial context. Scott-Macon concedes that January 15, 2004 was the deadline by which Zoltek needed to have its money. Under Scott-Macon's interpretation, it would have been appropriate for it to do nothing at all until June 5, 2004 – nine months after the signing of the Agreement – by which time Zoltek would likely have been defunct.

Furthermore, paragraph 5 of the Agreement – under which Scott-Macon is to be paid a "monthly retainer" for only three months (and not for nine months) bears out Zoltek's view that the Agreement did not commit Zoltek to Scott-Macon exclusively and unalterably for nine months.

It is undisputed that Scott-Macon drafted the Agreement. Scott-Macon assured Zoltek, both at the time of signing the Agreement and all times relevant thereafter, that if Scott-Macon failed to perform adequately, the contract could be canceled at any time, Rumy Depo., pp. 40:4-13, 60:15-17, 71:24-72:13, 71:6-10; Schott Depo., pp. 12:2-14, 61:20-62:1. Thus, although Scott-Macon now claims that the Agreement was to last for nine months prior to any termination, Zoltek understood that the Agreement contained a thirty day cancellation clause. Thus, with two reasonable interpretations of the Agreement's express language, the Agreement is facially ambiguous. Under New York law, the ambiguity must be construed against Scott-Macon and in favor of Zoltek.

By construing the Agreement in favor of Zoltek, either party may terminate the Agreement with thirty days' written notice. Mr. Rumy gave that notice. On November 17, 2003, he sent Allan Benton an unequivocal termination notice stating that Zoltek would no longer honor the exclusivity of the Agreement. Rumy Depo., pp. 135:25-136:4, Ex. 12 (*see*

Albert Decl. Ex. B). Accordingly, Zoltek effectively terminated the exclusive arrangement with Scott-Macon on November 17, 2003.

2. Even Under Scott-Macon's Interpretation, It Is Not Entitled To Any Payment From Zoltek Because The Companies That Invested In Zoltek Are Not Disclosed on the Scott-Macon's Institutional Investor Contact List.

According to the Agreement, "if within eighteen months of the date of termination of this Agreement, [Zoltek] completes a Placement with an Institutional Investor (including any parent, subsidy or affiliate thereof) contained in the Institutional Investor Contact List delivered by Scott-Macon to [Zoltek] within 30 days after the date of termination of this Agreement, then [Zoltek] shall pay to Scott-Macon a Placement Fee . . . ." Schott Depo., Ex. 15, p. 5, § 9 (b).[5] On or about November 19, 2003, Scott-Macon delivered its Institutional Investor Contact List to Zoltek, Rumy Depo., pp. 89:15-24, Ex. 10 (*see* Albert Decl. Ex. A), albeit without any consultation. Had Zoltek obtained financing from an investor on that list, Scott-Macon would have an arguable claim for compensation.

Here, though, Scott-Macon is plainly not entitled to a placement fee. This Institutional Investor Contact List does not contain the names of any of the investors (including any parent, subsidy or affiliate thereof) from whom Zoltek ultimately obtained financing. Rumy Depo., pp. 89:15-24, Exhibit 10 (*see* Albert Decl. Ex. A). Accordingly, because Zoltek's investors are not designated on the Institutional Investor Contact List, Scott-Macon is not entitled to a placement fee.

[5] Paragraph 4(b) of the Agreement required Scott-Macon to prepare the Institutional Investor Contact List "in consultation with [Zoltek]", Schott Depo., Ex. 15, and Scott-Macon plainly failed to consult; had it done so, it would have had another opportunity to be reminded of Zoltek's pre-existing contacts. That requirement of consultation would make no sense if there were no understanding that certain potential investors would not be listed and would not entitle Scott-Macon to a fee.

One obvious purpose of the List was to give Zoltek the opportunity to disclose its pre-existing relationships so that the work done before can continue, because those prior contacts would then not appear on the List. At the time of the signing of the Agreement, Zoltek had an ongoing relationship with Equiplace. It fully disclosed its relationship with Equiplace prior to signing the Agreement. Scott-Macon allowed Zoltek to believe that this relationship would not be affected by the Agreement. Rumy Depo., pp. 24:20-23, 28:14-18, 36:21-37:10, 65:3-7, 127:24-128:4. Thus, Equiplace's efforts in regard to contacting potential investors for Zoltek is not relevant to this action.

Section 2 of the Agreement explains why Scott-Macon was to be "informed" of inquiries to Zoltek: the purpose was "to properly coordinate the efforts of Scott-Macon", avoiding a waste of effort attendant to Scott-Macon's contacting companies that have already contacted Zoltek. Scott-Macon's real concern with respect to Omicron[6] and Midsummer is, at best, a claim for the time spent in duplicative effort. Scott-Macon contacted Omicron on December 4, 2003; Scott-Macon contacted Midsummer on December 5, 2003. Benton Depo., pp. 64:15-24. These contacts took place after the Agreement's exclusivity had been terminated by Zoltek on

[6] Scott-Macon accuses of Zoltek of hiding the Agreement from Omicron. However, Zoltek disclosed its relationship with Scott-Macon to Omicron. Rumy Depo., pp. 170:6-175:6. In fact, Zoltek's counsel prepared a disclosure statement stating that no fee would be due Scott-Macon in connection with the Omicron-led financings. Schott Depo., Ex. 8 at OC 16-18. The disclosure was an accurate representation of Zoltek's position in this matter.

Scott-Macon also accuses Zoltek of failing to file the disclosure with the SEC, alleging that doing so would have been a misrepresentation to the SEC. There is no basis for this incorrect and inaccurate assumption. The disclosure was not included in the SEC filings; however, there is no evidence that failing to file it was deliberate action to prevent misrepresentation to the SEC. Here, the evidence indicates that the disclosure was prepared in good faith.

Scott-Macon claims that Zoltek purposefully did not inform Omicron that Scott-Macon had potential investors because doing so would have caused Omicron to realize that Zoltek had lied about its relationship with Scott-Macon. The evidence shows that Zoltek did, indeed, inform Omicron that Scott-Macon had potential investors. Schott Depo., pp. 108:12-22. In fact, it was Omicron that did not have any interest in the investors brought by Scott-Macon. Schott Depo., pp. 23-25. Zoltek was informed that the investors suggested by Scott-Macon had a negative reputation in the market and that those investors had not been beneficial to the companies which they had invested in. Schott Depo., pp. 109:2-8. Accordingly, Scott-Macon's accusation is incorrect.

November 17, 2003. Further, Zoltek informed Scott-Macon of the term sheets from Omicron and Midsummer prior to the time that Scott-Macon contacted Midsummer or Omicron. Rumy Depo., pp. 128:5-12. Thus, Scott-Macon did not expend its own efforts to contact either Midsummer or Omicron.

Scott-Macon is certainly not entitled to any fee based on any contacts with Omicron or Midsummer. Scott-Macon simply telephoned those firms and put their names on a January 2004 contact list after it already knew that Zoltek terminated the exclusivity of the Agreement and after Zoltek had given Scott-Macon the term sheets forwarded by Omicron. Further, the contacts consisted of only a telephone call; Scott-Macon did not expend any significant effort on behalf of Zoltek in making the contacts. Scott-Macon is not entitled to any placement fee and is simply trying to capitalize on the efforts of others.

B. Scott-Macon Cannot Recover Because It Materially Breached The Agreement When It Failed To Undertake Reasonable Efforts To Obtain Financing For Zoltek.

It is axiomatic that, in order for Scott-Macon to recover, it must show that it performed its obligations under the Agreement. *See, e.g., S.O. Textiles Co., Inc. v. A & E Products Group,* 18 F. Supp.2d 232, 238 (E.D.N.Y. 1998); *R.H. Damon & Co., Inc. v. Softkey Software Products, Inc.*, 811 F. Supp. 986, 991 (S.D.N.Y. 1993). It has not done so. Scott-Macon's failure to use reasonable efforts constituted a material breach of the Agreement, thereby justifying Zoltek's termination of the exclusivity of the Agreement. *See In re Brandon (Nationwide Mut. Ins. Co.)*, 97 N.Y.2d 491, 496, 769 N.E.2d 810, 813, 743 N.Y.S.2d 53, 56 (2002) (material breach excuses performance). Whether a party has expended reasonable efforts is a question of fact to be decided by the jury. *See, e.g., Losei Realty Corp. v. City of New York*, 254 N.Y. 41, 47, 171 N.E. 899, 902 (1930) (reasonableness of efforts in mitigation of contract damages was factual issue); *Tynan Incinerator Co., Inc. v. International Fidelity Ins. Co.*, 117 A.D.2d 796, 797, 499

N.Y.S.2d 118, 120 (2d Dept. 1986); *1000 Northern of New York Co. v. Great Neck Medical Associates*, 7 A.D.3d 592, 593, 775 N.Y.S.2d 884, 885 (2d Dept. 2004) (whether or not commercially reasonable efforts were used was a question of fact).

Although the Agreement used the term "reasonable efforts," Zoltek understood the term "reasonable efforts" to be interchangeable with "best efforts," Rumy Depo., pp. 58:25-59:1. Mr. Rumy's view simply expresses the law of New York. *See, e.g.*, *Timberline Development, LLC v. Kronman*, 263 A.D.2d 175, 178-79, 702 N.Y.S.2d 237, 239-40 (1st Dept. 2000) ("reasonable efforts" and "best efforts" are employed interchangeably). Additionally, Alan Scott understood "reasonable efforts" to mean diligent pursuit, expending every effort to successfully achieve the goal. Scott Depo., pp. 8:19-9:4. Accordingly, whether Scott-Macon "diligently pursue[d] the assignment and [did] everything that [they] could to successfully complete it" is a question of fact for the jury. *Id.*

Here, Scott-Macon failed to use requisite diligence. First, Scott-Macon took over a month to create the confidential information memorandum ("CIM"). Schott Depo., pp. 123:2-124:7. Because the CIM had taken so long to create, Zoltek was forced to accept the sub-par CIM even though it did not adequately represent the interests of Zoltek. Schott Depo., pp. 124:25-125:16. Typically, CIM documentation can be created in approximately one week. Schott Depo., pp. 128:15-24. Therefore, if Scott-Macon had used "reasonable efforts" and acted diligently, the CIM should have been prepared both more quickly and more effectively.

Second, Scott-Macon's method of contacting potential investors was, in and of itself, a long, drawn-out process. First, Scott-Macon would make a preliminary phone call, and if the investor was interested, Scott-Macon would send the investor a copy of the CIM. Scott-Macon would then follow up with emails and phone calls. Benton Depo., pp. 23:5-24, 38:5-12, 39:13-

19. Thus, the contact process could take up to several weeks before a potential investor had received all the materials it needed to make an informed decision.

Third, Scott-Macon was targeting "long-term investors" which are known to take time in making investment decisions. Benton Depo., pp. 68:22-25. Despite the knowledge that Zoltek had to procure financing in approximately three months and that the targeted investors take considerable time in coming to a decision point, Scott-Macon delayed contacting potential investors until October 3, 2003. Tepper Depo., Ex. P at SMS000328, 332-33, 338, 341, 347-48, 350, 355, 358, 367, 375, 378-79, 384, 409, 417, 421, 431, 440, 457-58. Thus, Scott-Macon waited 28 days before making a single phone call even though they knew that such investors would typically take at least a month to make a firm decision on whether or not to go forward with an investment. Benton Depo., pp. 68:22-25. Essentially, Scott-Macon wasted almost one-third of the time which Zoltek had to procure financing.

When Zoltek expressed sincere doubt in Scott-Macon's ability to deliver the necessary financing, Scott-Macon never informed Zoltek that it was to shift its focus from "long-term investors" to "hedge funds." Benton Depo., pp. 85:17-20. By failing to indicate the steps Scott-Macon would take if "long-term" investors elected not to invest in Zoltek, Scott-Macon failed to give Zoltek adequate assurances of performance. Without any assurance that financing could be procured, Zoltek had to seek alternative measures to remain a viable entity. Schott Depo., pp. 13:21-24. Accordingly, Scott-Macon's failure to diligently pursue financing excused Zoltek's action in procuring financing from another source. Zoltek was well within its rights to demand that Scott-Macon give adequate assurances of its performance, but those assurances were not forthcoming. *See Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*, 92 N.Y.2d

458, 468, 705 N.E.2d 656, 662, 682 N.Y.S.2d 664, 670 (1998) (extending doctrine of demand for adequate assurance of performance to common-law non-UCC contract).

C. Scott-Macon Cannot Recover Because Zoltek Did Not Breach the Agreement.

Scott-Macon's allegations that Zoltek's actions constitute breach of the Agreement are misdirected. First, Zoltek had fully disclosed its relationship with Equiplace prior to signing the Agreement. Scott-Macon allowed Zoltek to believe that this relationship would not be affected by the Agreement; Benton expressly told that to Rumy. Rumy Depo., pp. 24:20-23, 28:14-18, 36:21-37:10, 65:3-7, 127:24-128:4. In fact, Scott-Macon informed Zoltek that it would not seek investors from the hedge-type funds which Equiplace worked with. Rumy Depo., pp. 24:13-23. Thus, it is inaccurate and unfair to claim that Equiplace's activities on behalf of Zoltek could constitute a breach of the Agreement.

Second, Zoltek did inform Scott-Macon of the communications which it had with Omicron and Midsummer. Rumy Depo., pp. 128:5-12. The original contacts were not initiated by Zoltek, and Zoltek reasonably responded to those inquiries, for Zoltek believed (as Benton had said) that Scott-Macon was only pursuing long-term investors; Zoltek had no idea that Scott-Macon had shifted its focus from "long-term investors" to "hedge funds."[7] Schott Depo., 30:8-32:16; Benton Depo., pp. 85:17-20.

Accordingly, Zoltek's conduct could not constitute a breach of the Agreement. At all relevant times, Zoltek acted in good faith under the Agreement according to the terms as they were represented by Scott-Macon. It would be inappropriate to grant summary judgment as to liability under such circumstances.

[7] If there were any truth to Scott-Macon's assertion that it was actively pursuing hedge funds under the terms of the Agreement as the parties understood it, then Scott-Macon would have added those hedge funds to the List after consulting with Zoltek. No such consultation or listing ever took place.

Scott-Macon alleges that it has been damaged in that Zoltek has refused to pay: (i) the December 2003, retainer fee; (ii) the allowable reimbursable costs; and (iii) the fees and warrants for the financings Zoltek has completed with Omicron and Midsummer. First, Zoltek did not pay the December 2003, retainer fee because Zoltek terminated the Agreement in November 2003. Second, the Agreement provides that Zoltek will reimburse Scott-Macon for certain allowable expenses up to $10,000; all expenses exceeding $10,000 must be approved in advance. Schott Depo. Ex. 15. However, Scott-Macon demanded payment for expenses in excess of $10,000, none of which had been approved by Zoltek in advance. Finally, as explained above, Scott-Macon was not entitled to the fees or warrants it demanded pursuant to Zoltek's three financings with Omicron and Midsummer.

D. Scott-Macon Cannot Recover Because It Fraudulently Induced Zoltek to Enter into the Agreement.

Even if this Court finds that the Agreement was not unilaterally terminable at any time with thirty days' written notice, there is a genuine issue of material fact as to whether the Agreement was void *ab initio*.[8] In its proposed Second Amended Complaint and in its Counterclaims, Zoltek has adequately alleged that Scott-Macon fraudulently induced Zoltek into entering into the Agreement. Scott-Macon falsely represented (i) that Zoltek's relationship with Equiplace would not interfere with the Agreement; (ii) that Zoltek could terminate the Agreement with thirty days' written notice; (iii) that Scott-Macon had the experience and expertise necessary to procure adequate financing for Zoltek; and (iv) that Scott-Macon had investors ready, willing, and able to invest in Zoltek.

[8] The same standard applies whether the fraud is alleged for purposes of contract avoidance or for recovering damages in tort. *Channel Master Corp. v. Aluminium Limited Sales, Inc*., 4 N.Y.2d 403, 406, 151 N.E.2d 833, 835, 176 N.Y.S.2d 259, 262 (1958). Zoltek's counterclaims in the New York action and its claims in the Transferred Action seek those damages.

Scott-Macon's allegations that Zoltek cannot allege a proper fraud claim under New York law are incorrect. First, Scott-Macon argues that the Agreement precludes any parol evidence from being introduced. However, the parol evidence rule simply does not operate to bar claims of fraudulent inducement. *See, e.g., Sabo v. Delman*, 3 N.Y.2d 155, 161, 164 N.Y.S.2d 714, 717, 143 N.E.2d 906, 908-09 (1957); *DiFilippo v. Hidden Ponds Assocs.*, 146 A.D.2d 737, 738, 537 N.Y.S.2d 222, 224 (2d Dept. 1989). Scott-Macon's reliance on the Agreement's merger clause takes it no further, for "where the complaint states a cause of action for fraud, the parol evidence rule is not a bar to showing the fraud either in the inducement or in the execution *despite an omnibus statement that the written instrument embodies the whole agreement, or that no representations have been made*." *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 320, 157 N.E.2d 597, 598-99, 184 N.Y.S.2d 599, 601-02 (1959) (emphasis added). Thus, the misrepresentations made outside of the Agreement are material to the transaction.

Second, Scott-Macon's argument that Zoltek cannot recover for fraud (or avoid the contract due to fraud) falls short of the mark. Zoltek does not allege that the fraud arises from breach of the contract or from a misrepresentation of future intention. *See, e.g., Channel Master Corp. v. Aluminium Limited Sales, Inc.*, 4 N.Y.2d 403, 408, 151 N.E.2d 833, 836, 176 N.Y.S.2d 259, 263 (1958); *Sabo v. Delman*, 3 N.Y.2d 155, 159, 143 N.E.2d 906, 907, 164 N.Y.S.2d 714, 716 (1957). Rather, Zoltek alleges that Scott-Macon fraudulently induced it to enter into the Agreement by misrepresenting or omitting the following facts:

- Failing to disclose the financial relationship between Scott-Macon and CSFB;
- Misrepresenting that the exclusivity clause would not be enforced with respect to placement agents looking into hedge funds;

- Misrepresenting that Scott-Macon had the expertise and experience necessary to obtain the financing that Zoltek desperately needed; and
- Misrepresenting that Scott-Macon already had investors lined up to invest in Zoltek.

Those misrepresentations support a claim for fraudulent inducement under New York law. *See, e.g.*, *Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.*, 98 F.3d 13, 20 (2d Cir. 1996); *Deerfield Communications Corp. v. Chesebrough-Ponds, Inc.*, 68 N.Y.2d 954, 956, 502 N.E.2d 1003, 1004, 510 N.Y.S.2d 88, 89 (1986).

## III. SCOTT-MACON IS NOT ENTITLED TO SUMMARY JUDGMENT IN THE TRANSFERRED ACTION.

Summary judgment is inappropriate in the Transferred Action. This action was transferred from the Eastern District of Missouri along with Plaintiff's motion for leave to file a second amended complaint. Plaintiff's motion is still pending, and, thus, until such motion is granted or denied, summary judgment is inappropriate in this action.

Zoltek has alleged, in its proposed Second Amended Complaint, a basis for Scott-Macon Ltd.'s liability that is well-grounded in fact and in law. The proposed amendment was designed to address the issues that Judge Limbaugh adverted to in his order of transfer. Scott-Macon's suggestion that Judge Limbaugh somehow foreclosed these claims in his order of transfer is simply false; Judge Limbaugh's statement related to the allegations in the first amended complaint, and Zoltek addressed those concerns in its proposed second amended complaint. Judge Limbaugh did not grant the motion to dismiss, nor did he rule on the motion for leave to file the second amended complaint. Instead, he transferred the action, and the motion for leave, to be decided by this Court.

The Federal Rules of Civil Procedure demand that leave to amend should be granted freely where justice so requires. *See* Fed. R. Civ. P. 15(a). Accordingly, this Court should deny Scott-Macon's request for summary judgment and grant leave for Zoltek to file the second amended complaint, for the record as developed in discovery plainly supports a claims based on both the alter ego theory of liability and on agency theory.

A. Scott-Macon Ltd. Is Liable Because Scott-Macon Securities, Inc. Is An Alter Ego of Scott-Macon, Ltd.

New York law recognizes the alter-ego theory and allows for piercing of the corporate veil in situations where a parent corporation controls and dominates its wholly owned subsidiary, and then uses that subsidiary to commit a wrongful or unjust act. *See, e.g., Am. Protein Corp. v. A.B. Volvo*, 844 F. 2d 56, 60 (2d Cir. 1988); *Mars Elecs. of N.Y. v. U.S.A. Direct, Inc.*, 28 F. Supp. 2d 91, 97 (E.D.N.Y. 1998). Several factors that indicate when piercing the corporate veil is appropriate include: (1) whether the parent deals with the subsidiary at arms length; (2) whether corporate formalities are observed; (3) if the parent and subsidiary share common office space, telephones, etc.; (4) overlap in control, directors, officers, or personnel; (5) whether the subsidiary is adequately capitalized; (6) the extent of business discretion displayed by the subsidiary; and (7) whether the corporations are treated as independent profit centers. *Mars Elecs.*, 28 F. Supp.2d at 97-98.

Scott-Macon Securities, Inc. is merely the alter ego of Scott-Macon, Ltd. First, Scott-Macon, Ltd., and Scott-Macon Securities do not observe reasonable corporate formalities. Scott-Macon Securities, Inc., is a wholly owned subsidiary of Scott-Macon, Ltd. Scott Depo., pp. 6:19-20. Scott-Macon, Ltd., and Scott-Macon Securities do not "work with a table of organization." Scott Depo., pp. 8:11-12, 11:7-8. Further, several of the owners of Scott-Macon, Ltd., are also employees of the other company. Scott Depo., pp. 6:19-7:10.

Second, Scott-Macon Securities, Inc., and Scott-Macon, Ltd., do not deal with one another at arms length. Both Scott-Macon, Ltd., and Scott-Macon Securities share the same corporate office, located at 800 Third Ave., New York, New York. Scott Depo., pp. 4:2-4; Tepper Depo., pp. 9:8-9. Both corporations use the same phone and facsimile numbers. Tepper Depo., Exhibit F, p. (i); Schott Depo., Exhibit 13, SMS000740. Additionally, both corporations have overlap in directors and personnel. Scott Depo., pp. 6:19-7:10. For example, Alfred Scott is President of Scott-Macon, Ltd., and Chairman of Scott-Macon Securities. Scott Depo., pp. 10:15-20. Allan Benton is employed as Vice Chairman for both Scott-Macon, Ltd., and Scott-Macon Securities. Tepper Depo., Ex. F, p. (i); Schott Depo., Ex. 13, SMS000740. Additionally, Robert Dimmitt is also an officer of both companies. Scott Depo., pp. 10:25-11:3.

Third, Scott-Macon, Ltd., exercised control over the business relationship between Scott-Macon Securities and Zoltek. With the exception of the Agreement, all of Allan Benton's communications were made on Scott-Macon, Ltd., stationery. *See* Schott Depo., Ex. 13, SMS000740. Further, at no time during the course of Zoltek's business relationship did Scott-Macon, Ltd., disassociate itself from Scott-Macon Securities, Inc. Here, both corporations acted as a single unity in all business transactions with Zoltek. It is clear that Scott-Macon, Ltd., controlled the daily actions of Scott-Macon Securities. Therefore, Scott-Macon, Ltd., and Scott-Macon Securities should be treated as a single entity.

Finally, Scott-Macon, Ltd., and Scott-Macon Securities made fraudulent representations to induce Zoltek to enter into the Agreement. Scott-Macon misrepresented the fact that Scott-Macon had experience in negotiating and securing financing of the type required by Zoltek. Scott-Macon also misrepresented that Scott-Macon had investors willing to provide the desired financing for Zoltek at the time the Agreement was entered into. Zoltek reasonably relied on

Scott-Macon due to their purported superior knowledge and experience. Finally, Scott-Macon never secured appropriate financing for Zoltek. Because both corporations acted in unison in all their dealings with Zoltek, and because both corporations fraudulently induced Zoltek to sign the Agreement, it is proper for this Court to pierce the corporate veil and treat both corporations as a single entity.

B. Scott-Macon, Ltd. Is Liable To Zoltek Under The Agency Theory Of Liability.

Scott-Macon, Ltd. is also liable to Zoltek under agency theory because Scott-Macon Securities, Inc. acted as an apparent agent for Scott-Macon, Ltd. Under New York law, an agency relationship arises where a principal, by words or conduct communicated to a third party, gives rise to the appearance and belief that the agent possesses authority to enter into a transaction. *See, e.g., Green Door Realty Corp. v. TIG Ins. Co*., 329 F.3d 282, 289 (2d Cir. 2003); *Hallock v. State*, 64 N.Y.2d 224,231, 474 N.E.2d 1178, 1181, 485 N.Y.S.2d 510, 513 (1984). Here, Scott-Macon, Ltd., participated fully in the creation of the Agreement between Scott-Macon Securities, Inc., and Zoltek. With the exception of the Agreement, almost all of the transactions with Zoltek were documented on Scott-Macon, Ltd. stationery. Tepper Depo., Ex. F, pp. SMS000516, 517, 524, 525; Ex. G; Ex. H, SMS001123; Ex. J; Ex. M; Schott Depo., Ex. 9, SMS005683-84; Ex. 13, SMS000740-43. Zoltek relied on the care and skill of both Scott-Macon Securities, Inc., and Scott-Macon, Ltd., when it signed the Agreement for financial services. Accordingly, Scott-Macon, Ltd. is liable to Zoltek as a principal of its agent, Scott-Macon Securities, Inc.

## CONCLUSION

For the foregoing reasons, Zoltek Companies, Inc. respectfully requests that this Court deny Plaintiff Scott-Macon Securities, Inc.'s and Defendant Scott-Macon, Ltd.'s motion sfor summary judgment in both the New York Action and the Transferred Action.

Dated: New York, New York
January 7, 2005

KODNER, WATKINS, MUNCHNICK,
DUNNE & WEIGLEY, L.C.

/s/ Gerald M. Dunne
By: ______________________________
Gerald M. Dunne, Esq.
Old Town Executive Office Building
168 N. Meramec Avenue, Suite 200
St. Louis, Missouri 63105-3758
(314) 727-9111
(314) 727-9110 Facsimile

REITLER BROWN & ROSENBLATT LLC

/s/ Craig J. Albert
By: ______________________________
Craig J. Albert, Esq.
800 Third Ave., 21st Floor
New York, New York 10022
(212) 209-3050