KODNER, WATKINS, MUNCHNICK,
DUNNE & WEIGLEY, L.C.
Gerald M. Dunne, Esq.
Old Town Executive Office Building
168 N. Meramec Avenue, Suite 200
St. Louis, Missouri 63105-3758
(314) 727-9111
(314) 727-9110 Facsimile

REITLER BROWN & ROSENBLATT LLC
Craig J. Albert, Esq. (CA-0495)
800 Third Avenue, 21st Floor
New York, New York 10022
(212) 209-3050
Attorneys for Zoltek Companies, Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------x

SCOTT MACON SECURITIES, INC.,

Plaintiff,

04 CV 2124 (MBM)

-against-

ZOLTEK COS., INC.,

Defendant.

----------------------------------------------------------------------x

ZOLTEK COS., INC.,

Plaintiff,

-against-

04 CV 4896 (MBM)

SCOTT MACON, LTD.,

Defendant.

----------------------------------------------------------------------x

**ZOLTEK COMPANIES, INC.'S RESPONSES TO SCOTT-MACON'S LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS AND STATEMENT OF ADDITIONAL MATERIAL FACTS**

Pursuant to Local Rule 56.1, the following is Zoltek Companies, Inc.'s ("Zoltek"), response to the alleged material facts which Scott-Macon Securities, Inc., and Scott-Macon,

Limited (collectively referred to as "Scott-Macon" unless otherwise specified), contend there is no issue to be tried. Additionally, Zoltek has also included further statements of material facts that Zoltek contends remain to be tried.

1. Admit.

2. Admit.

3. Admit.

4. Admit.

5. Deny. Zoltek admits that the absolute deadline for delivering financing was January 15, 2004. However, Zoltek made it clear to Scott-Macon from the beginning that in order to obtain the financing by the absolute final date of January 15, 2004, there had to be viable financing in place by no later than December 15, 2003. Deposition of Zsolt Rumy ("Rumy Depo"), pp.68:09-70:10; Deposition of Kevin Schott ("Schott Depo"), 14:19-15:20; Deposition of Allan Benton ("Benton Depo."), pp. 82:19-83:23.

6. Deny. Zoltek admits that it executed an engagement letter drafted and sent by Scott-Macon that purported to name Scott-Macon as the exclusive placement agent to assist Zoltek in locating investors ("Agreement"). However, at the time Zoltek signed the Agreement, Zoltek believed that Scott-Macon was the exclusive agent for equity-type financing. Rumy Depo, pp.61:24-62:8.

7. Zoltek admits that the Agreement does contain the provision cited by Scott-Macon in this Paragraph. However, Zoltek objects to the characterization of the following provisions:

   a. Scott-Macon was to act as Zoltek's exclusive placement agent only for equity-type financing transactions, Rumy Depo, 62:3-8;

b. At the time of the signing of the Agreement, Zoltek had an ongoing relationship with Equiplace; Scott-Macon was aware of this relationship; and Scott-Macon allowed Zoltek to believe that said relationship would not be affected by the Agreement, Rumy Depo, 24:20-23, 28:14-18, 36:21-37:10, 65:3-7;

c. Admit;

d. Although Scott-Macon used the term "reasonable efforts" in the Agreement, Zoltek understood the term to be interchangeable with "best efforts," Rumy Depo, 58:25-59:1. Alfred Scott understood "reasonable efforts" to mean "that we diligently pursue the assignment and do everything that we can to successfully complete." Scott Depo., pp. 8:19-9:4.

e. Early in their relationship, Scott-Macon represented to Zoltek that they could virtually assure the necessary financing because they had the right investors to make the necessary deals, Rumy Depo, 27:23-28:8.

f. Admits (i)-(vi).

g. Scott-Macon assured Zoltek, at the time of signing the Agreement and all times relevant thereafter, that if Scott-Macon failed to perform adequately, the contract could be canceled at any time, Rumy, 40:4-13, 60:15-17, 71:24-72:13, 71:6-10; Schott Depo, 12:2-14, 61:20-62:1.

h. Admits (i)-(v);

i. Admits that there was such a clause in the Agreement.

8. Admit.

9. Admit.

10. Admit. Despite negotiations between the parties, none of the drafts of the Agreement contained the substantive provisions desired by Zoltek. Rumy Depo., pp. 50:20-23, 60:11-13. However, Scott-Macon assured Zoltek, at all times relevant thereafter, that if Scott-Macon failed to perform adequately, the contract could be canceled at any time. Rumy Depo., 40:4-13, 60:15-17, 71:24-72:13, 71:6-10; Schott Depo., 12:2-14, 61:20-62:1. Zoltek signed the agreement because it believed in Scott-Macon's purported integrity. *Id*. at 66:8-17. Zoltek also was under significant pressure to obtain financing and did not have time to continue to negotiate the terms of the contract. Rumy Depo, 52:6-19, 60:11-61:15.

11. Admit.

12. Admit.

13. Admit.

14. Admit. However, the confidential information memorandum ("CIM") took over a month to create and did not adequately represent Zoltek or its interests. Schott Depo, 123:2-124:7. Although CIM can be created in a matter of days, it typically takes approximately one week to prepare a CIM. *Id*. at 128:15-24. However, in the essence of timing, Zoltek was forced to accept the sub-par CIM. *Id*. at 124:25-125:16.

15. Deny. The citations to the evidence do not support the conclusion. This statement is not entirely supported by the citations to evidence.

16. Admit.

17. Admit.

18. Admit.

19. Deny. Zoltek agrees that Scott-Macon informed Zoltek of some of its efforts, but denies that Scott-Macon kept Zoltek "up-to-date" on a regular basis. Rumy Depo, 84:20-85:15;

Schott Depo, 23:10-12. Scott-Macon never informed Zoltek that it was to shift its focus from "long-term investors" to "hedge funds." Deposition of Allan Benton ("Benton Depo"), 85:17-20. Zoltek admits that Scott-Macon delivered a list after Zoltek informed Scott-Macon that it would no longer honor the exclusivity of the Agreement. Rumy Depo, 89:19-24.

20. Admit.

21. Admit.

22. Admit.

23. Zoltek admits that Scott-Macon recommended to Zoltek that Schott attend all of the in-person meetings, but Scott-Macon did not make it clear as to why Schott's presence was necessary. Rumy Depo, 154:2-6. Scott-Macon never informed Schott that his presences was desired or recommended. Schott Depo, 21:10-20.

24. Admit.

25. Admit.

26. Admit.

27. The citations to the evidence do not support the statement that Zoltek did not discuss the term sheets with Scott-Macon, Cornell, or Ramius. Zoltek admits that Kevin Schott did not discuss the term sheets with Scott-Macon. Schott Depo, 89:24-90:2. Scott-Macon never suggested that the term sheet was a starting point from which negotiations could be begun. Rumy Depo., 17-21.

28. Admit.

29. Admit. During its negotiations with Scott-Macon, Zoltek disclosed to Scott-Macon that it had an on-going relationship with Equiplace. Rumy Depo., pp. 24:20-26:8, 28:14-18, 36:21-37:10, 65:3-7, 127:24-128:4. Allan Benton told Zoltek that Zoltek's relationship with

Equiplace would not be affected by the proposed agreement between Zoltek and Scott-Macon. Rumy Depo., pp. 24:20-23, 28:14-18, 36:21-37:10, 65:3-7, 127:24-128:4. Benton explained to Mr. Rumy that the pre-existing relationship with Equiplace would be unaffected because Equiplace and Scott-Macon targeted different investors, in that Equiplace looked primarily to "hedge fund investors", while Scott-Macon would pursue only "long-term investors." Rumy Depo., pp. 24:3-25:12, 61:24-62:8.

30. Admit. Equiplace sent the Zoltek presentation to Midsummer. Deposition of Michael A. Amsalem ("Amsalem Depo"), 10:17-11:10. Zoltek was unaware of Equiplace's activity. Rumy Depo., 112:15-17.

31. Admit. Equiplace sent the Zoltek presentation to Midsummer. Deposition of Amsalem Depo., 10:17-11:10. Equiplace sent the presentation to Midsummer because it was representing Zoltek in the acquisition of financing. *Id*. at 12:6-15. Zoltek was unaware of Equiplace's activity. Rumy Depo., 112:15-17.

32. This statement is not supported by the evidence cited. Michael A. Amsalem thought he had had a conference call with Zoltek, but could not positively verify the date. Amsalem Depo., 16:11-19:20.

33. Admit.

34. Admit.

35. Admit.

36. Admit.

37. Admit. Zoltek did not share the information with Scott-Macon because Zoltek regularly received such solicitations and such solicitation never materialized. Schott Depo, 32:17-22.

38. Admit.

39. Admit.

40. Admit.

41. This statement is not supported by the evidence cited. Scott Bader believes that a fee agreement was sent on November 4, 2003, but was unable to verify that one was sent because the fee agreement was not attached to the email. Deposition of Scott Bader ("Bader Depo"), 39:21-25.

42. Admit. However, at a later time, Zoltek informed Scott-Macon of the term sheets from Omicron and Midsummer; this disclosure occurred prior to the time that Scott-Macon contacted Midsummer or Omicron. Rumy Depo, 128:5-12.

43. Admit.

44. Deny. This statement mischaracterizes Kevin Schott's testimony. Mr. Schott stated that he, himself, did not inform Scott-Macon about Zoltek's November 12, 2003, meeting with Omincrom; he also stated that he was unaware of whether Zsolt Rumy had informed Scott-Macon of the meeting. Schott Depo, 92:25-93:7.

45. Admit.

46. Admit.

47. Admit.

48. Admit.

49. Admit.

50. Deny. Zoltek admits that Scott-Macon contacted Midsummer and Omicron purportedly to obtain financing for Zoltek. However, Zoltek informed Scott-Macon of the term

sheets prior to the time that Scott-Macon contacted Midsummer or Omnicrom. Rumy Depo, 128:5-12.

51. Admit.

52. Admit.

53. Admit.

54. Admit.

55. Admit.

56. Admit.

57. Admit.

58. Admit.

59. Admit.

60. Admit.

61. Admit.

62. Admit.

63. Admit.

64. Admit.

65. Admit.

66. Admit.

67. Admit.

68. Deny. Zoltek admits that Scott-Macon sent the cited list. However, the cited document does not represent the complete list of investors that allowed for Scott-Macon to claim a recovery fee. The Institutional Investor Contact List was delivered to Zoltek pursuant to § 9(b) of the Agreement, on or about November 19, 2003. Rumy Depo., pp. 89:19-24; Exhibit 10.

69. Admit.

70. Admit.

71. Admit. However, Zoltek refused to pay the final monthly retainer because Scott-Macon was not using reasonable efforts to obtain financing. Rumy Depo, 75:25-76:9. Zoltek did not pay the bill for the "reimbursable expenses" because the expenses were not properly enumerated as to when and why they were incurred. Rumy Depo, 78:11-80:1. The fee and/or warrants were not paid out because Zoltek had terminated the contract prior to the closing of the financing. Rumy Depo, 78:16-21.

**ZOLTEK'S STATEMENT OF ADDITIONAL MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1 THAT REMAIN TO BE TRIED**

The following is a statement of the additional material facts as to which Zoltek Companies, Inc. contends there is a genuine issue to be tried, pursuant to Rule 56.1(b) of the Local Civil Rules.

1. Scott-Macon, Ltd. and Scott-Macon Securities, Inc. are investment bankers who claim to have specific expertise in Zoltek's industry. *See* Scott Depo., pp. 6:2-8, 7:15-22.

2. Scott-Macon, Ltd. and Scott-Macon Securities, Inc., share the same corporate office, located at 800 Third Ave., New York, New York. Scott Depo., pp. 4:2-4; Deposition of Jeffrey Tepper ("Tepper Depo."), pp. 9:8-9.

3. Scott-Macon, Ltd. and Scott-Macon Securities, Inc., use the same phone and facsimile numbers. Tepper Depo., pp. Exhibit F, p. (i); Deposition of Kevin Schott ("Schott Depo."), pp. Exhibit 13, SMS 740-43.

4. Scott-Macon, Ltd. and Scott-Macon Securities, Inc., significant overlap of directors and personnel. Scott Depo., pp. 6:19-7:10. Alfred Scott is President of Scott-Macon, Ltd. and Chairman of Scott-Macon Securities, Inc. Scott Depo., pp. 10:15-20. Allan Benton is

employed as Vice Chairman for both Scott-Macon, Ltd. and Scott-Macon Securities, Inc. Tepper Depo., pp. Exhibit F, p. (i); Schott Depo., pp. Exhibit 13, SMS 742. Robert Dimmitt is also an officer of both companies. Scott Depo., pp. 10:25-11:3.

5. Scott-Macon, Ltd., and Scott-Macon Securities do not "work with a table of organization." Scott Depo., pp. 8:11-12, 11:7-8.

6. With the exception of the Agreement, predominantly all of Scott-Macon's communications were made on Scott-Macon, Ltd., stationery. *See* Schott Depo, Exhibit 13, SMS 740-43; Tepper Depo, Ex. F: SMS 516, 517, 524, 525; Ex. G, Ex. H, SMS 1123; Ex. J; Ex. M.

7. In July 2003, Zoltek entered into an agreement with Equiplace Securities, LLC ("Equiplace"), pursuant to which Equiplace was to serve as a non-exclusive placement agent for Zoltek. The agreement between Zoltek and Equiplace provided that Equiplace would receive a fee for the successful completion of financing from any private placement investor that Equiplace introduced to Zoltek. The Equiplace agreement did not contain a time limitation. Rumy Depo., pp. 110:20-111:9.

8. At the same time Zoltek entered into the agreement with Equiplace, Zoltek began to look into alternate financing possibility than those offered by Equiplace. Rumy Depo., 17:8-10.

9. Zoltek contacted Credit Suisse First Boston ("CSFB") to seek financing prospects. CSFB informed Zoltek that Zoltek's needs were too small for CSFB to handle, but that CSFB had a group of pre-screened investment bank firms that would be more suited to Zoltek's needs. Rumy Depo., 18:6-16. Scott-Macon was one of three firms suggested to Zoltek by CSFB. Rumy Depo., 19:11-16.

10. Zoltek was unaware of the fee agreement between Scott-Macon and CSFB. Scott Depo., 18:11-22; Benton Depo., 35:12-17; Rumy Depo., 20: 12:19-22.

11. Scott-Macon "virtually assured" Zoltek that Scott-Macon had the right investors to obtain financing for Zoltek. Rumy Depo., pp. 27:23-28:8; Benton Depo., pp. 13:20-25, 68:8-10.

12. At the time of the signing of the Agreement, Zoltek had an ongoing relationship with Equiplace. Zoltek had fully disclosed its relationship with Equiplace prior to signing the Agreement. Scott-Macon allowed Zoltek to believe that this relationship would not be affected by the Agreement. Rumy Depo, 24:20-23, 28:14-18, 36:21-37:10, 65:3-7, 127:24-128:4.

13. At the time Zoltek signed the Agreement, Zoltek believed that Scott-Macon was the exclusive agent for only equity-type financing, since Benton had expressly told him that. Rumy Depo., pp. 24:3-25:12, 61:24-62:8. Scott-Macon informed Zoltek that it would not seek investors from the hedge-type funds which Equiplace worked with. Rumy Depo, 24:13-23.

14. Scott-Macon assured Zoltek, at the time of signing the Agreement, and all times relevant thereafter, that if Scott-Macon failed to perform adequately, the contract could be canceled at any time, Rumy, 40:4-13, 60:15-17, 71:24-72:13, 71:6-10; Schott Depo, 12:2-14, 61:20-62:1.

15. None of the drafts of the Agreement contained the provisions which had been discussed between Scott-Macon and Zoltek. Rumy Depo, 50:20-23, 60:11-13. Zoltek signed the agreement, despite the changed terms, because Scott-Macon assured Zoltek that it (Zoltek) could terminate the contract if Scott-Macon failed to perform in a satisfactory manner. *Id*. at 71:11-72:14. Zoltek signed the agreement because it believed in Scott-Macon's purported integrity.

*Id*. at 66:8-17. Zoltek also was under significant pressure to obtain financing and did not have time to continue to negotiate the terms of the contract. Rumy Depo, 52:6-19, 60:11-61:15.

16. The confidential information memorandum ("CIM") took over a month to create and did not adequately represent Zoltek or its interests. Schott Depo, 123:2-124:7. However, because time was of the essence, Zoltek was forced to accept the sub-par CIM. *Id*. at 124:25-125:16.

17. Scott-Macon was targeting "long-term investors;" such investors typically take at least a month to make a firm decision on whether or not to go forward with an investment. Benton Depo, 68:22-25.

18. When Zoltek expressed sincere doubt in Scott-Macon's ability to deliver the necessary financing, Scott-Macon never informed Zoltek that it was to shift its focus from "long-term investors" to "hedge funds." Benton Depo., pp. 85:17-20.

19. By failing to indicate the steps Scott-Macon would take if "long-term" investors elected not to invest in Zoltek, Scott-Macon failed to give Zoltek adequate assurances of performance. Without any assurance that financing could be procured, Zoltek had to seek alternative measures to remain a viable entity. Schott Depo., pp. 13:21-24.

20. On or about November 17, 2003, Rumy sent Benton an email stating that Zoltek could no longer afford to wait for Scott-Macon to procure the necessary financing necessary for Zoltek to maintain its ongoing viability and, therefore, could not continue to honor the exclusivity clause in the Agreement. Rumy Depo., pp. 138:20-139:2, 144:17-145:19, Exhibit 12.

21. Scott-Macon delivered the Institutional Investor Contact List pursuant to § 9(b) of the Agreement, on or about November 19, 2003. Rumy Depo., pp. 89:19-24; Exhibit 10.

Dated: New York, New York
January 7, 2005

KODNER, WATKINS, MUNCHNICK,
DUNNE & WEIGLEY, L.C.

/s/ Gerald M. Dunne
By: ____________________________
Gerald M. Dunne
Attorneys for Defendant
Old Town Executive Office Building
168 N. Meramec Avenue, Suite 200
St. Louis, Missouri 63105-3758
(314) 727-9111
(314) 727-9110 Facsimile

REITLER BROWN & ROSENBLATT LLC

/s/ Craig J. Albert
By: ____________________________
Craig J. Albert, Esq. (CA-0495)
Attorneys for Defendant
800 Third Avenue, 21st Floor
New York, New York 10022
(212) 209-3050