UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| SCOTT-MACON SECURITIES, INC., Plaintiff, -v- ZOLTEK COMPANIES, INC., Defendant. | : | Civ. No. 04 CV 2124 (MBM) |
| ZOLTEK COMPANIES, INC., Plaintiff, -v- SCOTT-MACON LIMITED, Defendant. | : | Civ. No. 04 CV 4896 (MBM) |

**REPLY MEMORANDUM OF LAW OF SCOTT-MACON SECURITIES, INC. IN FURTHER SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT AND OF SCOTT-MACON, LTD. IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Joseph B. Shumofsky (JS 2147)
DORSEY & WHITNEY LLP
250 Park Avenue
New York, NY 10177-1500
(212) 415-9200

Attorneys for

Plaintiff SCOTT-MACON SECURITIES, INC.
and Defendant SCOTT-MACON, LTD.

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ........................................................................................1

A. SCOTT MACON SECURITIES IS ENTITLED TO SUMMARY JUDGMENT AS TO LIABILITY IN THE NEW YORK ACTION...........................................3

1. Zoltek's Purported Termination of the Exclusivity Provisions of the Agreement Was Invalid in View of the Clear and Unambiguous Terms of the Agreement and Constitutes Additional Evidence of Zoltek's Breach. ..3

2. Under ¶ 9 of the Agreement, Scott-Macon Securities is Entitled to Payment of a Placement Fee from Zoltek Pursuant to the Financings that Zoltek Closed with Omicron and Midsummer Capital. ...............................6

3. Scott-Macon Securities Performed Its Obligations Under the Agreement..9

4. Zoltek's Admissions in Its 56.1 Statement Establish Liability Against Zoltek for Breach of Contract. ...................................................................14

5. Zoltek's Claim That It was Fraudulently Induced to Enter into the Agreement Is Meritless. ...............................................................................18

B. SCOTT MACON, LTD. IS ENTITLED TO SUMMARY JUDGMENT IN THE TRANSFERRED ACTION. ...................................................................................22

1. Zoltek's Motion To Amend Is Procedurally Defective. ............................23

2. The Record Demonstrates That Zoltek's Claims Against Scott-Macon, Ltd., Even As Alleged In The Proposed Second Amended Complaint, Are Meritless. ..........................................................................................24

CONCLUSION...........................................................................................................26

# TABLE OF AUTHORITIES

**PAGE**

## FEDERAL CASES

In re Chateaugay Corp., 116 B.R. 887 (Bankr. S.D.N.Y. 1990) ..............................3, 5, 17

Deligiannis v. Pepsico, Inc., 757 F. Supp. 241 (S.D.N.Y. 1991) .....................................18

Fuji Photo Film U.S.A., Inc. v. Aero Mayflower Transit Co., Inc., No. 85 Civ. 4669, 1986 WL 5383 (S.D.N.Y. May 2, 1986)..........................................................24

Happy Dack Trading Co. v. Agro-Industrial, Inc., 602 F. Supp. 986 (S.D.N.Y. 1984)...........................................................................................6

Horizon Plastics, Inc. v. Constance, No. 00 Civ. 6458, 2004 WL 1234049 (S.D.N.Y. June 2, 2004) ......................................................................................24

Manchester Equip. Co., Inc. v. American Way and Moving Co., Inc., 60 F. Supp. 2d 3 (E.D.N.Y. 1999)………………………………………………….................24

Massaro v. Detroit Deisel Corp., 116 F.3d 1472, 1996 WL 738844 (2d Cir. 1996) ...................................................................19,

Morrissey v. General Motors Corp., 21 Fed. Appx. 70, 2001 WL 1313753 (2d Cir. Oct. 23, 2001) .............................................................................4, 19, 21

Mursau Corp. v. Florida Penn Oil & Gas, Inc., 638 F. Supp. 259 (W.D. Pa. 1986).........21

Radobenko v. Automated Equip. Corp., 520 F.2d 540 (9th Cir. 1975)..............................5

Travelers Indem. Co. of Ill. v. CDL Hotels, USA, Inc., 322 F. Supp. 2d 482 (S.D.N.Y. 2004).........................................................................................21

United States v. Wallace & Wallace Fuel Oil Co., Inc., 540 F. Supp. 419 (S.D.N.Y. 1982)...........................................................................................5

## STATE CASES

Ehrlich v. American Moninger Greenhouse, 26 N.Y.2d 255, 309 N.Y.S.2d 341 (1970)..........................................................................6

Garwood v. Sheen & Shine, Inc., 175 A.D.2d 569, 572 N.Y.S.2d 237 (4th Dep't 1991)..........................................................................................................25

Greenfield v. Philles Records, Inc., 98 N.Y.2d 562, 750 N.Y.S.2d 565 (2002)............3, 17

Mallad Construction Corp. v. County Federal Savings and Loan Associate, 32 N.Y.2d 285, 344 N.Y.S.2d 925 (1973).............................................................3

Morris v. New York State Dept. of Taxation, 82 N.Y.2d 135, 141, 603 N.Y.S.2d 807, 810-11 (1993)...............................................................................24, 25

Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp., 92 N.Y.2d 458, 682 N.Y.S.2d 664 (1998).........................................................................13

Uribe v. Merchants Bank of N.Y., 91 N.Y.2d 336, 670 N.Y.S.2d 393 (1998) ...............3, 4

Wegman v. Dairylea Co-op, Inc., 50 A.D.2d 108, 376 N.Y.S.2d 728 (4th Dep't 1975)...............................................................................................25

**FEDERAL STATUTES**

Fed. R. Civ. P. 7(b)................................................................................................23

## PRELIMINARY STATEMENT

In its papers in opposition to summary judgment, Zoltek Companies, Inc. ("Zoltek") relies on after-the-fact, self-serving and conclusory statements in a desperate attempt to create a triable issue of fact and avoid the plain terms of the Agreement. Zoltek's attempts are unavailing. See Memorandum of Law of Zoltek Companies, Inc. in Opp'n to the Mots. of Scott-Macon Securities, Inc. and Scott-Macon, Ltd. for Summ. J. (Def.'s Opp'n). The alleged oral representations that Zoltek offers to suggest that the Agreement does not reflect the negotiations between the parties are belied by the clear and unambiguous language of the contract and are unsubstantiated by any documents. Indeed, the Agreement includes an integration clause that states that the Agreement contains all material terms.

In particular, Zoltek attempts to make issue of whether or not it informed Scott-Macon Securities, Inc. (Scott-Macon Securities") of its double-dealing efforts with other placement agents despite the provision of the Agreement identifying Scott-Macon Securities as Zoltek's exclusive placement agent. Schott Depo. Ex. 15 at ¶ 1. However, the Agreement plainly designated Scott-Macon Securities as Zoltek's exclusive placement agent and clearly provided that, if Zoltek received financing during the life of the Agreement (regardless of through whose efforts that financing was obtained), Scott-Macon Securities is entitled to a placement fee as provided by the Agreement. See Schott Dep. Ex. 15 at ¶¶ 6, 9. The Agreement was clear that the term was for nine months (until June 5, 2004) and thereafter until the unilateral termination by either party upon thirty day written notice and could not be unilaterally terminated beforehand. Schott Depo. Ex. 15 at ¶ 9. Once terminated, the Agreement also provided that Scott-Macon Securities would receive a placement fee for any financing completed within eighteen months of termination received from an investor that Scott-Macon Securities included on its contact list. Id.

Zoltek admits to having received three financings from Omicron Capital L.P. ("Omicron") and Midsummer Capital L.L.C. ("Midsummer") in January, March and October 2004. See Scott-Macon Securities, Inc.'s and Scott-Macon, Ltd.'s Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 in Supp. of Their Mots. for Summ. J. ("Scott-Macon Securities, Inc.'s and Scott-Macon, Ltd.'s 56.1 Statement") ¶¶ 45-46; Zoltek Companies, Inc.'s Responses to Scott-Macon's Rule 56.1 Statement of Undisputed Material Facts ("Zoltek's 56.1 Statement") ¶¶ 45-46. Indeed, Omicron and Midsummer are two of the investors that Scott-Macon Securities contacted on behalf of Zoltek. See Scott-Macon Securities, Inc.'s and Scott-Macon, Ltd.'s 56.1 Statement ¶ 68. Scott-Macon Securities received no payments with respect to such investors. Thus, regardless of when this Court finds that the Agreement was terminated (it is Scott-Macon Securities' position that, at the earliest, the Agreement ended in June 5, 2004 after its initial nine-month term), the three financings entitle Scott-Macon Securities to placement fees under the Agreement.

Accordingly, considering that Scott-Macon Securities performed under the Agreement, see infra part A.3, and that Zoltek has breached the Agreement by, inter alia, working with other placement agents in contravention to the exclusivity provisions of the Agreement and failing to pay placement fees to Scott-Macon Securities, this Court should award summary judgment to Scott-Macon Securities as to liability in the New York Action and to Scott-Macon, Ltd. in the Transferred Action, and assign the New York Action to a magistrate judge for an inquest on damages.

**A. SCOTT MACON SECURITIES IS ENTITLED TO SUMMARY JUDGMENT AS TO LIABILITY IN THE NEW YORK ACTION.**

Zoltek has not raised any issue of material fact that warrants denial of Scott-Macon Securities motion for summary judgment.

**1. Zoltek's Purported Termination of the Exclusivity Provisions of the Agreement Was Invalid in View of the Clear and Unambiguous Terms of the Agreement and Constitutes Additional Evidence of Zoltek's Breach.**

Zoltek claims that ¶ 9 of the Agreement provided that the Agreement could be cancelled at any time pursuant to thirty days' written notice. See Def.'s Opp'n at 12. Zoltek's forced interpretation, however, is belied by the plain and unambiguous terms of the Agreement. "The best evidence of what parties to a written agreement intend is what they say in their writing." Greenfield v. Philles Records, Inc., 98 N.Y.2d 562, 569, 750 N.Y.S.2d 565, 569 (2002); accord In re Chateaugay Corp., 116 B.R. 887, 905 (Bankr. S.D.N.Y. 1990) ("The elementary wisdom of the best evidence rule rests on the fact that the document is a more reliable, complete and accurate source of information as to its contents and meaning than anyone's description . . . .") (quoting Gordon v. United States, 344 U.S. 414, 421 (1953)).

When a contract is complete, clear and unambiguous, extrinsic evidence of the parties' intent should not be considered, and the court should interpret the contract as a matter of law. See Greenfield, 98 N.Y.2d at 569, 750 N.Y.S.2d at 569; Mallad Constr. Corp. v. County Fed. Savings and Loan Assoc., 32 N.Y.2d 285, 291, 344 N.Y.S.2d 925, 930 (1973). A contract is unambiguous if the provisions at issue include language that has "a definite and precise meaning, unattended by danger of misconception." Greenfield, 98 N.Y.2d at 569, 750 N.Y.S.2d at 569; see also Uribe v. Merchants Bank of N.Y., 91 N.Y.2d 336, 341, 670 N.Y.S.2d 393, 396 (1998) (stating that to assess the clarity or ambiguity of a contract provision, a court should consider the

reasonable expectation and purpose of the ordinary businessman and whether the terms are common speech).

Here, the language of the Agreement could not be more clear, unambiguous, or use more simple language, stating: "The Agreement shall continue for a period of nine months and thereafter until the unilateral termination of the agreement by either [Zoltek] or [Scott-Macon Securities] upon at least thirty (30) days written notice to the other party." Schott Depo. Ex. 15 at ¶ 9.[1] Because the Agreement uses plain and clear language, "[it is] entitled to [be] enforced according to its terms . . . [and] not to be subverted by straining to find an ambiguity which otherwise might not be thought to exist." Uribe, 91 N.Y.2d at 341, 670 N.Y.S.2d at 396 (alterations in original).

Zoltek's contrived interpretation that the above-quoted provision permitted it to cancel the exclusivity provisions of the Agreement when it forwarded to Scott-Macon Securities its November 17, 2003 email, see Declaration of Craig J. Albert ("Albert Decl.") ¶ 4, Ex. B, is not supported by the language of ¶ 9. As a matter of law, ¶ 9 is clear on its face that the Agreement was intended to "continue for a period of nine months," and thus, termination prior to that nine-month term is contrary to the stated language of the Agreement, and constitutes a breach of the Agreement. Additionally, ¶ 9 does not provide for the termination of specific provisions of the Agreement while allowing a party to continue to adhere to other provisions. See Morrissey v. General Motors Corp., 21 Fed. Appx. 70, 73, 2001 WL 1313753, at * 3 (2d Cir. Oct. 23, 2001) (holding that a party may not "selectively add or alter contract terms, while affirming the

---

1 All of the relevant deposition transcripts have been attached to the Amended Declaration of Stewart D. Aaron in Support of the Motions for Summary Judgment of Plaintiff Scott-Macon Securities, Inc. and Defendant Scott-Macon, Ltd. ("Aaron Decl."). Citations herein follow the same form as Scott-Macon Securities' and Scott-Macon Ltd.'s moving papers.

contract generally"). Thus, Zoltek could not terminate the exclusivity provisions of the Agreement while purporting to follow the remaining provisions of the Agreement.[2]

Notwithstanding the clear meaning of the Agreement with respect to its termination, Zoltek asks this Court to resort to parol evidence. In support of its constrained interpretation of the Agreement, Zoltek offers only its own self-serving, post hoc testimony that it understood that the Agreement contained a thirty-day cancellation clause and that Scott-Macon Securities allegedly assured Zoltek that it could cancel the Agreement at any time. See Def.'s Opp'n at 13. However, where, as here, a court has before it a clear and unambiguous document, evidence of "post hoc, self-serving statements about [a party's] view of the intent of the parties involved in [a] transaction" are irrelevant and should be disregarded. See In re Chateaugay Corp., 116 B.R. at 905; see also United States v. Wallace & Wallace Fuel Oil Co., Inc., 540 F. Supp. 419, 426 (S.D.N.Y. 1982) (holding that "the parol evidence rule . . . protects written contracts from later self-serving modifications"); Radobenko v. Automated Equip. Corp., 520 F.2d 540, 544 (9th Cir. 1975) (holding that to allow the non-movant to create a genuine issue of material fact based upon self-serving, contradictory depositions undermines "the utility of summary judgment as a procedure for screening out sham issues of fact"), cited in Jeffreys v. P.O. Rossi, 275 F. Supp. 2d 463, 477 (S.D.N.Y. 2003). Thus, even if admissible, Zoltek's defense does not bar summary judgment because it has offered no sufficient evidentiary proof such as documentary evidence or testimony from non-parties that would support its contrived understanding of the Agreement.

---

2 In a January 5, 2004 email from Zoltek to Scott-Macon Securities, discussing the possibility of Scott-Macon Securities securing financing, Zoltek stated that "including your investors will only be possible if you waive the minimum fees in your engagement letter and limit the commissions only to the investors you bring to the total deal." Rumy Dep. Ex. 20. Thus, by referring to the Agreement and inquiring about a waiver of fees, Zoltek viewed the Agreement to still be in effect in January 2004.

See Happy Dack Trading Co. v. Agro-Indus., Inc., 602 F. Supp. 986, 992 n.7 (S.D.N.Y. 1984); see also Ehrlich v. American Moninger Greenhouse, 26 N.Y.2d 255, 309 N.Y.S.2d 341 (1970) (holding in a case where defendant opposed summary judgment on ground that there had been no consideration for note at issue notwithstanding the recital of "value received" on the note, that defendant's conclusory statements regarding the alleged intended purpose of note were insufficient to raise triable issue). Here, Zoltek has offered nothing other than conclusory, self-serving statements simply in an attempt to raise a triable issue of fact, which this Court should ignore as contrary to the clear language of the Agreement.

**2. Under ¶ 9 of the Agreement, Scott-Macon Securities is Entitled to Payment of a Placement Fee from Zoltek Pursuant to the Financings that Zoltek Closed with Omicron and Midsummer Capital.**

Zoltek asserts that, even adopting Scott-Macon Securities' understanding of ¶ 9 of the Agreement, Scott-Macon Securities still is not entitled to fees in connection with the financings that Zoltek closed with Omicron and Midsummer. See Def.'s Opp'n at 14-16. Zoltek's position is meritless. Pursuant to the plain language of the Agreement, Scott-Macon Securities is entitled to a fee for any financing obtained prior to the termination of the Agreement, which in no event could occur prior to June 5, 2004. Schott Depo. Ex. 15 at ¶ 6 ("[Zoltek] will pay [Scott-Macon Securities] by wire transfer on the day of the closing . . . of a Placement, a cash fee (the "Placement Fee") equal to greater of . . . ."), ¶ 9 (stating that termination would not effect Zoltek's obligation to pay a Placement Fee with respect to any Placement closed prior to the date of termination of this Agreement"). Accordingly, it cannot in good faith be disputed that Scott-Macon Securities is entitled to fees for the financings that closed in January and March 2004 (see Scott-Macon Securities' and Scott-Macon, Ltd.'s 56.1 Statement ¶ 45; Zoltek's 56.1 Statement ¶

45), prior to the culmination of the Agreement's initial nine-month term, regardless of which investors provided financing to Zoltek.[3]

Additionally, as provided for in ¶ 9 of the Agreement, in the event that the Agreement is deemed to have been terminated at some point beginning on or after June 5, 2004, following the initial nine-month term, Scott-Macon is entitled to a fee for any financing obtained within eighteen months of the date of termination of the Agreement if the investors from whom Zoltek secured financing were included on Scott-Macon Securities' final and complete list of investors that Scott-Macon Securities contacted in an effort to obtain financing for Zoltek. Schott Depo. Ex. 15 at ¶ 9. Thus, because Zoltek obtained additional financing from Omicron and Midsummer in October 2004 (see Scott-Macon Securities' and Scott-Macon, Ltd.'s 56.1 Statement ¶ 45-46; Zoltek's 56.1 Statement ¶ 45-46), which was within eighteen months of June 5, 2004, and Omicron and Midsummer were both included on the final investor contact list that Scott-Macon Securities provided to Zoltek pursuant to its request on January 5, 2004 (see Scott-Macon Securities' and Scott-Macon, Ltd.'s 56.1 Statement ¶¶ 65, 68; Zoltek's 56.1 Statement ¶ 65), Scott-Macon Securities is entitled to a fee for the October 2004 financing.

Zoltek asserts incorrectly that the final investor contact list that Scott-Macon Securities provided to Zoltek was a November 19, 2003 list, which did not include Omicron and

---

3 The Agreement contemplated that all efforts would be coordinated through Scott-Macon Securities. Schott Depo. Ex. 15 ¶¶ 1-2. Zoltek's argument that Scott-Macon Securities was intended to serve as the exclusive placement agent only for the purposes of locating financing from long-term investors, as opposed to hedge funds or other types of investors, is belied by the Agreement itself. Paragraph 1 states that Scott-Macon Securities was the exclusive placement agent for financings obtained from "one or more Institutional Investors," defined to include "any bank, savings institution, trust company, insurance company, investment company . . . any private investment fund or hedge fund, pension or profit sharing trust, broker-dealer, or other financial institution, institutional buyer, or 'accredited investor' . . . ." Schott Depo. Ex. 15 at ¶ 1. The Agreement, on its face, does not make any distinctions or limitations as to the types of institutional investors for which Scott-Macon Securities served as Zoltek's exclusive placement agent. See infra part A.5.

Midsummer. See Def.'s Opp'n at 14. First, for purposes of financings that closed during the initial nine-month term of the Agreement, whether or not the investors from whom Zoltek received financing were on Scott-Macon Securities' investor contact list is irrelevant. The Agreement provided simply that Zoltek is obligated to "pay a Placement Fee with respect to any Placement closed prior to the effective date of . . . termination" of the Agreement. Schott Depo. Ex. 15 at ¶ 9. Second, Zoltek's contention that Scott-Macon Securities' November 19, 2003 contact list is the controlling document with respect to those investors for which Scott-Macon Securities may claim to be owed a fee from Zoltek is based on Zoltek's contorted reading of ¶ 9 of the Agreement, which is unfounded. See supra part A.1. Because the Agreement, as a matter of law, was still in effect after November 19, 2003, the November 19, 2003 list is not dispositive for purposes of this Agreement. Instead, the January 8, 2004 list, which includes Omicron and Midsummer, is the latest list that was provided to Zoltek, pursuant to Zoltek's own solicitations, and is relevant for purposes of ¶ 9 of the Agreement, relating to financings following termination of the Agreement for which Scott-Macon Securities is entitled to a placement fee.[4]

---

4 Zoltek alleges that it had informed Scott-Macon Securities of its dealings with Omicron and Midsummer (see Def.'s Opp'n at 16), and contends that Scott-Macon Securities did not contact Omicron or Midsummer independently, but rather pursuant to information received from Zoltek. Thus, Zoltek argues that Scott-Macon Securities did not expend any efforts on behalf of Zoltek in contacting Omicron and Midsummer and should not be entitled to a placement fee with respect to the Omicron and Midsummer financings.

Once again, Zoltek's assertions are based on nothing other than Zoltek's own post-hoc, self serving statements. There is not a shred of documentary evidence that substantiates that Zoltek informed Scott-Macon Securities about its relationship with G. Koppolow & Associates ("Gilbert Koppolow"), Omicron or Midsummer. This is merely another desperate attempt by Zoltek to establish a triable issue of fact. While Zoltek asserts that it informed Scott-Macon Securities of its dealings with Omicron and Midsummer prior to Scott-Macon Securities contacts with those investors, it is important to take note that Zoltek admitted to hiding from Gilbert Koppolow and Omicron that Scott-Macon Securities was working on Zoltek's behalf and to lying to Gilbert Koppolow and Omicron regarding the continuation of Zoltek's relationship with Scott-Macon Securities when specifically asked by Gilbert

**3. Scott-Macon Securities Performed Its Obligations Under the Agreement.**

Zoltek correctly stated that "[it] is axiomatic that, in order for Scott-Macon [Securities] to recover, it must show that it performed its obligations under the Agreement." Def.'s Opp'n at 16 (citing cases). Indeed, the evidence demonstrates and Zoltek itself has admitted that Scott-Macon Securities performed under the Agreement. Paragraph 4 of the Agreement outlined Scott-Macon Securities' obligations to Zoltek. Schott Depo. Ex. 15 at ¶ 4. Zoltek acknowledges that Scott-Macon:

- performed due diligence on Zoltek and its finances and recommended a structure for any secured financing pursuant to ¶ 4(a), see Zoltek's 56.1 Statement ¶¶ 11-13;

- prepared an executive summary and confidential information memorandum ("CIM") in consultation with Zoltek pursuant to ¶ 4(b), see Zoltek's 56.1 Statement ¶ 14;

---

Koppolow and Omicron. See Scott-Macon Securities' and Scott-Macon, Ltd.'s 56.1 Statement ¶¶ 53-58; Zoltek's 56.1 Statement ¶ 53-58.

Zoltek's assertion that it had informed Scott-Macon Securities of its relationships with Equiplace and Gilbert Koppolow is further belied by Zoltek's own actions. If the parties truly had, as Zoltek, asserts, an understanding that Zoltek's relationships with other placement agents were not in contravention of the exclusivity provision of the Agreement, it would have been unnecessary for Zoltek to send the November 17, 2003 email to Scott-Macon Securities that purportedly terminated the exclusivity provision, see Albert Decl. ¶ 4, Ex. B, because the parties already would have been operating under a prior understanding.

In any event, ¶ 2 of the Agreement provides that Zoltek "will not initiate any discussions regarding a Placement except through Scott-Macon," and ¶ 1 provides that Scott-Macon Securities is the "exclusive placement agent" to Zoltek. Thus, even assuming Zoltek had told Scott-Macon about Koppolow, Omicron and/or Midsummer, Zoltek is in breach of the Agreement because it pursued discussions without Scott-Macon Securities, and did not pay the fees due to Scott-Macon Securities under ¶¶ 6, 9. Notably, ¶¶ 6 and 9 require Zoltek to pay fees to Scott-Macon upon the closing of a Placement; such payment is due even though Scott-Macon Securities was excluded from the transaction. Schott Depo. Ex. 15 at ¶¶ 1-2, 6, 9. Thus, even assuming Zoltek's contrived version of the facts were true, summary judgment as to liability is appropriate.

- contacted prospective investors and provided interested investors with a copy of the CIM pursuant to ¶ 4(d), see Zoltek's 56.1 Statement ¶¶ 16, 18, 20;
- coordinated meetings between potential investors and Zoltek pursuant to ¶ 4(e), see Zoltek's 56.1 Statement ¶¶ 21-22, 25, 67; and
- solicited proposals from interested investors pursuant to ¶ 4(f), see Zoltek's 56.1 Statement ¶¶ 26, 66, 69.

Furthermore, the evidence reflects that Scott-Macon Securities prepared a list of investors to contact on behalf of Zoltek and provided Zoltek with a copy of such a list periodically pursuant to ¶ 4(c) of the Agreement. See Scott-Macon Securities' and Scott-Macon, Ltd.'s 56.1 Statement ¶¶ 15, 19. While Zoltek denied that Scott-Macon Securities performed these duties, see Zoltek's 56.1 Statement ¶¶ 15, 19, a review of the evidence makes clear that Zoltek's denials are nothing more than additional feeble attempts to create non-existent issues of fact. The citations in support of Scott-Macon Securities' assertion that it formulated a list of potential investors and updated that list over time is irrefutable. See Scott-Macon Securities' and Scott-Macon, Ltd.'s 56.1 Statement ¶ 15. Zoltek inexplicably denies Scott-Macon Securities' allegation and states that the citations to evidence do not support Scott-Macon Securities' conclusion. Zoltek, however, fails to offer any alternative citations to the record and fails to explain how Scott-Macon Securities' citations to the record are not appropriate.

Additionally, while Zoltek denies that Scott-Macon Securities kept Zolt Rumy ("Rumy"), the CEO of Zoltek, "up-to-date" about its efforts to locate financing for Zoltek, Rumy admitted in his deposition that Scott-Macon Securities provided him with documents to advise him of the contacts Scott-Macon Securities was making on behalf of Zoltek. Rumy Depo. 90:16-20. In addition, Kevin Schott ("Schott"), the CFO of Zoltek, testified at his deposition that Scott-Macon Securities was "keeping Mr. Rumy up-to-date" about the efforts it was making to secure

financing for Zoltek. Schott Depo. 23:5-9. Thus, Zoltek's denials of these allegations is confounding.[5]

In connection with the pending motion, Zoltek has conceded that Scott-Macon Securities undertook the following specific acts on behalf of Zoltek:

- contacted 263 potential investors, see Zoltek's 56.1 Statement ¶ 20;
- sent CIMs to 55 potential investors, see Zoltek's 56.1 Statement ¶ 18;
- arranged and coordinated eight in-person meetings with potential investors, see Zoltek's 56.1 Statement ¶ 21;
- located two potential investors who, in December 2003, offered to invest \$8 million and \$4 million, respectively, in Zoltek, see Scott-Macon Securities' and Scott-Macon, Ltd.'s 56.1 Statement ¶ 20; and
- worked on behalf of Zoltek into January 2004 and contacted Zoltek to advise that Scott-Macon Securities had located additional investors interested in investing up to \$9.5 million in Zoltek, see Zoltek's 56.1 Statement ¶¶ 66, 69.[6]

Nonetheless, despite all of the substantial efforts that Zoltek admits Scott-Macon expended on Zoltek's behalf, Zoltek argues that Scott-Macon Securities did not exercise reasonable efforts under the Agreement merely as another desperate attempt to create a triable issue of fact where none exists. See Def.'s Opp'n 16-19. Zoltek argues that Scott-Macon

5 Zoltek's attempts to demonstrate that Scott-Macon Securities did not fulfill its obligations pursuant to ¶ 4(c) of the Agreement by not preparing the list of institutional investors "in consultation with [Zoltek]," see Def.'s Opp'n at 15-16, are meritless. Scott-Macon Securities did provide the contacts lists to Zoltek for its review and comment. Indeed, it is Zoltek that breached ¶ 4(c) of the Agreement by never furnishing to Scott-Macon Securities a list of all investors with whom Zoltek had contacts prior to Scott-Macon Securities' retention as Zoltek's exclusive placement agent.

6 Scott-Macon Securities accomplished all of this, particularly locating investors willing to invest up to \$9.5 million in Zoltek, despite Zoltek's double-dealings with other placement agents including Equiplace Securities, LLC ("Equiplace") and Gilbert Koppolow in violation of the exclusivity provisions of the Agreement, which undermined Scott-Macon Securities' efforts.

Securities "delayed contacting potential investors until October 3, 2003." See id. at 18. Of course, Zoltek conveniently chooses to disregard that between September 5, 2003, the date the Agreement was executed, and October 3, 2003, Scott-Macon Securities did not waste time, but rather was engaged in preparing the CIM with Zoltek's assistance and formulating the list of potential investors to contact.

Zoltek also asserts incredulously that the CIM that Scott-Macon Securities drafted was "sub-par." See Zoltek's 56.1 Statement ¶ 14. Curiously, despite alleging that the CIM "did not adequately represent Zoltek or its interests," Zoltek admits that it assisted Scott-Macon Securities in preparing the CIM. See Scott-Macon Securities' and Scott-Macon, Ltd.'s 56.1 Statement ¶ 14; Zoltek's 56.1 Statement ¶ 14. Moreover, Zoltek is a sophisticated company. See Scott-Macon Securities' and Scott-Macon, Ltd.'s 56.1 Statement ¶ 1; Zoltek's 56.1 Statement ¶ 1. Surely, Zoltek would not have permitted Scott-Macon Securities to send out the CIM on Zoltek's behalf, if Zoltek believed that the CIM did not represent Zoltek's interests adequately.

These allegations with respect to the purported failings of the CIM are merely another example of Zoltek's offerings of after-the-fact, self serving statements. Of course, when specifically asked at his deposition to identify those sections of the CIM that are inadequate, Schott could not identify a single section. Schott Depo. 123:6-124:7. Also, there is not a single piece of documentary evidence that Zoltek could point to, to substantiate Zoltek's assertion that it believed the CIM was deficient and that it shared those feelings with Scott-Macon Securities.

Zoltek further contends that it did not receive adequate assurances from Scott-Macon Securities of its performance. See Def.'s Opp'n at 18. [7] This assertion is flatly contradicted by

---

7 Zoltek incorrectly stated that it was within its rights to demand adequate assurances of performance from Scott-Macon Securities. See Def.'s Opp'n at 18. A party is entitled to demand assurance of future performance when reasonable grounds for insecurity exist. See

the record and admissions of Zoltek. Zoltek admitted that Scott-Macon Securities continued working on behalf of Zoltek through December 2003 and January 2004. See Scott-Macon Securities' and Scott-Macon, Ltd.'s 56.1 Statement ¶¶ 63-67, 69-70; Zoltek's 56.1 Statement ¶¶ 63-67, 69-70. Furthermore, in correspondence that Zoltek received from Scott-Macon Securities, Scott-Macon Securities reiterated its commitment to continue to work to obtain financing for Zoltek. For example, in a January 6, 2004 letter to Zoltek, advising Zoltek that certain investors were interested in provided financing up to $6.5 million, Scott-Macon Securities stated: "We continue to be highly focused on assisting Zoltek in successfully completing this financing on a timely basis." Rumy Depo. Ex. 21. Similarly, in a January 12, 2004 letter, informing Zoltek that Scott-Macon Securities had located investors interested in providing up to $9.5 million, Scott-Macon Securities stated: "We look forward to continuing to work with you to complete the amount of financing that meets your strategic objectives." Aaron Decl. ¶ 20, Ex. S. Finally, in a January 22, 2004 letter to Zoltek, Scott-Macon Securities conveyed to Zoltek that it was interested in moving ahead with a $5 million financing from investors that Scott-Macon Securities located and awaited direction from Zoltek. Rumy Depo. Ex. 22.[8]

---

Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp., 92 N.Y.2d 458, 464-66, 682 N.Y.S.2d 664,668-69 (1998). Here, Zoltek had no basis for believing that Scott-Macon Securities would not continue to perform its obligations under the Agreement. Furthermore, while the court in Norcon, extended the doctrine of adequate assurances to non-UCC contract cases, the court only extended the doctrine to apply to the type of long-term commercial and complex contracts at issue in that case. See id. 92 N.Y.2d at 468, 682 N.Y.S.2d at 670. In Norcon, one of the parties performance was years away, and performance was unknown absent demanding adequate assurances. See id. Such factors were absent with respect to the Agreement at issue here, and the doctrine of adequate assurances does not apply to the present context.

8 On January 5, 2004, Zoltek sent an email to Scott-Macon Securities stating that it was seeking Omicron's permission to include the investors that Scott-Macon Securities identified

It is evident that Scott-Macon Securities expended substantial efforts on behalf of Zoltek pursuant to the Agreement. Zoltek has not presented any sufficient evidence, other than post-hoc, self serving statements, to attempt to demonstrate that Scott-Macon Securities did not exercise reasonable efforts that would justify finding a triable issue of fact.[9] As a matter of law, Scott-Macon Securities performed all of its duties under the Agreement.

**4. Zoltek's Admissions in Its 56.1 Statement Establish Liability Against Zoltek for Breach of Contract.**

By its communications and relationships with Equiplace, Gilbert Koppolow, Omicron and Midsummer, Zoltek violated the provisions of the Agreement that designated Scott-Macon Securities as Zoltek's exclusive placement agent and required Zoltek "to promptly inform" Scott-Macon Securities of any third-party interest with respect to investing in Zoltek. Schott Depo. Ex. 15 at ¶¶ 1-2. Despite that the terms of the Agreement required that Zoltek work exclusively with Scott-Macon Securities, Zoltek admitted that "[a]t the same time that Scott-Macon Securities was expending efforts on behalf of Zoltek to secure financing, Zoltek was working with another

---

in the Omicron led financing. Scott-Macon Securities' and Scott-Macon, Ltd.'s 56.1 Statement ¶ 65; Zoltek's 56.1 Statement ¶ 65. While Rumy testified at his deposition that Zoltek sought Omicron's permission, Rumy Depo. 184:20-186:12, Omicron, an objective non-party to this action, stated that Zoltek never informed Omicron that Scott-Macon Securities had identified other potential investors to join in the transaction or requested permission to include those investors in the transaction. Bernstein Depo. 37:8-20. It is apparent that Zoltek never brought the possibility to Omicron's attention because Omicron would have realized that it had been lied to by the Company. See Scott-Macon Securities' and Scott-Macon, Ltd.'s 56.1 Statement ¶¶ 53-61; Zoltek's 56.1 Statement ¶ 53-61.

9 It is important to keep in mind that while the Agreement obligated Scott-Macon Securities to undertake certain efforts and perform several tasks on behalf of Zoltek, the Agreement was clear that at no time was Scott-Macon Securities required to guarantee or successfully obtain financing for Zoltek. Schott Depo. Ex. 15 at ¶ 3 ("It is understood that execution of this Agreement does not assure the successful completion of the Placement, or any portion thereof, and that Scott-Macon is undertaking the Placement on a 'reasonable efforts' basis.").

placement agent." See Scott-Macon Securities' and Scott-Macon, Ltd.'s 56.1 Statement ¶ 28; Zoltek's 56.1 Statement ¶ 28.

Indeed, at the outset of its contractually exclusive business relationship with Scott-Macon Securities, Zoltek already was working with another placement agent, Equiplace, thereby placing Zoltek in breach upon execution of the Agreement. See Scott-Macon Securities' and Scott-Macon, Ltd.'s 56.1 Statement ¶ 29; Zoltek's 56.1 Statement ¶ 29. Pursuant to its non-exclusive relationship with Zoltek, inter alia, Equiplace reached out to Midsummer on behalf of Zoltek, leading to a conference call between Midsummer and Zoltek in late October 2003. See Scott-Macon Securities' and Scott-Macon, Ltd.'s 56.1 Statement ¶¶ 30-33; Zoltek's 56.1 Statement ¶¶ 30-33. In addition to breaching the exclusivity provisions of the Agreement, Zoltek was obligated to promptly inform Scott-Macon Securities of Zoltek's contact with Midsummer.[10]

Additionally, on October 17, 2003, Zoltek began to receive communications from Gilbert Koppolow, which quickly led to a conference call between Zoltek and Omicron on November 3, 2003, the receipt of a term sheet from Omicron and a fee agreement from Gilbert Koppolow on November 4, 2003, and a meeting between Zoltek and Omicron at Zoltek's offices, at which Gilbert Koppolow was present, on November 12, 2003. See Scott-Macon Securities' and Scott-Macon, Ltd.'s 56.1 Statement ¶¶ 36-44; Zoltek's 56.1 Statement ¶¶ 36-44. Zoltek did not promptly advise Scott-Macon Securities of its contacts with Gilbert Koppolow and Omicron. See Scott-Macon Securities' and Scott-Macon, Ltd.'s 56.1 Statement ¶¶ 37, 42, 44; Zoltek's 56.1 Statement ¶¶ 37, 42, 44. The communications that Zoltek had with Gilbert Koppolow and

10 Even assuming that Zoltek had advised Scott-Macon Securities of its contact with Midsummer, which is denied, Zoltek nevertheless is in breach of the Agreement because Zoltek initiated discussions with Midsummer without going through Scott-Macon Securities (breach of ¶ 2), and did not pay Scott-Macon Securities the fees due in respect of the Midsummer Placement (breach of ¶¶ 6, 9).

Omicron violated Zoltek's contractual obligations to deal with Scott-Macon Securities exclusively and to promptly inform Scott-Macon Securities of a third-party's interest in financing.

As it turned out, it was Zoltek's communications with Gilbert Koppolow and Omicron that ultimately resulted in the three financings that Omicron headed, in which Midsummer participated and for which Gilbert Koppolow was the placement agent. See Scott-Macon Securities' and Scott-Macon, Ltd.'s 56.1 Statement ¶¶ 45-47; Zoltek's 56.1 Statement ¶¶ 45-47. It is evident that Zoltek's double-dealing undermined Scott-Macon Securities' efforts because by the time that Scott-Macon Securities contacted Omicron and Midsummer, Scott-Macon Securities learned that those investors already had been in contact with Zoltek independent of Scott-Macon Securities and that those investors refused to deal with Scott-Macon Securities because they were already dealing with Zoltek. See Scott-Macon Securities' and Scott-Macon, Ltd.'s 56.1 Statement ¶¶ 51-52; Zoltek's 56.1 Statement ¶¶ 51-52.

Zoltek again offers its own after-the-fact, self-serving statements in another attempt to create a triable issue and ignore the plain terms of the Agreement. Zoltek conveniently asserts that it did advise Scott-Macon Securities of its communications with Equiplace, Gilbert Koppolow, Omicron and Midsummer and that despite the terms of the Agreement, the parties understood that Scott-Macon Securities would act as Zoltek's exclusive placement agent only for long-term investors and not hedge funds. See Def.'s Opp'n at 19. Such a statement is disproved, however, by the plain terms of the Agreement, which provide that from the commencement of its relationship with Zoltek, Scott-Macon Securities would be Zoltek's exclusive placement agent for hedge funds, among other types of investors. Schott Depo. Ex. 15 at ¶ 1.

It is unnecessary to refer to extrinsic evidence considering that the Agreement's terms clearly set forth the parties' responsibilities. See In re Chateaugay Corp., 116 B.R. at 903; Greenfield, 98 N.Y.2d at 569, 750 N.Y.S.2d at 569. The Agreement is a complete and integrated contract. Accepting Zoltek's unsubstantiated allegations would invalidate the exact intention of the parol evidence rule. See Greenfield, 98 N.Y.2d at 569, 750 N.Y.S.2d at 569 ("The best evidence of what parties to a written agreement intend is what they say in their writing."). Once again there is not a scintilla of documentary evidence to confirm that Zoltek shared any of information regarding its relationships with Equiplace, Gilbert Koppolow, Omicron or Midsummer with Scott-Macon Securities.[11] Accordingly, what this Court is left with to consider is Zoltek's conclusory, self-serving statements, which are insufficient to defeat summary judgment or contradict that, as a matter of law, Zoltek breached the Agreement. See In re

[11] There is concrete evidence, however, that Zoltek hid information from Gilbert Koppolow and Omicron about the nature and status of its relationship with Scott-Macon Securities. Zoltek admitted that it lied to Gilbert Koppolow and Omicron, representing that Zoltek had ended its relationship with Scott-Macon Securities and that Scott-Macon Securities no longer sought financing for Zoltek, when that was not the case. See Scott-Macon Securities' and Scott-Macon, Ltd.'s 56.1 Statement ¶¶ 53-58; Zoltek's 56.1 Statement ¶¶ 53-58. Zoltek's admission to its lie underscores that it is inclined to engage in a pattern of double-dealing, playing one placement agent off another in an effort to obtain as much financing as possible for itself regardless of its outstanding contractual obligations.

Zoltek's attempts to dispute that it hid its relationship with Scott-Macon Securities from Omicron are disconcerting. Zoltek brazenly states that it did share the details of its relationship with Scott-Macon Securities with Omicron and even prepared an SEC disclosure statement with respect to its relationship with Scott-Macon Securities in connection with the financing that closed in January 2004. See Def.'s Opp'n at 15 n.6. Yet, by its own admissions, Zoltek knows that its disclosures to Omicron came only after Omicron learned of Scott-Macon Securities' involvement pursuant to telephone calls from Scott-Macon Securities. It was Omicron who requested the preparation of the SEC disclosure statement addressing the relationship between Zoltek and Scott-Macon Securities because of Omicron's concern about Scott-Macon Securities' involvement. See Scott-Macon Securities' and Scott-Macon, Ltd.'s 56.1 Statement ¶¶ 51-61; Zoltek's 56.1 Statement ¶¶ 51-61. Despite Zoltek's obvious defiance, it expects this Court to believe that "[a]t all relevant times, Zoltek acted in good faith under the Agreement." See Def.'s Opp'n at 19.

Chateaugay Corp., 116 B.R. at 905 (holding that evidence of "post hoc, self-serving statements about [a party's] view of the intent of the parties involved in [a] transaction" are irrelevant and should be disregarded.); Wallace & Wallace, 540 F. Supp. at 426 (S.D.N.Y. 1982) (holding that "the parol evidence rule . . . protects written contracts from later self-serving modifications").

**5. Zoltek's Claim That It was Fraudulently Induced to Enter into the Agreement Is Meritless.**

Zoltek believes that it can establish triable issues of fact based on alleged oral representations that Scott-Macon Securities offered to Zoltek, which allegedly fraudulently induced Zoltek to enter into the Agreement. See Def.'s Opp'n at 20-22. Zoltek is wrong.

To establish a claim for fraudulent inducement, a party must show: (1) a misrepresentation, (2) fraudulently uttered, (3) with intent to induce reliance, (4) inducing justifiable reliance, and (5) resulting in injury. See Deligiannis v. Pepsico, Inc., 757 F. Supp. 241, 253 (S.D.N.Y. 1991). Here, Zoltek claims that Scott-Macon Securities made the following misrepresentations (or omissions) to Zoltek :

- misrepresenting that Scott-Macon Securities had the expertise and experience necessary to obtain financing for Zoltek;
- misrepresenting that Scott-Macon Securities had investors lined up to invest in Zoltek;
- misrepresenting that the exclusivity provision of the Agreement would not be enforced with respect to placement agents looking into hedge funds;
- misrepresenting that Zoltek could terminate the Agreement upon thirty days written notice at any time;
- failing to disclose the financial relationship between Scott-Macon Securities and Credit Suisse First Boston ("CSFB").

See Def.'s Opp'n at 20-22. Regardless that Scott-Macon Securities denies that it made any of these alleged misrepresentations to Zoltek, none of these alleged misrepresentations (or omissions) can sustain a claim for fraudulent inducement or defeat summary judgment.

A claim for fraudulent inducement "cannot be based solely upon the failure to perform the promises that served as consideration for the contract itself." Deligiannis, 757 F. Supp. at 254. As consideration for the Agreement, Scott-Macon Securities was to assist Zoltek to secure financing. Alleged misrepresentations regarding Scott-Macon Securities' expertise, experience or ability to locate investors, directly relate to Scott-Macon Securities' ability to perform under the Agreement and the consideration for the Agreement. Thus, such alleged misrepresentations cannot support a claim for fraudulent inducement.

Additionally, a claim for fraudulent inducement is not cognizable where a party was aware of the alleged fraud of which it now complains. See Morrissey, 21 Fed. Appx. at 73, 2001 WL 1313753, at * 2; see also Massaro v. Detroit Deisel Corp., 116 F.3d 1472, 1996 WL 738844, at *3 (2d Cir. 1996) (holding that a party cannot claim reasonable reliance upon an alleged misrepresentation for purposes of maintaining a claim for fraudulent inducement where party was on notice that oral representations were not part of contract, particularly where a party admits its suspicions caused it to raise concerns with the other party). Here, Zoltek has admitted that it consciously signed the Agreement, which contained an integration clause, Schott Depo. Ex. 15 at ¶ 17, despite that the Agreement did not include certain oral representations that Scott-Macon Securities allegedly made during negotiations. The integration clause states: "This Agreement contains the complete agreement between the parties with respect to the subject matter hereof and supersedes any prior understandings, agreements or representations by or between the parties, written or oral." Schott Depo. Ex. 15 at ¶ 17.

During negotiations, Zoltek admits that it exchanged drafts of the Agreement with Scott-Macon Securities and was represented by outside counsel and its CEO, who had negotiated agreements with placement agents on prior occasions. See Scott-Macon Securities' and Scott-

Macon, Ltd.'s 56.1 Statement ¶¶ 8-10; Zoltek's 56.1 Statement ¶¶ 8-10. Furthermore, at his deposition, Rumy testified that the drafts of the Agreement that he received from Scott-Macon Securities purportedly did not reflect certain oral representations that he had received from Scott-Macon Securities during negotiations, including alleged representations that Zoltek could continue to work with other placement agents to obtain financing. Rumy also stated that he allegedly expressed his dissatisfaction to Scott-Macon Securities on several occasions that the draft Agreement was "totally inconsistent" with the parties' negotiations, yet the Agreement was never changed to include different terms. Despite Scott-Macon Securities' alleged refusal to amend the draft Agreement to reflect the parties' negotiations, Rumy testified that he nonetheless signed the Agreement. Rumy Depo. 36:4-13, 40:14-23, 49:2-17, 50:3-7, 50:17-23, 60:7-14, 61:24-62:25, 67:5-25, 71:6-10.[12]

Accordingly, Zoltek was on notice before executing the Agreement that Scott-Macon Securities refused to include any of the alleged oral representations made during negotiations in the Agreement. To prove fraudulent inducement, however, a party must demonstrate reasonable

---

12 During negotiations of the Agreement, Scott-Macon Securities received handwritten suggested comments from Thompson Coburn, on behalf of Zoltek. See Declaration of Joseph B. Shumofsky in Support of Motions for Summary Judgment of Plaintiff Scott-Macon Securities, Inc. and Defendant Scott-Macon, Ltd. ("Shumofsky Decl.") ¶ 3, Ex. B. A review of those handwritten comments reveals that Zoltek's own counsel did not suggest any changes to the exclusivity provision of the Agreement. Indeed, the handwritten comments reveal no suggestion, for example, that hedge funds be carved out of the Agreement considering that allegedly the parties agreed that Scott-Macon Securities would not target hedge funds. Similarly, there is no suggested language to indicate that although the Agreement designated Scott-Macon Securities as Zoltek's exclusive placement agent, Zoltek's continued relationship with Equiplace would not be a problem in view of the parties alleged agreement to that effect. Additionally, while there are suggested changes to ¶ 9, regarding the term of the Agreement, there is no suggested language to indicate that Zoltek could terminate the Agreement at any time even though Zoltek states that was also an agreement between parties. Thus, despite Zoltek's representation that the parties reached certain oral agreements that were not included in the final version of the Agreement, Zoltek itself did not even attempt to ensure that those alleged oral agreements were reflected in the Agreement when given the opportunity.

reliance on an alleged material misrepresentation. See Massaro, 116 F.3d 1472, 1996 WL 738844, at *3. Being fully aware, it was Rumy's decision whether or not to proceed. Zoltek's reliance on Scott-Macon Securities' alleged oral promises during negotiations, which were directly contradicted by the plain terms of the Agreement, was unreasonable as a matter of law. See Morrissey, 21 Fed. Appx. at 73, 2001 WL 1313753, at * 2-3. Thus, Zoltek cannot claim that it was fraudulently induced to enter into the Agreement based on those alleged oral representations.

Finally, allegedly failing to disclose the financial relationship between Scott-Macon Securities and CSFB also cannot establish a claim for fraudulent inducement. CSFB referred Zoltek to Scott-Macon Securities for purposes of obtaining financing. Pursuant to a referral agreement that Scott-Macon Securities has with CSFB, CSFB was entitled to a referral fee. Benton Depo. 8:20-10:12. Scott-Macon Securities owed no duty to Zoltek to disclose the details of its financial relationship with CSFB, and Zoltek cites no case law to the contrary. See Travelers Indem. Co. of Ill. v. CDL Hotels, USA, Inc., 322 F. Supp. 2d 482, 499 (S.D.N.Y. 2004) ("When dealing with a claim of fraud based on material omissions, it is settled that a duty to disclose arises only when one party has information that the other party is entitled to know because of a fiduciary or other similar relation of trust or confidence between them. When parties deal at arm's length in a commercial transaction, no relation of confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances.") (citations omitted); see also Mursau Corp. v. Florida Penn Oil & Gas, Inc., 638 F. Supp. 259, 261-62 (W.D. Pa. 1986) (holding that nondisclosure to buyer of limited partnership that law firm seller retained would receive finder's fee if deal closed was insufficient to support fraud claim).

Furthermore, information regarding the financial relationship between Scott-Macon Securities and CSFB was immaterial to Zoltek's decision to enter the Agreement. Zoltek knew that CSFB referred Zoltek to Scott-Macon Securities and that an agreement relating to referrals existed between Scott-Macon Securities and Credit Suisse First Boston. See Zoltek's Statement of Additional Material Facts Pursuant to Local Rule 56.1 that Remain to be Tried ("Zoltek's Additional 56.1 Statement") ¶ 9; Scott-Macon Securities, Inc.'s and Scott-Macon, Ltd.'s Response to Zoltek's Statement of Additional Material Facts Pursuant to Local Rule 56.1 that Remain to be Tried ¶ 10 ("Scott-Macon Securities, Inc.'s and Scott-Macon, Ltd.'s 56.1 Response Statement"). Despite being on notice of a referral relationship between Scott-Macon Securities and CSFB, Zoltek never inquired about the specifics of that relationship. Moreover, although Zoltek alleged a counterclaim in the New York Action for fraudulent concealment based on, inter alia, Scott-Macon Securities' failure to disclose details about its referral arrangement with CSFB, Zoltek never requested a copy of the referral agreement from Scott-Macon Securities during discovery. Once again, Zoltek is attempting to make an issue where there truly is none.

**B. SCOTT MACON, LTD. IS ENTITLED TO SUMMARY JUDGMENT IN THE TRANSFERRED ACTION.**

Zoltek claims that summary judgment in the Transferred Action is inappropriate at this time because Zoltek's motion for leave to file a second amended complaint, which allegedly will address the failings of the First Amended Petition, was still pending when the Missouri Court transferred the Transferred Action to this Court. See Def.'s Opp'n at 22; Shumofsky Decl. at ¶ 4-5, Exs. C-D (attaching Zoltek's motion to amend and Proposed Second Amended Compl. and Scott-Macon, Ltd.'s opposition to that motion).[13] Despite that Zoltek's motion to amend is

[13] In its decision, the Missouri Court stated that "given the existence of the forum selection clause [contained in the Agreement at ¶ 16 and providing that each party submits to the

procedurally defective, the record developed through discovery does not support any claim against Scott-Macon, Ltd.

**1. Zoltek's Motion To Amend Is Procedurally Defective.**

Under Rule 7(b) of the Federal Rules of Civil Procedure, a motion "shall state with particularity the grounds therefor . . . ." Fed. R. Civ. P. 7(b). Rule 7(b) governs Zoltek's motion to amend. *See* Moore's Federal Practice, § 15.17[1], at 15-66 (3d ed. 2004) ("All motions, including requests for leave to amend, must satisfy Rule 7, which requires a party to set forth with particularity the relief requested and the grounds supporting the request." (footnote omitted)).

Zoltek's motion is defective because it does not set forth with particularity the grounds for its motion to amend. Rather, in a one-sentence motion, Zoltek states in a conclusory manner that "the interests of justice would be best served by reinstating all claims in the Complaint against Scott-Macon Securities, Inc." Nowhere does Zoltek explain why Scott-Macon Securities was dropped as a defendant from the First Amended Petition or why this Court should permit the amendment considering that the New York Action already involves the exact same subject matter, names Scott-Macon Securities as a party, and includes Zoltek's counterclaims against Scott-Macon Securities.

jurisdiction of New York in any case arising out of the Agreement], the Court believes that the plaintiff's decision to sue in St. Louis is indicative of bad faith and appears to be little more than a preemptive strike." Aaron Decl. ¶ 13 at Ex. L. Zoltek's claims in its opposition that the Agreement contains a "permissive New York 'service of suit' clause," and that it acted in good faith to sue in Missouri pursuant to prevailing doctrine holding that, under such clauses, a party may choose to commence an action in an alternative forum. See Def.'s Opp'n at n.2. Presumably, Judge Limbaugh was familiar with the same "prevailing doctrine" on which Zoltek relies, yet still found Zoltek's conduct to have been in bad faith.

**2. The Record Demonstrates That Zoltek's Claims Against Scott-Macon, Ltd., Even As Alleged In The Proposed Second Amended Complaint, Are Meritless.**

To pierce the corporate veil with respect to related companies, a party must establish that "(1) the [parent company] exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury." Morris v. New York State Dept. of Taxation, 82 N.Y.2d 135, 141, 603 N.Y.S.2d 807, 810-11 (1993); see also Manchester Equip. Co., Inc. v. American Way and Moving Co., Inc., 60 F. Supp. 2d 3, 7 (E.D.N.Y. 1999). The evidence does not satisfy this standard.

Scott-Macon, Ltd. is not the alter-ego of Scott-Macon Securities. While there is overlap between the two companies with respect to personnel and business location, there is no evidence that Scott-Macon, Ltd. exercised control over the business relationship at issue here. See Fuji Photo Film U.S.A., Inc. v. Aero Mayflower Transit Co., Inc., No. 85 Civ. 4669, 1986 WL 5383, at *3 (S.D.N.Y. May 2, 1986) (citing Rapid Transit Subway Const. Co. v. City of New York, 259 N.Y. 472 (1932) (holding that possessing all common officers and sharing office space are insufficient to disregard the "separate personality" of a subsidiary corporation); see generally Horizon Plastics, Inc. v. Constance, No. 00 Civ. 6458, 2004 WL 1234049, at *4 (S.D.N.Y. June 2, 2004) (holding that sharing office space and staff members does not indicate influence exercised rose to level of dominance required under New Jersey law). Additionally, to suggest that Scott-Macon Securities was the agent of Scott-Macon, Ltd. is equally baseless. The Agreement on its face shows that the parties to the Agreement are Zoltek and Scott-Macon Securities. There is no evidence that indicates that, in entering into the Agreement, Zoltek was intending to rely on the expertise of Scott-Macon, Ltd. See Def.'s Opp'n at 25. Here, Zoltek could only point to the fact that Scott-Macon Securities sometimes inadvertently used the

stationery of Scott-Macon, Ltd. See Zoltek's Additional 56.1 Statement ¶ 6; Scott-Macon Securities, Inc.'s and Scott-Macon, Ltd.'s 56.1 Response Statement ¶ 6.

Regardless of the alleged control that Scott-Macon, Ltd. exercised over Scott-Macon Securities,

> domination standing alone, is not enough; some showing of a wrongful or unjust act . . . is required. The party seeking to pierce the corporate veil must establish that the [parent company], through [its] domination, abused the privilege of doing business in the corporate form to perpetuate a wrong or injustice against the party such that a court in equity will intervene.

Morris, 82 N.Y.2d at 141-42, 603 N.Y.S.2d at 811. Here, Zoltek makes no attempt to meet this standard. There is no evidence that Scott-Macon Limited used its purported control of Scott-Macon Securities to perpetrate a fraud on Zoltek. Rather, Zoltek is merely alleging that Scott-Macon Limited (and/or Scott-Macon Securities) made false representations to Zoltek. Thus, in these circumstances, there is no basis to hold Scott-Macon, Ltd. liable for Scott-Macon Securities alleged wrongful conduct, and Zoltek's claims against Scott-Macon Limited are unfounded.[14]

---

14 In any event, the motion to amend should be denied because Zoltek's claims in the Proposed Second Amended Complaint are legally insufficient. First, Zoltek's fraud claim, contained in Count II of its proposed Second Amended Complaint, is premised upon three purported misrepresentations that directly relate to Scott-Macon Securities' performance under the Agreement. See Shumofsky Decl. ¶ 4, Ex. C at ¶ 6. The language of the Agreement belies these alleged representations. Schott Depo. Exc. 15 at ¶ 3-4. Such representations cannot properly form the basis of a fraud claim under New York law because they relate to the very breach of contract alleged in Count I. See Garwood v. Sheen & Shine, Inc., 175 A.D.2d 569, 569, 572 N.Y.S.2d 237, 237 (4th Dep't 1991) ("The complaint fails to state a legally sufficient cause of action for fraud because the only fraud alleged relates to the breach of the employment contract."); see also Wegman v. Dairylea Co-op, Inc., 50 A.D.2d 108, 113, 376 N.Y.S.2d 728, 735 (4th Dep't 1975) ("[i]t is recognized that a cause of action for fraud will not arise when the only fraud relates to a breach of contract.") (citation omitted) (alteration in original).

**CONCLUSION**

For the reasons stated above, and for the reasons stated in Scott-Macon Securities and Scott-Macon, Ltd.'s moving brief, it is respectfully requested that Scott-Macon Securities' motion for summary judgment as to liability in the New York Action be granted in all respects. It is further requested that Zoltek's counterclaims in the New York Action be dismissed in their entirety. It is further requested that the New York Action be referred to a magistrate judge to determine the amount of damages due to Scott-Macon Securities and whether an award of specific performance with respect to the warrants owed is appropriate. Finally, it is further requested that Scott-Macon, Ltd.'s motion for summary judgment in the Transferred Action be granted in all respects.

Dated: January 28, 2005

DORSEY & WHITNEY LLP

By: /s/
Joseph B. Shumofsky (JS 2147)
250 Park Avenue
New York, New York 10177
(212) 415-9200

Attorneys for Plaintiff Scott-Macon Securities, Inc. and Defendant Scott-Macon, Ltd.

---

Second, as pled, Zoltek's breach of contract claim also is deficient. Zoltek asserts that Scott-Macon Securities "breached the [September 5, 2003] Agreement, by failing to use its best efforts to obtain financing for Zoltek . . . ." Shumofsky Decl. ¶ 4, Ex. C at ¶ 8 (emphasis added). As pled, this allegation of breach is fatally deficient because it misstates the obligation of Scott-Macon Securities under the Agreement. The Agreement calls for Scott-Macon Securities to use only "reasonable efforts," not best efforts. Schott Depo. Ex. 15 ¶ 3. Thus, even assuming that Scott-Macon Securities did not use its "best efforts" in performing under the Agreement, it did not breach the Agreement, because its efforts still were reasonable. See supra part A.3.