MICHAEL B. MUKASEY, U.S.D.J.

These two actions arise from a September 5, 2003 contract between Scott-Macon Securities and Zoltek Companies ("Zoltek") for the placement of investments in Zoltek. In the first case ("New York action"), Scott-Macon Securities brings various state law claims against Zoltek. In the second ("Transferred Action"), transferred to this court from the United States District Court for the Eastern District of Missouri, Zoltek sues Scott-Macon Limited for breach of contract and fraudulent misrepresentation. Jurisdiction is based on the diverse residences of the parties. See 28 U.S.C. § 1332. Scott-Macon Securities moves for partial summary judgment as to liability in the first action and Scott-Macon Limited moves for summary judgment dismissing the second action. For the reasons set forth below, both motions are granted.

I.

The following facts, viewed in the light most favorable to Zoltek, are relevant to this opinion.

A.    Zoltek - Scott-Macon Relationship

Zoltek is a Missouri company that processes carbon fiber to create building material. Zsolt Rumy is the founder and Chief Executive Officer of Zoltek. (Scott-Macon Securities and Scott-Macon Ltd.'s Statement of Undisputed Material Facts

1

Pursuant to Local Rule 56.1 ("Scott-Macon Rule 56.1 Statement")
at ¶ 1)  In 2003, Zoltek consulted investment bankers to help
locate financing.  (Id. ¶ 2)  Scott-Macon Securities is an
investment banking company that is a wholly-owned subsidiary of
Scott-Macon Limited, a Delaware corporation.  (Id. ¶ 3)  Scott-
Macon Securities performs private placements and raises financing
for its clients, usually in amounts of $5 million to $30 million,
and has worked with companies in the chemical industry.  (Id.)

        Around July 2003, Zoltek contacted Credit Suisse First
Boston ("CSFB") to seek financing.  (Zoltek Companies' Statement
of Additional Material Facts Pursuant to Local Rule 56.1 ("Zoltek
Rule 56.1 Statement") at ¶ 9)  Zoltek's needs were too small for
CSFB to handle, so CSFB suggested a group of pre-screened
investment banking firms more suited to Zoltek's needs.  (Id.)
Scott-Macon was one of these.[1]  (Id.)  Zoltek claims that it was
unaware Scott-Macon and CSFB had a fee agreement for referrals.
(Id. ¶ 10)  Scott-Macon responds that although it did not discuss
with Zoltek the details of the fee agreement before Scott-Macon
and Zoltek themselves entered into a contract, "Zoltek was clear
that CSFB referred Zoltek to Scott-Macon and that an agreement
relating to referrals existed between Scott-Macon and [CSFB]."
(Scott-Macon Securities' and Scott-Macon Ltd.'s Response to

_____

        [1]    Unless noted otherwise, "Scott-Macon" hereafter refers
to Scott-Macon Securities.

Zoltek's Statement of Additional Material Facts Pursuant to Local Rule 56.1 ("Scott-Macon Rule 56.1 Response") at ¶ 10)

On July 31, 2003, Rumy, on behalf of Zoltek, met with Allan Benton, Vice-Chairman of Scott-Macon, and Jeffrey Tepper, Managing Director of Scott-Macon Securities, at Scott-Macon's offices in New York. (Scott-Macon Rule 56.1 Statement ¶ 4) Zoltek advised Scott-Macon that January 15, 2004 was Zoltek's deadline to obtain financing. Zoltek claims that it also made clear to Scott-Macon that in order to put the financing in place by that deadline, the financing had to appear "viable" no later than December 15, 2003. (Zoltek Companies' Response to Scott-Macon's Local Rule 56.1 Statement of Undisputed Material Facts ("Zoltek Rule 56.1 Response") at ¶ 5)

On September 5, 2003, Zoltek and Scott-Macon executed an engagement letter (the "Agreement"; Ex. 15 to Dep. of Kevin Schott ("Schott Dep.")). The Agreement provides that Scott-Macon

> will serve as the exclusive placement agent to [Zoltek] in connection with the placement of equity and/or debt securities of [Zoltek] (a "Placement") with one or more Institutional Investors. An "Institutional Investor" for purposes of this Agreement means any bank, savings institution, trust company, insurance company, investment company as defined in the Investment Company Act of 1940, any private investment fund or hedge fund, pension or profit sharing trust, broker-dealer, or other financial institution, institutional buyer, or "accredited investor" as that term is defined by Rule 501 of Regulation D of the Securities Act of 1933.

3

(Agreement ¶ 1)

According to the Agreement, Zoltek would refrain from initiating any discussion of a placement except through Scott-Macon during the term of the Agreement. (Agreement ¶ 2) In addition, Zoltek was obligated to "promptly inform" Scott-Macon of any inquiry or indication of interest it received from a third party regarding investment in Zoltek. (Id.) Although "[i]t [was] understood that execution of [the] Agreement [did] not assure the successful completion of the Placement, or any portion thereof," Scott-Macon was obligated to exercise "reasonable efforts" to secure financing for Zoltek. (Agreement ¶ 3) Zoltek claims that it understood "reasonable efforts" "to be interchangeable with 'best efforts.'" (Zoltek Rule 56.1 Response ¶ 7) Zoltek claims also that Scott-Macon represented early in their relationship that they "could virtually assure the necessary financing because they had the right investors to make the necessary deals." (Zoltek Rule 56.1 Response ¶ 7; Zoltek Rule 56.1 Statement ¶ 11) Scott-Macon responds that it "merely advised Zoltek that it 'had experience in placing securities with investors and that [it] believed that [it] knew investors would have an interest in [Zoltek] . . . would understand [Zoltek's] business and be in a position to invest. Potentially.'" (Scott-Macon Rule 56.1 Response ¶ 11)

Under the Agreement, Scott-Macon was to provide the

4

following services:

1.  Perform due diligence on Zoltek and its finances and recommend a structure for any secured financing;

2.  Prepare an executive summary and confidential information memorandum ("CIM") in consultation with Zoltek;

3.  Prepare a list of investors to be contacted by Scott-Macon and provide Zoltek with a copy of the list;

4.  Contact prospective investors on the list and provide interested investors with a copy of CIM upon execution of a confidentiality agreement;

5.  Coordinate meetings between potential investors and Zoltek; and

6.  Solicit proposals from interested investors.

(Agreement ¶ 4; Scott-Macon Rule 56.1 Statement ¶ 7)  Although the term of the Agreement was "for nine months and thereafter until the unilateral termination of [the Agreement] by either [party] upon at least thirty (30) days written notice to the other party" (Agreement ¶ 9), Zoltek claims that Scott-Macon assured it at the time of signing that if Scott-Macon failed to perform adequately, the contract could be canceled at any time. (Zoltek Rule 56.1 Response ¶ 7)

For its services, Scott-Macon was to receive:

1.  an initial retainer;

2.   monthly retainers for a total of three months;

3.   reimbursement for expenses;

4.   a fee and warrants to purchase shares of Zoltek stock
     if Zoltek received financing during the term of the
     Agreement; and

5.   a fee and warrants to purchase shares of Zoltek stock
     if Zoltek received financing, within 18 months of
     termination of the Agreement, from an investor included
     on the list of investors allegedly contacted by Scott-
     Macon.  This list was to be provided to Zoltek within
     30 days after termination of the Agreement.

(Agreement ¶¶ 5-7, 9; Scott-Macon Rule 56.1 Statement ¶ 7)  The
Agreement includes a merger clause, which states that it is "the
complete agreement between the parties . . . and supersedes any
prior understandings, agreements or representations by or between
the parties, written or oral."  (Agreement ¶ 17; Scott-Macon Rule
56.1 Statement ¶ 7)  In addition, the Agreement could "not be
amended or waived except in a writing executed by the party
against which such amendment or waiver is sought be enforced."
(Agreement ¶ 17)

        Despite the exclusivity clause in the Agreement, Zoltek
had an ongoing relationship with Equiplace Securities, another
private placement firm, at the time it signed the Agreement.
Zoltek asserts that Scott-Macon was fully aware of this

relationship with Equiplace. (Zoltek Rule 56.1 Response ¶¶ 7, 29) Specifically, Zoltek claims that Benton assured Rumy that Zoltek's relationship with Equiplace would not be affected by the Agreement because Equiplace and Scott-Macon targeted different investors, Equiplace with "hedge fund investors" and Scott-Macon with "long-term investors." (Id. ¶ 29) Scott-Macon responds that "it was understood that Scott-Macon Securities was undertaking its responsibilities as Zoltek's placement agent on an exclusive basis, and nothing was discussed between Scott-Macon Securities and Zoltek to provide for 'carve-outs' in the Agreement for any parties with whom Zoltek may have been working." (Scott-Macon Rule 56.1 Response ¶ 12)

Before the Agreement was signed, Zoltek received drafts and discussed the terms of the Agreement with its outside legal counsel, Thompson Coburn LLP, who had an opportunity to review a draft. On August 27, 2003, Rumy forwarded to Scott-Macon Thompson Coburn's comments on the draft. (Scott-Macon Rule 56.1 Statement ¶ 8) Rumy reviewed the final version of the Agreement before signing it. (Id. ¶ 10) Zoltek maintains that "[d]espite negotiations between the parties, none of the drafts of the Agreement contained the substantive provisions desired by Zoltek." (Zoltek Rule 56.1 Response ¶ 10) "However," according to Rumy, "Scott-Macon assured Zoltek, at all times relevant thereafter, that if Scott-Macon failed to perform adequately, the

contract could be canceled at any time."  (Id.; Rumy Dep. 40)
Zoltek signed the Agreement "because it believed in Scott-Macon's
purported integrity" and "was under significant pressure to
obtain financing and did not have time to continue to negotiate
the terms of the contract."  (Zoltek Rule 56.1 Response ¶ 10;
Rumy Dep. 52, 60-61)

On August 26, 2003, before execution of the Agreement,
Scott-Macon provided Zoltek with proposed term sheets, suggesting
the types of financing that Scott-Macon believed Zoltek should
pursue.  (Scott-Macon Rule 56.1 Statement ¶ 11)  Zoltek forwarded
these proposals to Thompson Coburn and shared Thompson Coburn's
comments with Scott-Macon.  (Id.)  On September 23, 2003, Scott-
Macon sent revised term sheets to Zoltek.  (Id.)  In an August
26, 2003 letter, Benton also solicited due diligence materials
from Zoltek, including financial projections and cash flow
statements.  (Id. ¶ 12)

On September 9, 2003, Benton and Tepper of Scott-Macon
visited Zoltek's offices in St. Louis, Missouri to meet with Rumy
and Kevin Schott, Zoltek's Chief Financial Officer.  They
discussed Zoltek's business, a general plan for raising financing
for Zoltek, and the CIM.  (Id. ¶ 13)  After the meeting, Scott-
Macon drafted a CIM with the assistance of Zoltek.  (Id. ¶ 14)
Zoltek claims that the drafting took more than one month, and the
result "did not adequately represent Zoltek or its interest" and

that "in the essence of timing, Zoltek was forced to accept the sub-par CIM." (Zoltek Rule 56.1 Response ¶ 14)  Scott-Macon attributes "any additional time required to complete the [CIM to] Zoltek's failure to provide Scott-Macon with timely feedback, the disarray of Zoltek's company projections and the need to reformat the model explaining those projections." (Scott-Macon Rule 56.1 Response ¶ 16)  In addition, Scott-Macon asserts that the CIM "included the necessary information for a potential investor to adequately evaluate Zoltek and determine whether to invest." (Id.)

On October 3, 2003, Scott-Macon began contacting potential investors and ultimately reached 263 of them. (Scott-Macon Rule 56.1 Statement ¶ 20)  CIM's were sent to 55 potential investors. (Id. ¶ 18)  If a potential investor expressed interest, Scott-Macon sent a "teaser," which consisted of a concise overview of the executive summary contained in the CIM and a confidentiality agreement. (Id. ¶ 16)  If the investor signed the confidentiality agreement (or if Zoltek waived confidentiality), Scott-Macon sent the investor the entire CIM. (Id.)  Scott-Macon followed up with investors to whom CIM's had been sent and maintained a log of all activity related to securing financing for Zoltek. (Id.)  The log contained a list of the potential investors Scott-Macon contacted, the date that contacts were made, and a description of the activity. (Id. ¶

17)   Scott-Macon also kept logs of who received CIM's and their level of interest in Zoltek.  (Id. ¶ 18)

Initially, "long-term investors" were targeted.  After these investors expressed little interest in providing financing to Zoltek, Scott-Macon changed its focus to the hedge fund market.  (Scott-Macon Rule 56.1 Response ¶ 17)  Eventually, Scott-Macon coordinated in-person meetings with eight separate investors over a span of three weeks, the first on November 5, 2003 with Angelo Gordon & Company, who later would express interest in joining a placement procured by Zoltek through another placement agent.  (Scott-Macon Rule 56.1 Statement ¶ 21)  Rumy and Benton attended all eight meetings.  (Id. ¶ 22)  Schott did not attend any, despite Scott-Macon's recommendation that he do so.  (Id. ¶ 23)  Rumy never asked Schott to attend the meetings.  (Id. ¶ 24)  In addition to the in-person meetings, Scott-Macon also coordinated telephone conference calls with investors.  (Id. ¶ 25)

On November 17, 2003, Rumy sent Benton an e-mail stating that Zoltek could no longer afford to wait for Scott-Macon to secure the financing necessary for Zoltek to continue business.  (Zoltek Rule 56.1 Statement ¶ 20; Ex. B to Declaration of Craig Albert ("Albert Decl."))  Although he "realize[d] that the contract [the two parties had] is best effort basis," Rumy asserted that he could "not allow this process to proceed on an

exclusive basis." (Ex. B to Albert Decl.)  In addition, he
informed Benton that Zoltek had begun working already with other
placement agents.  (Id.)

In December 2003, Scott-Macon received term sheets
concerning proposed investments in Zoltek from two investors
Scott-Macon had contacted, Cornell Capital Partners ("Cornell")
on December 4 and Ramius Capital Group ("Ramius") on December 12.
(Scott-Macon Rule 56.1 Statement ¶ 26)  Both sets of term sheets
were forwarded to Zoltek.  (Id.)

Although Zoltek admits that Scott-Macon informed Zoltek
"of some of its efforts" in obtaining financing and that "from
time to time" sent lists of solicited investors (Rumy Dep. 84-85,
90; Schott Dep. 23), Zoltek denies that Scott-Macon "kept it 'up-
to-date' on a regular basis."  (Zoltek Rule 56.1 Response ¶ 19)
In particular, Zoltek claims that Scott-Macon never alerted
Zoltek that it "was to shift its focus from 'long-term investors'
to 'hedge funds.'"  (Id.)  Scott-Macon responds that under the
Agreement, Zoltek knew that Scott-Macon "was permitted to target
all types of institutional investors," including hedge funds.
(Scott-Macon Rule 56.1 Statement ¶ 18)

B.   Other Placement Agents

In July 2003, before Scott-Macon entered the picture,
Zoltek hired Equiplace as Zoltek's non-exclusive placement agent
to help locate and secure financing.  (Id. ¶ 29)  Under their

agreement, Equiplace would receive a fee for the successful completion of any private placement with any investor that Equiplace introduced to Zoltek. (Id.) Their agreement did not include a termination date and was in effect at the time Zoltek executed the Agreement with Scott-Macon (Id.) Zoltek dealt primarily with Paul Gorski at Equiplace. (Id.)

On October 16, 2003, Gorski contacted Scott Kaufman of Midsummer Capital about an investment in Zoltek. (Scott-Macon Rule 56.1 Statement ¶ 30) On October 20, Equiplace sent Midsummer a presentation regarding Zoltek. Scott-Macon claims that two days later, Midsummer had a telephone conference call with Zoltek. (Id. ¶ 32) On November 4, 2003, Midsummer received an e-mail from Gorski inquiring whether Midsummer had reviewed materials regarding Zoltek that Gorski had forwarded to Midsummer and whether Midsummer was interested in investing in Zoltek. (Id. ¶ 33)

Meanwhile, on October 17, 2003, Zoltek's Schott received a telephone call from Gilbert Koppolow, principal of G. Koppolow & Associates, another placement agent. (Id. ¶¶ 34-35) Koppolow asked Schott whether Zoltek needed help with financing. (Id. ¶ 35) Schott responded that Zoltek was seeking financing actively and would consider Koppolow's proposals. (Id.) Schott informed Rumy of Koppolow's call and Rumy advised Schott that he could communicate further with Koppolow. (Id.) Zoltek never

notified Scott-Macon of Koppolow's call because "Zoltek regularly received such solicitations and such solicitation never materialized." (Id. ¶ 37)

Koppolow contacted Richard Bader, who assisted Koppolow in locating potential investors for companies. (Id. ¶ 38) On October 31, 2003, Koppolow and Bader called Omicron Capital ("Omicron") and spoke with Bruce Bernstein, Omicron Co-President, to discuss the possibility of investing in Zoltek. (Id. ¶ 39)

On November 3, 2003, Schott, Bernstein, Koppolow, and Bader discussed that topic via telephone conference call. (Id. ¶ 40) Scott-Macon claims that on the same day, Omicron sent Bader a proposed term sheet for investing in Zoltek.[2] (Id. ¶ 41) The next day, Bader forwarded the term sheet and a standard fee agreement to Schott by e-mail. (Id.) Zoltek did not tell Scott-Macon that it had received this term sheet until a later date. (Zoltek Rule 56.1 Response ¶ 42)

On November 12, 2003, at Rumy's invitation, Bernstein and Bruce Daly of Omicron met with Rumy, Schott, Koppolow, and Bader in Zoltek's St. Louis office. The parties discussed an overview of Zoltek, and Omicron was given a tour of Zoltek's offices and facilities. (Scott-Macon Rule 56.1 Statement ¶ 43)

_____

[2]     Zoltek responds that although Bader believes that a fee agreement was sent on November 4, he was unable to verify it because the fee agreement was not attached to the e-mail. (Zoltek Rule 56.1 Response ¶ 41)

Scott-Macon and Zoltek dispute whether Zoltek ever informed
Scott-Macon about this November 12, 2003 meeting.  (<u>Id.</u> ¶ 44;
Zoltek Rule 56.1 Response ¶ 44)

With G. Koppolow & Associates as the placement agent
(<u>id.</u> ¶ 47), Omicron invested in Zoltek as follows: (i) a $7
million placement that closed in January 2004; (ii) a $5.75
million placement that closed in March 2004; and (iii) a $20
million  placement that closed in October 2004.  (Scott-Macon
Rule 56.1 Statement ¶ 45)  At Omicron's invitation, Midsummer
participated in all three financings.  (<u>Id.</u> ¶ 46)  Zoltek
executed a fee agreement with G. Koppolow & Associates with
respect to these financings and eventually paid pursuant to that
agreement.  (<u>Id.</u> ¶ 48-49)

Scott-Macon itself contacted Midsummer and Omicron to
inquire about their interest in Zoltek.  (<u>Id.</u> ¶ 50)  On December
5, 2003, Scott-Macon's Benton called Michael Amsalem, President
of Midsummer, to discuss an investment in Zoltek.  (Scott-Macon
Rule 56.1 Statement ¶ 51)  Amsalem told Benton that he could not
work with Scott-Macon because he was negotiating already with
Zoltek.  (<u>Id.</u>)

One day earlier, Benton contacted Bernstein of Omicron
to discuss investing in a carbon fiber company.  (<u>Id.</u> ¶ 52)
Bernstein expressed interest.  (<u>Id.</u>)  On December 12, Benton
called Bernstein again and specified Zoltek as the investment

opportunity. (Id.) Bernstein ended the conversation without disclosing that Omicron already was negotiating with Zoltek. (Id.) Later that same day, Bernstein called Bader to ask about Scott-Macon's involvement in obtaining financing for Zoltek. (Id. ¶ 53) He was concerned that the Zoltek investment opportunity was being shopped to other investors. (Id.)

Scott-Macon claims that these contacts with Omicron and Midsummer "were totally independent [of Zoltek] and came from our initiation." (Benton Dep. at 64) Zoltek responds that Zoltek had informed Scott-Macon of its negotiations with Omicron and Midsummer (Zoltek Rule 56.1 Response ¶ 50), although at his deposition, Rumy was unsure of when exactly this communication occurred. (Rumy Dep. at 128)

Before receiving the call from Bernstein, neither G. Koppolow & Associates nor Bader knew of Scott-Macon's relationship with Zoltek. (Scott-Macon Rule 56.1 Statement ¶ 54) Bader contacted Schott at Zoltek to express concern that Scott-Macon had contacted Omicron and had some relationship with Zoltek. (Id. ¶ 55) Schott responded, "As of this morning, Zsolt [Rumy] has shut down Scott-Macon from talking to other potential investors. There should be no more problems." (Id. ¶ 56) However, Schott had not spoken to Rumy about Omicron's or Bader's concerns and was never told by Rumy that Scott-Macon had been "shut down." (Id. ¶ 57) Schott did not want Bader or Omicron to

15

worry about Scott-Macon's relationship with Zoltek.  (Id. ¶ 58)

Bernstein of Omicron insisted that Zoltek's relationship with Scott-Macon and any potential fee due to Scott-Macon be disclosed in the closing documents to be filed with the Securities and Exchange Commission ("SEC").  (Id. ¶ 59)  Thompson Coburn drafted a document disclosing Zoltek's relationship with Scott-Macon and send it to Omicron's counsel, Bryan Cave, who in turn forwarded it to Omicron.  (Id. ¶ 60)  It disclosed Zoltek's belief that its Agreement with Scott-Macon did not apply to the transactions with Omicron and that no fee would be due to Scott-Macon in connection with the Omicron-led financings.  (Id.)  Although Omicron believes that the disclosure was included in the documents filed with the SEC in relation to the three Omicron-led financings, no documents in the SEC filings mention Scott-Macon.  (Id.)

Despite Schott's assurance to Bader and Omicron that Scott-Macon's efforts on behalf of Zoltek had been "shut down," Scott-Macon continued to solicit and negotiate with investors for Zoltek through December 2003 and January 2004.  (Id. ¶ 63)  In January 2004, Scott-Macon contacted Zoltek about potential investors interested in participating in the Omicron-led financings.  (Id. ¶ 64)  Zoltek replied that it would discuss with Omicron whether Omicron wanted additional investors involved in the financings.  (Id.)

On January 5, 2004, Rumy sent an e-mail to Benton of Scott-Macon stating that Zoltek was aware of the investors who wanted to "piggy back onto the Omicron financing" and that Zoltek had sought Omicron's permission to include those investors in the transaction. (Id. ¶ 65; Ex. 20 to Rumy Dep.) Rumy requested from Benton a list of the potential investors and all investors that Scott-Macon had contacted on behalf of Zoltek. (Ex. 20 to Rumy Dep.) Rumy asserted also that unless Scott-Macon would waive the minimum fees as specified in the Agreement, the potential investors could not be included in the Omicron financing. (Id.) The next day, Benton sent Rumy a letter advising that Angelo Gordon & Company, Treeline Investment Partners, and SF Capital were interested in investing approximately $6 million to $6.5 million in Zoltek. (Scott-Macon Rule 56.1 Statement ¶ 66; Ex. 21 to Rumy Dep.)

On January 7, Benton sent Rumy an e-mail stating that Bluegrass Growth Fund Partners was interested in scheduling a telephone conference call with Zoltek to discuss financing. (Scott-Macon Rule 56.1 Statement ¶ 67; Ex. 22 to Rumy Dep.) On January 8, Benton forwarded Rumy a list of the investors that Scott-Macon had contacted on behalf of Zoltek. (Scott-Macon Rule 56.1 Statement ¶ 68) The list included Omicron and Midsummer. (Id.; Ex. M to Deposition of Jeffrey Tepper ("Tepper Dep."))

Zoltek claims that this list did not represent the

complete list of investors upon which Scott-Macon could claim a recovery fee and that instead Scott-Macon had delivered the relevant list on November 19, 2003, after Zoltek had notified Scott-Macon that it could no longer honor the exclusivity clause of the Agreement. (Zoltek Rule 56.1 Response ¶ 68)

On January 12, Benton sent Rumy an e-mail informing him that Angelo Gordon & Company, Treeline Investment Partners, SF Capital, and Bluegrass Growth Fund Partners were interested in investing in Zoltek on the same terms as the Omicron financing, and that their combined investment would be between $6.5 million and $9.5 million. (Scott-Macon Rule 56.1 Statement ¶ 69; Ex. S to Declaration of Stewart Aaron ("Aaron Decl.")) On January 22, Benton sent Schott a letter stating that Scott-Macon remained interested in helping Zoltek to secure financing and had investors interested in coordinating their efforts with Omicron and Midsummer. (Scott-Macon Rule 56.1 Statement ¶ 70; Ex. 23 to Rumy Dep.) In addition, Benton inquired whether Zoltek had received permission from Omicron to include in any financing the group of investors Scott-Macon had assembled. (Ex. 23 to Rumy Dep.)

Zoltek did not pursue financings with the additional investors assembled by Scott-Macon who had expressed interest in joining the Omicron-led financings. (Bernstein Dep. at 37)

Scott-Macon claims that it is entitled to (i) payment

18

of the December monthly retainer; (ii) reimbursement of Scott-Macon's allowable expenses pursuant to the Agreement; and (iii) fees and warrants to purchase shares of Zoltek stock in connection with any financings that Zoltek concluded with Omicron and Midsummer.  (Id. ¶ 71)  Zoltek claims that (i) it refused to pay the December monthly retainer because the Agreement had effectively been terminated on November 17, 2003 due to Scott-Macon's failure to use "reasonable efforts" in locating financing for Zoltek; (ii) it did not pay the fee and warrants for the same reason; and (iii) it did not pay bills for expenses exceeding $10,000 because these expenses had not been approved by Zoltek in advance.  (Zoltek Rule 56.1 Response ¶ 71)

C.    Procedural History

On March 17, 2004, Scott-Macon Securities sued Zoltek in this court for breach of contract and breach of implied covenant of good faith and fair dealing.  In addition to fees and expenses due under the Agreement, Scott-Macon sued for specific performance to compel issuance of warrants to purchase Zoltek common stock, or equivalent damages.  Zoltek moved to dismiss or transfer the case to the Eastern District of Missouri, where Zoltek had commenced an action on February 27, 2004 against Scott-Macon Limited for breach of contract and fraudulent inducement.

Judge Stephen Limbaugh of the Eastern District of

Missouri transferred the case initiated by Zoltek to this district. Zoltek v. Scott-Macon, Ltd., No. 04-376 (E.D. Mo. June 2, 2004). Thereafter, Zoltek withdrew its motion to dismiss or transfer the New York Action, and filed its answer as well as counterclaims against Scott-Macon Securities for breach of contract and fraudulent inducement to contract. On July 19, 2004, Scott-Macon Securities replied and asserted an additional claim against Zoltek for indemnification pursuant to the Agreement. On July 27, 2004, Scott-Macon Limited filed its answer to the complaint in the Transferred Action. On December 3, 2004, Scott-Macon Securities moved for partial summary judgment as to liability in the New York Action and Scott-Macon Limited moved for summary judgment in the Transferred Action. The cases have been consolidated.

## II.

Scott-Macon argues that even construing the evidence in the light most favorable to Zoltek and drawing all justifiable inferences in Zoltek's favor, there exist no genuine issues of material fact as to Zoltek's (i) violation of the exclusivity clause by employing Equiplace and Koppolow; (ii) failure to notify Scott-Macon promptly of its communications with Midsummer, Omicron, and Koppolow; and (iii) refusal to pay fees and expenses under the Agreement. See Huminski v. Corsones, 396 F.3d 53, 69-

70 (2d Cir. 2004).  Hence, according to Scott-Macon, it is
entitled to summary judgment as to liability in the New York
Action and summary judgment dismissing the Transferred Action.
See id.; Fed. R. Civ. P. 56(c).

In response, Zoltek asserts four factual issues.
First, it argues that it effectively terminated the exclusivity
provision of the Agreement.  Second, according to Zoltek, Scott-
Macon failed to satisfy the "reasonable efforts" provision with
"its half-hearted and tardy efforts to find financing for
Zoltek."  (Zoltek's Mem. of Law in Opp'n to Scott-Macon Parties'
Summ. Judgment Mots. ("Zoltek Opp'n") at 11)  Zoltek's
counterclaim in the New York Action and breach of contract claim
against Scott-Macon in the Transferred Action are based on this
argument.

Third, Zoltek claims that it did not breach the
Agreement because it had fully disclosed to Scott-Macon its
relationship with Equiplace before signing the Agreement, that
both parties understood that this relationship would not be
affected by the Agreement, and that Scott-Macon informed Zoltek
that it would pursue "long-term investors" instead of the hedge
funds with which Equiplace worked.  (Id.)  Zoltek contends that
based on this representation by Scott-Macon, it "reasonably
responded" to inquiries from Omicron and Midsummer without
consulting first with Scott-Macon.  (Id.)  Finally, Zoltek claims

that Scott-Macon cannot recover under the Agreement because it fraudulently induced Zoltek to enter the Agreement by (i) failing to disclose the financial relationship between Scott-Macon and CSFB; (ii) misrepresenting that the exclusivity clause would not be enforced as to placement agents pursuing hedge funds; (iii) misrepresenting that Scott-Macon had the expertise and experience necessary to obtain financing for Zoltek; and (iv) misrepresenting that Scott-Macon had investors willing to invest in Zoltek.  (Id. at 21-22)  This argument underlies Zoltek's second counterclaim in the New York Action and its fraud claim in the Transferred Action.

A.    Fraudulent Inducement

        Zoltek's claim that it was induced to sign the Agreement by fraud is aimed at creating a genuine issue of material fact as to whether the Agreement was void ab initio. Scott-Macon's alleged misrepresentations are beyond the four corners of the Agreement and hence constitute parol evidence. Under New York law, "parol evidence is admissible to aid in interpretation of a contract only when the language of the contract is ambiguous."  Burger King Corp. v. Horn & Hardart Co., 893 F.2d 525, 527 (2d Cir. 1990) (citing Int'l Klafter Co. v. Continental Casualty Co., 869 F.2d 96, 100 (2d Cir. 1989) and Namad v. Salomon, Inc., 74 N.Y.2d 751, 753, 545 N.Y.S.2d 79, 80-81 (1989)).

"[W]hether a contract is ambiguous is a matter of law for the court to decide, and parol evidence is not admissible to create an ambiguity." Readco, Inc. v. Marine Midland Bank, 81 F.3d 295, 299 (2d Cir. 1996) (citing W.W.W. Assocs., Inc. v. Giancontieri, 77 N.Y.2d 157, 162-63, 565 N.Y.S.2d 440, 443 (1990)). "Contract language is ambiguous if it is reasonably susceptible of more than one interpretation, and a court makes this determination by reference to the contract alone." Burger King, 893 F.2d at 527 (citations omitted). "The court must determine whether the document is ambiguous by giving the words of the contract their ordinary and reasonable meaning." Marks v. Carrier, No. 90-6714, 1992 WL 245684, at *3 (S.D.N.Y. Sept. 21, 1992). Moreover, if a contract contains an integration clause such as Paragraph 17 of the Agreement and thus "recites that all of the parties' agreements are merged in the written document, parol evidence is not admissible to vary, or permit escape from, the terms of the integrated contract." Manufacturers Hanover Trust Co. v. Yanakas, 7 F.3d 310, 315 (2d Cir. 1993).

However, the parol evidence rule does not bar proof that execution of a contract was induced by fraud. See Levy v. Lucent Technologies, Inc., No. 01-2936, 2003 WL 118500, at *14 (S.D.N.Y. Jan. 14, 2003) (citing Alexander v. CIGNA Corp., 991 F. Supp. 427, 437 (D.N.J. 1998)). Moreover, the merger clause in the Agreement is not specific enough to operate as a disclaimer

of the alleged representations that form the basis of Zoltek's claim of fraudulent inducement. See Grumman Allied Indus., Inc. v. Rohn Indus., Inc., 748 F.2d 729, 735 (2d Cir. 1984); Sotheby's Fin. Servs., Inc. v. Baran, No. 00-7897, 2003 WL 21756126, at *5 (S.D.N.Y. July 29, 2003).

To establish its claim of fraudulent inducement, Zoltek must show (i) a misrepresentation of material fact, (ii) by which Scott-Macon intended to defraud Zoltek, (iii) that Zoltek reasonably relied on the misrepresentation, and (iv) that Zoltek suffered injury as a result of such reliance. See Bridgestone/Firestone, Inc. v. Recovery Credit Servs., 98 F.3d 13, 19 (2d Cir. 1996).

"The failure to fulfill a promise to perform future acts is not ground for a fraud action unless there existed an intent not to perform at the time the promise was made." Stamelman v. Fleishman-Hillard, Inc., No. 02-8318, 2004 WL 1719348, at *3 (S.D.N.Y. July 29, 2004). The New York Court of Appeals has distinguished between "promissory statements as to what will be done in the future," which give rise only to a breach of contract claim, and "false representations of fact," which give rise to a separate claim of fraudulent inducement. See Deerfield Communications v. Chesebrough-Ponds, Inc., 68 N.Y.2d 954, 956, 510 N.Y.S.2d 88 (1986) (citing Sabo v. Delman, 3 N.Y.2d 155, 160, 164 N.Y.S.2d 714 (1957)).

What Rumy called Scott-Macon's "virtual assurance" of ready investors was simply Scott-Macon's statement that it "had done deals just like [Zoltek's] in the same industry with long-term investors that have an appetite for just the kind of deal [Zoltek was] looking for." (Rumy Dep. at 27-28) As Zoltek admits, Benton "essentially confirmed" Rumy's testimony –- that Scott-Macon represented that it "had experience in placing securities with investors and that [Scott-Macon] believed that [it] knew investors would have an interest in [Zoltek] . . . and be in a position to invest. Potentially." (Zoltek Opp'n at 5; Benton Dep. at 13) Benton recalled also that Scott-Macon "told [Zoltek] at the outset of the transaction that [it] would get the financing done for [Zoltek]" and that this promise was why Zoltek "gave [Scott-Macon] fairly long time as an exclusive [placement agent]. They gave us a nine-month exclusive." (Benton Dep. at 68) These statements indicate only Scott-Macon's intent to perform under the Agreement; they are not sufficient to support a claim of fraud under New York law. See McKernin v. Fanny Farmer Candy Shops, Inc., 176 A.D.2d 233, 234, 574 N.Y.S.2d 58, 59 (2d Dep't 1991) (where a fraud claim "is premised upon an alleged breach of contractual duties and the supporting allegations do not concern representations which are collateral or extraneous to the terms of the parties' agreement, a cause of action sounding in fraud does not lie"); Metro. Transp. Auth. v. Triumph Adver.

Prods., 116 A.D.2d 526, 527, 497 N.Y.S.2d 673, 675 (1st Dep't 1986) (dismissing fraud claim where claim "allege[d] only a breach of the representation of performance implicit in making the bid and a subsequent assurance of performance").

Put another way, a claim of fraudulent inducement "cannot be based solely upon the failure of the promises that served as consideration for the contract itself." Deligiannis v. PepsiCo, Inc., 757 F. Supp. 241, 254 (S.D.N.Y. 1991). Here, the alleged promises of expertise and availability of investors constitute the consideration for Zoltek's retention of Scott-Macon. Hence, because Zoltek's fraudulent inducement claim is that Zoltek made these oral promises and did not fulfill them, Zoltek cannot establish fraudulent inducement. See id.; see also Cranston Print Works Co. v. Brockmann Int'l, A.G., 521 F. Supp. 609, 614 (S.D.N.Y. 1981). Moreover, at least as to alleged representations that Scott-Macon had lined up interested investors and had expertise in the relevant field, Paragraph 3 of the Agreement provides expressly that it "does not assure the successful completion of the Placement." (Agreement ¶ 3)

In addition, Zoltek fails to adduce evidence of fraudulent intent. It is well settled that a purely conclusory allegation that defendants never intended to perform, standing alone, cannot convert a claim for breach of contract into one for fraudulent inducement to contract. See Greenberg v. Chrust, 198

F. Supp.2d 578, 583-84 (S.D.N.Y. 2002); <u>Hotel Constructors, Inc.</u>
v. <u>Seagrave Corp.</u>, 574 F. Supp. 384, 387 (S.D.N.Y. 1983).

Furthermore, Zoltek does not raise a genuine issue of
material fact regarding the reasonableness of its alleged
reliance.  Zoltek admits that it exchanged drafts of the
Agreement with Scott-Macon and was represented by outside
counsel.  Rumy, an experienced and sophisticated businessman, had
negotiated and executed agreements with investment bankers and
other placement agents before.  (Scott-Macon Rule 56.1 Statement
¶¶ 8-9; Zoltek Rule 56.1 Response ¶¶ 8-9)  It was no different
here; Rumy was involved heavily in negotiating with Scott-Macon.
He recounted that none of the drafts of the Agreement sent by
Scott-Macon to Zoltek reflected the purported oral representation
that Zoltek could continue to work with Equiplace and other
placement agents during the term of the Agreement.  However, he
did express to Scott-Macon on several occasions that he was
dissatisfied with the Agreement, that it was "totally
inconsistent" with the parties' negotiations, and that it was not
changed to include certain terms that allegedly were agreed upon
orally.  (Rumy Dep. 36, 40, 49, 50, 60-62, 67, 71)

Moreover, Scott-Macon received notes, dated August 26,
2003, from Zoltek's counsel Thompson Coburn, none indicating the
alleged oral representations Zoltek wanted to memorialize in the
Agreement.  (Declaration of Joseph Shumofsky ("Shumofsky Decl.")

¶ 3 and Ex. B)  It is especially telling that Thompson Coburn did not suggest any changes to the exclusivity provision, that hedge funds or any other class of potential investor be carved out of the Agreement, or that the Agreement leave undisturbed Zoltek's relationship with Equiplace.  Although Thompson Coburn suggested changes to Paragraph 9 –- the termination provision –- none of the suggestions indicate a desire to give Zoltek the ability to terminate the Agreement at any time with a 30-day notice.  See infra.

Despite his awareness and outright suspicion of Scott-Macon's drafting role, Rumy nonetheless signed the Agreement on behalf of Zoltek. Zoltek's reliance on Scott-Macon's alleged misrepresentations during negotiations, which are directly contradicted by the plain language of the Agreement, was unreasonable and cannot sustain a claim or defense of fraudulent inducement.  See Wells Fargo Bank Northwest, N.A. v. Taca Int'l Airlines, S.A., 247 F. Supp.2d 352, 370-71 (S.D.N.Y. 2002); Sotheby's v. Dumba, No. 90-6458, 1992 WL 27043, at *6 (S.D.N.Y. Jan. 31, 1992) ("Courts in our jurisdiction have repeatedly refused to accept the defense that an agreement should be invalidated merely because one party induced the other to sign the document by falsely stating that it had no legal effect); Norstar Bank of Upstate, N.Y. v. Office Control Sys., Inc., 165 A.D.2d 265, 268, 566 N.Y.S.2d 743, 745 (3d Dep't 1991) (finding

that "where . . . defendant is neither uneducated nor unable to read and he could have ascertained the true nature of the document by reading it" defense of fraud in factum or fraudulent inducement is unavailable); <u>Humble Oil & Refining Co.</u> v. <u>Gibbered Esso Serv. Station, Inc.</u>, 30 A.D.2d 952, 294 N.Y.S.2d 190, 192 (1st Dep't 1968) ("Since the written instrument contains terms different from those allegedly orally represented, and [the sophisticated businessman] is presumed to have read the writing, he may not claim he relied on the [alleged misrepresentations]").

Further, Zoltek fails to establish how Scott-Macon's alleged non-disclosure of its referral agreement with CSFB rises to the level of fraud. Under New York law, when parties are engaged in business negotiations, a duty to speak –– the starting point for a claim of fraudulent omission –– arises in only three limited circumstances: (1) from the need to complete or clarify a partial or ambiguous statement; (2) from a fiduciary relationship between the parties; and (3) if one party has superior knowledge of certain information, that information is not readily available to the other party, and the first party knows that the second party is acting on the basis of mistaken knowledge. <u>See</u> <u>Banque Arabe et Internationale D'Investissement</u> v. <u>Maryland Nat'l Bank</u>, 57 F.3d 146, 155 (2d Cir. 1995); <u>Manley</u> v. <u>AmBase Corp.</u>, 126 F. Supp.2d 743, 755-56 (S.D.N.Y. 2001). To this point, Zoltek has alleged no facts that establish any of these circumstances.

Moreover, Zoltek, besides its conclusory statement that "[h]ad it known of [the] arrangement [between Scott-Macon and CSFB], it would not have contracted with Scott-Macon at all," does not explain how the alleged omission was material to its decision to hire Scott-Macon.  (Zoltek Opp'n at 5)

Hence, there is no trial-worthy issue as to Zoltek's claim of fraudulent inducement.

B.   Termination Provision

Again, Paragraph 9 of the Agreement reads:

This Agreement shall continue for a period of
nine months and thereafter until the
unilateral termination of this agreement by
either [Zoltek] or Scott-Macon upon at least
thirty (30) days written notice to the other
party.

(Agreement ¶ 9)  Scott-Macon argues that this provision is subject to only one possible reading, that the Agreement shall last at least nine months and may be cancelled any time thereafter with 30 days written notice.  Accordingly, termination before the end of that nine-month period contravenes the Agreement.

Zoltek contends that the provision is subject to a second "reasonable interpretation": that the Agreement can be cancelled at any time upon 30 days' written notice, "it being anticipated at the outset that the Agreement will last for nine months."  (Zoltek Opp'n at 12)  In support, Zoltek refers to Paragraph 5, under which Zoltek was to pay Scott-Macon a $10,000

"monthly retainer" for three months, in addition to an initial
retainer fee of $10,000 paid at the time the Agreement was
executed. (Agreement ¶ 5)  Zoltek contends that because the
"monthly retainer" was to paid for "only three months," this
provision "bears out [its] view that the Agreement did not commit
Zoltek to Scott-Macon exclusively and unalterably for nine
months." (Zoltek Opp'n at 13)

In addition, Zoltek refers to the January 15, 2004
deadline Zoltek had set for financing and argues that "under
Scott-Macon's interpretation [of the termination clause], it
would have been appropriate for it to do nothing at all until
June 5, 2004 –- nine months after the signing of the Agreement --
by which time Zoltek would likely have been defunct." (Zoltek
Opp'n at 13)  Finally, Zoltek claims that according to
deposition testimony of its representatives Rumy and Schott,
Scott-Macon made assurances at the signing of the Agreement that
if thereafter Scott-Macon failed to perform adequately, the
contract could be cancelled at any time. (Id.)  That deposition
testimony is beyond the four corners of the Agreement and thus
constitutes parol evidence.

Zoltek's proposed interpretation of Paragraph 9
conflicts with the plain language of the Agreement.  Invoking the
financing deadline and Paragraph 5 of the Agreement simply betray
a party "straining to find an ambiguity which otherwise might not

be thought to exist"; they do not make the meaning of the termination provisions a trial-worthy issue. Uribe v. Merchants Bank of New York, 91 N.Y.2d 336, 341, 670 N.Y.S.2d 393, 396 (1998). The connection between the monthly retainer provision and Zoltek's proposed interpretation of Paragraph 9 is less than tenuous. Zoltek's claim that Scott-Macon's reading of the Agreement would have allowed it to remain idle for nine months makes no sense in light of Scott-Macon's contractual obligation to employ its "best efforts" in finding financing for Zoltek.

Because Paragraph 9 is clear and unambiguous, parol evidence need not be considered to alter or interpret the express language of Paragraph 9. See Readco, Inc. v. Marine Midland Bank, 81 F.3d 295, 299 (2d Cir. 1996); Manufacturers Hanover Trust, 7 F.3d at 315.

C.   Reasonable Efforts

In order for Scott-Macon to recover for breach of contract, it must show that it performed its own obligations under the Agreement. See Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525 (2d Cir. 1994). Zoltek argues that Scott-Macon failed to use reasonable efforts in seeking financing, and thereby breached the Agreement and justified Zoltek's termination of the exclusivity clause. See in re Brandon, 97 N.Y.2d 491, 496, 743 N.Y.S.2d 53, 56 (2002).

New York courts use the term "reasonable efforts"

interchangeably with "best efforts."  See, e.g., Liu v. Beth
Israel Med. Center, No. 02-2034, 2003 WL 21488081, at *3-4
(S.D.N.Y. June 26, 2003); Timberline Dev., LLC v. Kronman, 263
A.D.2d 175, 178-79, 702 N.Y.S.2d 237, 239-40 (1st Dep't 2000).
Under such a clause, a party is entitled to give "reasonable
consideration to its own interests" in determining an appropriate
course of action to reach the desired result.  Bloor v. Falstaff
Brewing Corp., 601 F.2d 609, 614 (2d Cir. 1979); accord Triple-A
Baseball Club Assocs. v. Northeastern Baseball, Inc., 832 F.2d
214, 226 (1st Cir. 1987).  Hence, a party may exercise
discretion, within its good faith business judgment, in devising
a strategy for achieving its ultimate goal.  See Travellers
Int'l, A.G. v. Trans World Airlines, Inc., 41 F.3d 1570, 1575-76
(2d Cir. 1994); Western Geophysical Co. of Am. v. Bolt Assocs.,
Inc., 584 F.2d 1164, 1171 (2d Cir. 1978); see also E. Farnsworth,
Contracts, § 7.17 (3d ed. 2004) (duty of "best efforts" requires
"a party to make such efforts as are reasonable in the light of
that party's ability and the means at its disposal and of the
other party's justifiable expectations").

        First, Zoltek claims that Scott-Macon failed to use
"requisite diligence" by taking over a month -- instead of the
usual week -- to create the CIM; as a result, Zoltek "was forced
to accept the sub-par CIM even though it did not adequately
represent the interests of Zoltek."  (Zoltek Opp'n at 17)

It is undisputed that on August 26, 2003, Scott-Macon sent Zoltek proposed term sheets suggesting the types of financing thought suitable for Zoltek. On that same day, Scott-Macon also started the due diligence process by soliciting financial projections, cash flow statements, and other materials from Zoltek. After receiving feedback from Zoltek and its counsel Thompson Coburn, Scott-Macon submitted revised term sheets to Zoltek on September 23.

Zoltek admits that it helped Scott-Macon prepare the CIM. In his deposition testimony, Zoltek's Schott did not specify which parts of the CIM were deficient. (Schott Dep. 123-24 ("I'm not going to get into specifics . . . [The CIM] doesn't give what the essence of what the company is, where it's going in the process of –- related to the carbon fiber market.") Contrary to his general complaint that the CIM "doesn't explain the company very well and where the company's future lies," (id. 123) the CIM contains detailed descriptions of Zoltek's operations, history, and future prospects, especially in relation to the broader market of carbon fiber manufacturing. (Exs. D-F to Tepper Dep.) Regardless, Zoltek, itself a sophisticated business entity experienced in dealing with placement agents and investment bankers, eventually approved the CIM to be sent to potential investors.

Second, Zoltek argues that Scott-Macon's method of

pursuing investors was "a long, drawn-out process" that "could take up to several weeks before a potential investor had received all the materials it needed to make an informed decision." (Zoltek Opp'n at 18) Zoltek contends that Scott-Macon's pursuit of "long-term investors," which "are known to take time in making investment decisions," exacerbated the problem. (Id.) Scott-Macon "waited 28 days before making a single phone call even though they knew that such ["long-term"] investors would typically take at least a month to make a firm decision" on whether to invest. (Zoltek Opp'n at 18)

Zoltek does not allege how, if at all, Scott-Macon's decision to pursue "long-term investors" at the outset -- and to shift to hedge funds later -- was an imprudent strategy, especially when only half of the time between the Agreement's execution and Zoltek's financing deadline of January 15, 2004 had elapsed. At the time Zoltek abandoned the exclusivity clause, little more than two months had passed since the execution of the Agreement. Scott-Macon still had two months left to procure investors for the financing until the January 15 deadline set by Zoltek.

During the 28-day "delay," Scott-Macon prepared term sheets, the CIM, and contact lists of potential investors. Zoltek fails to address how Scott-Macon's fulfillment of these duties -- enumerated in the Agreement -- within the time period

35

constitutes a delay and a breach of the "reasonable efforts" clause.  Moreover, if "long-term investors" normally take at least one month to decide whether to invest, the investors Scott-Macon targeted had much more time than that to do so.  More than three months remained after Scott-Macon's initial contacts in early October for the parties to negotiate and work out deals before the January 15 deadline.

Third, Zoltek argues that Scott-Macon "failed to give Zoltek adequate assurances of performance" by not indicating the steps Scott-Macon would take if "long-term investors" decided not to invest in Zoltek.  (Zoltek Opp'n at 18)  Zoltek asserts also that it was kept in the dark about Scott-Macon's shift of focus from "long-term investors" to hedge funds.  (Id.)  Accordingly, Zoltek felt forced to look to other options for procuring financing.  (Id.)

Zoltek's claim that Scott-Macon did not notify Zoltek of its shift in focus to hedge fund investors is somewhat of a diversion in light of (i) Zoltek's own breach of the Agreement by negotiating with hedge funds through Equiplace and Koppolow well before Scott-Macon's own pursuit of hedge funds, and (ii) Scott-Macon's position under the Agreement as the exclusive placement agent for both hedge funds and "long-term investors."  Moreover, it is questionable whether the doctrine of adequate assurance of performance applies to this non-U.C.C. case.  See N.Y.U.C.C. § 2-

609 (stating that a party may in writing demand adequate assurance of due performance "[w]hen reasonable grounds for insecurity arise" with respect to the other party's performance); Norcon Power Partners v. Niagara Mohawk Power Corp., 92 N.Y.2d 458, 464-66, 682 N.Y.S.2d 664, 668-69 (1998) (holding that for non-U.C.C. contracts, doctrine's applicability is limited to "the type of long-term commercial contract between corporate entities entered into by Norcon and Niagara Mohawk here, which is complex and not reasonably susceptible of all security features being anticipated, bargained for and incorporated in the original contract").

Regardless, Zoltek did not have reasonable grounds for believing that Scott-Macon would stop working on its behalf. See BAII Banking Corp. v. UPG, Inc., 985 F.2d 685, 703-04 (2d Cir. 1993); Phibro Energy, Inc. v. Empresa De Polimeros De Sines Sarl, 720 F. Supp. 312, 322-23 (S.D.N.Y. 1989). By the time Zoltek unilaterally terminated the Agreement on November 17, 2003, Scott-Macon had completed the materials to be sent to potential investors and already had contacted many of these investors. It bears emphasis that under the Agreement, Scott-Macon was obligated to exercise "reasonable efforts" in obtaining financing for Zoltek. Assuming the "adequate assurance" doctrine even applies, it is only this "reasonable efforts" obligation -- and not "successful completion of the Placement" (Agreement ¶ 3) --

which Zoltek could invoke as "adequate assurance" of performance.

Whatever trepidations Zoltek may have had about meeting its

financing target, Scott-Macon did nothing to suggest that it

would cease to meet its obligations.[3]  The phrase "undertaking

the Placement on a 'reasonable efforts' basis" indicates that

Scott-Macon could exercise a degree of discretion in how it would

conduct its placement efforts.  Scott-Macon was not obligated

contractually to complete specific duties by specific dates.  Nor

was Scott-Macon required to pursue certain types of investors, or

---

[3]    Under New York law, the standard is high for a finding
that party has "reasonable grounds for security," justifying a
demand of adequate assurance of the other party's performance.
For example, summary judgment was granted in favor of the
plaintiff on the issue of liability in Consol. Edison Co. v.
Charles F. Guyon, Inc., 98 A.D.2d 483, 471 N.Y.S.2d 269 (1st
Dep't 1984), where the defendant notified the plaintiff that it
was closing down its manufacturing division and would not be able
to supply the contracted for pipes.  Moreover, defendant
subsequently offered to cancel the contract.  Similarly, in
Creusot-Loire Int'l, Inc. v. Coppus Eng'g Corp., 585 F. Supp. 45,
49 (S.D.N.Y. 1983), the plaintiff's motion for summary judgment
was granted where the defendant had supplied plaintiff previously
with burners that did not work properly.  The plaintiff therefore
had sufficient grounds to demand adequate assurance that the
burners to be supplied by the defendant would work properly.
Finally, in Turntables, Inc. v. Gestetner, 52 A.D.2d 776, 382
N.Y.S.2d 798, 799 (1st Dep't 1976), the court found that
reasonable grounds for insecurity existed where
the plaintiff buyer was in arrears in payment for goods already
delivered; its "showroom" turned out to be a telephone answering
service; its "factory" turned out to be someone else's premises,
to which the plaintiff did not have a key, and had no lease
space, employees, payroll, machinery, or equipment therein;
another supplier told the defendant seller that it had been stuck
with an unpaid bill of the plaintiff's; and the plaintiff had a
bad reputation for performance or payment.

particular investors, before or instead of others.

Zoltek has failed to adduce facts that create a material issue as to whether Scott-Macon used "reasonable" or "best" efforts in seeking financing for Zoltek. Zoltek's position is that Scott-Macon was too slow for its taste, and that Zoltek became so apprehensive that it felt "forced" to find other sources of financing. Yet, Zoltek had already begun pursuing those other sources -- *i.e.*, Equiplace -- long before it even signed the Agreement with Scott-Macon, in addition to accepting an approach from Koppolow only one month into its relationship with Scott-Macon. Zoltek's unilateral termination of the Agreement only two-and-a-half months after signing it -- and nearly two months before Zoltek needed to complete financing -- was unjustified.

D.   Zoltek's Breaches

Zoltek breached the Agreement by (i) failing to honor the exclusivity clause, and (ii) failing to inform Scott-Macon promptly as Zoltek became aware of third-party interest in the financing. To reiterate, Zoltek does not dispute that "[a]t the same time that Scott-Macon Securities was expending efforts on behalf of Zoltek to secure financing, Zoltek was working with [Equiplace]." (Scott-Macon Rule 56.1 Statement ¶ 28; Zoltek Rule 56.1 Response ¶ 28) As early as October 17, 2003, Zoltek had contact with Koppolow and eventually engaged the firm to close

three deals, all without consulting first with Scott-Macon.
(Scott-Macon Rule 56.1 Statement ¶¶ 35, 47; Zoltek Rule 56.1
Response ¶¶ 35, 47)

At the same time Omicron and Koppolow expressed
concerns about Zoltek's relationship with Scott-Macon and were
led to believe that Scott-Macon had been "shut down," Zoltek
continued to work with Scott-Macon, on the Omicron-led financings
no less.  (Scott-Macon Rule 56.1 Statement ¶¶ 53-54; Zoltek Rule
56.1 Response ¶¶ 53-54)  Through January 2004, Scott-Macon
contacted Zoltek about investors interested in participating in
the Omicron-led financings, to which Rumy himself responded that
he would discuss with Omicron whether additional investors were
needed.  (Scott-Macon Rule 56.1 Statement ¶¶ 63-70; Zoltek Rule
56.1 Response ¶¶ 63-70)  It is beyond dispute that Zoltek's
dealings with third parties –- both placement agents and
potential investors –- breached the exclusivity and prompt
notification provisions of the Agreement.

Accordingly, Scott-Macon is entitled to summary
judgment as to liability in the New York Action.  See Matsushita
Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)

E.   Transferred Action

Zoltek's breach of contract and fraudulent
misrepresentation claims against Scott-Macon Limited in the
Transferred Action are identical to its defenses and

40

counterclaims in the New York Action.[4]  Accordingly, summary

judgment is granted in favor of Scott-Macon Limited in the

Transferred Action as well.

F.   Damages

Scott-Macon's entitlement to the $10,000 retainer fee

for December 2003 cannot be seriously disputed in light of the

clear language of the Agreement.  Under New York law, the normal

measure of damages for breach of contract is expectation damages

-- the amount necessary to put the aggrieved party in as good a

position as it would have been had the contract been fully

performed.  See, e.g., Proteus Books Ltd. v. Cherry Lane Music

Co., 873 F.2d 502, 513 (2d Cir. 1989); G.V. Trademark Inv., Ltd.

v. Gemini Shirtmakers, Inc., No. 97-5835, 1999 WL 61808, at *2

(S.D.N.Y. Feb. 10, 1999) (citing Bausch & Lomb, Inc. v. Bressler,

977 F.2d 720, 728-29 (2d Cir. 1992)).  Had Zoltek performed under

the Agreement, it would have paid Scott-Macon a retainer fee of

$10,000 for the month of December 2003.  (Agreement ¶ 5)

Whether Scott-Macon is entitled to (i) reimbursement of

certain expenses incurred in connection with its efforts on

behalf of Zoltek, and (ii) fees and stock purchase warrants in

connection with the three Omicron-led financings, is less clear.

---

[4]      The issue of whether Scott-Macon Limited -- the named
defendant in the Transferred Action -- is liable under an "alter-
ego" theory for the actions of Scott-Macon Securities need not be
addressed.

As to the former, all that Zoltek has alleged is that Scott-Macon's expenses in excess of $10,000 were never approved in advance by Zoltek, pursuant to Paragraph 7 of the Agreement. (Agreement ¶ 7 ("[Zoltek] shall not be liable for reimbursement of more than $10,000 of such expenses without [its] consent.") Scott-Macon has neither responded to this allegation nor offered any evidence on the issue.

As for placement fees and warrants, Paragraph 9 of the Agreement provides that termination of the Agreement, which in no event could occur before June 5, 2004,

> (a) . . . shall not affect . . . [Zoltek's] obligation to pay a Placement Fee with respect to any Placement closed prior to the effective date of such termination, and (b) if within eighteen months of the date of termination of this Agreement, [Zoltek] completes a Placement with an Institutional Investor . . . contained in the Institutional Investor Contact List delivered by Scott-Macon to [Zoltek] within 30 days after the date of termination of this Agreement, then [Zoltek] shall pay to Scott-Macon a Placement Fee in accordance with the terms and provisions of paragraph 6 above.

(Agreement ¶ 9)  Scott-Macon argues that pursuant to Subsection (a) of the above provision, it is entitled to fees for the Omicron-led financings that closed in January and March 2004 regardless of whether Omicron and Midsummer were included on any Institutional Investor Contact List, because the deals closed "prior to the effective date of [] termination" of the Agreement."

As to the Omicron-led financing that closed in October 2004 -- after the initial nine-month term -- Scott-Macon argues that the Institutional Investor List it submitted on January 8, 2004, which included Omicron and Midsummer, is the "latest" and operative list for purposes of calculating Placement Fees owed to Scott-Macon for financings closed after termination of the Agreement. The list it submitted on November 19, 2003, Scott-Macon claims, is irrelevant because the Agreement was still in effect at the time.

In addition to arguing that the November 19, 2003 list applies, Zoltek contends that Scott-Macon is not entitled to fees or warrants in connection with any of the Omicron-led financings because it "did not expend any significant effort on behalf of Zoltek" in contacting Omicron or Midsummer. According to Zoltek, Scott-Macon "simply telephoned [Omicron and Midsummer] and put their names on a January 2004 contact list after it already knew that Zoltek terminated the exclusivity of the Agreement and after Zoltek had given Scott-Macon the term sheets forwarded by Omicron." (Zoltek Opp'n at 16).

Because these issues have not been presented as part of a focused discussion of damages, they will not be decided at this stage.

*                    *                    *

        For the reasons set forth above, Scott-Macon

Securities' motion for partial summary judgment as to liability

in the New York Action and Scott-Macon Limited's motion for

summary judgment in the Transferred Action are granted.


                                        SO ORDERED:

Dated:      New York, New York          Michael B. Mukasey
            May 11, 2005                U.S. District Judge